IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

WILLIAM C. SALLIE,                          :
                              *Petitioner*,  :
                                             :      No.: 5:11-CV-75 (MTT)
            v.                               :
                                             :
CARL HUMPHREY, Warden, Georgia              :
Diagnostic and Classification Prison,       :
                              *Respondent*.  :
_____     :


## SUPPLEMENTAL PETITION OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY[1]

### I.      CASE POSTURE[2]


117.    Petitioner filed his original Petition for Writ of Habeas Corpus (the "Original

Petition") in this Court on February 28, 2011.  The State filed a Motion to Dismiss the Petition

for Writ of Habeas Corpus as Untimely on March 1, 2011.  Original counsel for Petitioner, the

Georgia Resource Center, filed a Response to that Motion to Dismiss on March 18, 2011, along

---

[1] In adherence to the orientation of the model form contained in the Appendix of Forms accompanying the Rules Governing § 2254 Cases in the United States District Courts, as amended effective December 1, 2004 (and version AO 241 (Rev. 10/07) of the form supplied from the website of the United States District Court for the Middle District of Georgia), which states, "Do not argue or cite law.  Just state the specific facts that support your claim[,]" the allegations set forth below in this Supplemental Petition, ordered by the Court on July 26, 2011, are limited to the facts entitling petitioner to the specific relief of an order ruling that the original petition in this proceeding, filed by prior counsel on February 28, 2011, was timely filed or, alternatively, to an evidentiary hearing for the purpose of supplying the Court with further proof of his entitlement to such a ruling.

The allegations do not posit discussion of the federal law relevant to petitioner's grounds for such an order.  Further, the Supplemental Petition does not allege facts for the purpose of showing Petitioner's entitlement to relief relating to his convictions and sentences and his unconstitutional confinement.  Such pleading would be supplied in an amended petition to be filed at a date after the aforementioned requisite order concerning timeliness.

With respect to the federal law entitling him to such an order ruling his February 28, 2011 petition as timely filed, Petitioner will discuss that law as necessary in his reply to respondent's answer, which has been ordered to be filed by October 28, 2011, and any memorandum that may accompany that answer.

[2] As instructed by the Court in the August 4, 2011 telephone conference, this Supplemental Petition resumes the numbering from the Corrected Petition, filed on March 18, 2011, which ended with paragraph 116.

with a corrected Petition for Writ of Habeas Corpus (the "Corrected Petition").  The State filed

its Reply on April 1, 2011 and the Court heard oral argument on the motion on May 4, 2011.

118.    Undersigned counsel filed his notice of appearance on behalf of Petitioner on May

18, 2011 and made his first actual appearance in the matter in a telephone conference conducted

on June 1, 2011.  In that conference, the Court scheduled an evidentiary hearing on September

12, 2011 for Petitioner's claim, made by prior counsel in its March 18th Response to

Respondent's Motion to Dismiss, regarding equitable tolling of the federal limitations period's

pursuant to 28 U.S.C. § 2244(d)(1).

119.    On June 9, 2011, the Court published its order ruling, *inter alia*, that Petitioner (a)

did not timely file his petition[3] but (b) the petition was not subject to dismissal because further

development of the record was necessary to resolve Petitioner's claim that he is entitled to

equitable tolling of the statute of limitations.

120.    On June 10, 2011, the Court issued a scheduling order for the respective dates for

Petitioner and Respondent to disclose witnesses and documents in anticipation of the September

12, 2011 evidentiary hearing.

---

[3] Four days after the entry of the order, the U.S. Supreme Court granted certiorari review in Gonzalez v. Thaler (10-895) (decision below: 623 F.3d 222), a case from the Fifth Circuit wherein the first of three Questions Presented in the petition for certiorari review stated:  "Whether state law is relevant to determining when the States' direct review processes conclude, as the Seventh, Eighth, and Eleventh Circuits have held, or whether AEDPA dictates a single federally prescribed point in time when all state direct review processes are deemed to have concluded, as the Fifth and Ninth Circuits have held."

Upon granting certiorari review on June 13, 2011, the Court limited the case to the following two questions:  1. Was there jurisdiction to issue a certificate of appealability under 28 U.S.C. § 2253(C) and to adjudicate petitioner's appeal?  2. Was the application for a writ of habeas corpus out of time under 28 U.S.C. § 2244(D)(1) due to "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review"?

The Court will hear oral argument in Gonzalez on October 4, 2011.

121.    On June 17, 2011, the Court granted prior counsel from the Georgia Resource Center's motion to withdraw due to their conflict preventing their litigation of Petitioner's equitable tolling claims.  Undersigned counsel remained as the sole counsel for Petitioner.

122.    On July 26, 2011, the Court *sua sponte* ordered Petitioner, in light of the opinion in Chavez v. Secretary, Fla. Dept. of Corr., __ F.3d __, No. 10-13840 (11th Cir. Jul. 25, 2011), to file a supplemental petition "to state with particularity the facts upon which he bases his claim of equitable tolling" of the statute of limitations (the "Supplemental Petition").

123.    On August 26, 2011, the Court held a telephone conference in connection to Petitioner's Motion for an Extension of Time to File Supplemental Petition (seeking a thirty (30) day extension).  Petitioner's motion was granted, and the Court ordered that Petitioner shall have through and including September 28, 2011 to file this Supplemental Petition.  The Court further ordered that Respondent shall have through and including October 28, 2011 to file any response to the Supplemental Petition.

124.    As is the case with any federal habeas corpus petition, the present Supplemental Petition is a heightened pleading, *i.e.*, it is a fact pleading.  McFarland v. Scott, 512 U.S. 849, 856 (1994); Borden v. Allen, 646 F.3d 785 (11th Cir.).  It states Petitioner's bases for the specific relief sought by this limited purpose petition.  That relief is an order either ruling his Original Petition timely filed or, alternatively, granting an evidentiary hearing in order to supply the court with further proof of his entitlement to such a ruling.  These bases are stated herein with

particularity and support in the form of various declarations by Petitioner and others[4] and documents.[5]

125.    The particular nature of this ordered Supplemental Petition requires limited references to certain legal authorities.  This is necessary in order to frame specifically, certain factual grounds tied to Petitioner's two basic headings under which this Court's should rule his federal petition timely filed, namely, (1) equitable tolling and (2) state impediment to filing pursuant to 2244(d)(1)(B) (due, in critical part, to the conduct of his prior counsel in these proceedings, the Georgia Resource Center, *before* the Resource Center filed his *pro se* state habeas petition on October 14, 2004 and, subsequently became his counsel of record in 2005).[6]

126.    Thus, the Supplemental Petition does not allege facts or otherwise plead the bases for Petitioner's relief from the state judgment by which he is unconstitutionally confined by the Georgia Department of Corrections.  Pleading of those bases will need to be submitted in the manner of an amended petition to be pleaded subsequent to an order ruling that Mr. Sallie's Original Petition was timely filed and, thereby, that he may further proceed.

---

[4] Filed in support of the Supplemental Petition are declarations of the following individuals (in addition to Petitioner's undersigned counsel):  Paul E. Bartels; Stephen C. Bayliss; Evalee Bohlmann; Marcus C. Chamblee; Thomas J. Killeen; Seth A. Rosenthal; and Mary Elizabeth Wells.

[5] Accompanying the Supplemental Petition are Petitioner's Appendix, supplying 37 Attachments, and annexed to the Declaration of Joseph J. Perkovich are Exhibits A through R.

[6] Petitioner underscores the impossibility of raising that issue while the Resource Center was his counsel during the period following the filing of his petition in this Court on February 28, 2011 and, in any case, before this pleading.

## II.    FACTUAL BASES OF GROUNDS FOR RULING PETITION TIMELY FILED

### 1.    Case History Following Judgment *Sub Judice*

#### a.   *Pursuit of the Direct Appeal*

127.    The State court judgment *sub judice* is from Petitioner's second trial for the events and crimes surrounding his killing of John L. Moore, 41, shortly after midnight on March 29, 1990 during a botched invasion of the Moore's home in Bacon County on the outskirts of Alma.   That retrial concluded on March 5, 2001 with convictions and sentences including death despite District Attorney Richard E. Currie's consent to his trial counsel, on the eve of trial, to include life without parole as a sentencing option.[7]

128.    Currie, the Waycross Circuit District Attorney, had prepared to seek the death penalty again, as his predecessor had in Petitioner's first trial in Alma in 1991.  Currie had also concluded, given "the facts of the case" that pleading to life without parole "was something we should explore."[8]  Currie had the strong impression, largely based on feedback from his peers, that he would not be able to obtain a death sentence given the circumstances of the case and the Houston County venue.[9]

129.    Since it was "not a stranger-on-stranger killing," such a plea made sense to Currie, but Mr. Sallie's counsel, Chris Johnson and Palmer C. Singleton III, did not pursue his overtures.  As jury selection grew nearer, Singleton further perplexed Currie when he

---

[7] A copy of the transcript of Richard E. Currie's deposition conducted on April 19 & 20, 2007 in Petitioner's state habeas corpus proceedings is annexed to the Declaration of Joseph J. Perkovich ("Perkovich Decl.") as Exhibit M.

[8] Perkovich Decl. Ex. M (quotations within 45:5-46:7).

[9] Perkovich Decl. Ex. M, 34:12-35:4.

resuscitated the prosecutor's prior offer to make life without parole a third sentencing option.[10]

Currie obliged.[11]   Yet Singleton told him that Sallie would not plead out.[12]

130.    Upon the jury's verdict, Mr. Sallie was returned to "G-House," the death row

cellblocks, at the Georgia Diagnostic and Classification Prison ("GDCP") in Jackson, where he

had lived for approximately seven years after his first conviction and death sentence in 1991 and

prior to the reversal of that first judgment and his remand in 1998 to the custody of the Bacon

County jailer to await his retrial.

131.    The Supreme Court of Georgia reversed Petitioner's initial convictions and

sentences rendered on March 30, 1991 from his prosecution in Bacon County.  Shortly after Mr.

Sallie's first trial, the Southern Center for Human Rights took over his representation.  The

Southern Center is a venerated non-profit, public law office in Atlanta founded in the mid-1970s

and credited with pioneering effective capital defense and post-conviction strategies in

historically challenging jurisdictions.[13]

132.    In the early 1990s, Southern Center attorneys moved for a new trial and then

promptly initiated appellate litigation on Mr. Sallie's behalf.[14]  Seth Rosenthal, a public interest

fellow of the Southern Center had a primary role in Mr. Sallie's team during his two year

fellowship.[15]  Upon Rosenthal's departure from the Southern Center in 1995, the newly hired

---

[10] Id., 41:10-43:1.

[11] Id.

[12] Id.

[13] See http://www.schr.org.

[14] Declaration of Seth A. Rosenthal, dated August 25, 2011 ("Rosenthal Decl.") ¶¶ 3-5.

[15] Sallie Decl. ¶ 4; Rosenthal Decl. ¶ 2-4.

staff attorney Chris Johnson, a fellow recent Harvard Law School graduate, assumed chief responsibility for Mr. Sallie's appeal.[16]

133.   After about seven years of litigation, the Southern Center lawyers overturned Mr. Sallie's convictions and death sentence.[17]  The Supreme Court of Georgia ruled that Mr. Sallie's court-appointed lead trial counsel, Wendell Boyd English, labored under an unwaivable conflict because he was employed as the law clerk to the Waycross Judicial Circuit Court during Mr. Sallie's capital trial.[18]  Upon reversal and remand, the case returned to Bacon County.

134.   On the wave of this victory, the Southern Center, specifically attorneys Johnson and Palmer Singleton, continued to represent Mr. Sallie as he prepared to face a retrial.[19] Singleton, a lawyer who, by then, had nearly two decades of post-conviction and capital defense experience at the Southern Center, paired with Johnson in obtaining court appointment to defend Sallie at his retrial.  That permitted Johnson to be the *de facto* first chair in his first capital trial experience.

135.   Johnson and Palmer succeeded in changing the venue.  Alma was adjudged to be unsuitable due to the notoriety of the case (notwithstanding the significant passage of time), and the opprobrium for the defendant, an outsider deemed, in the minds of many of Alma's three thousand inhabitants, to have ruptured the community's fabric.[20]  The District Attorney's office

---

[16] Rosenthal Decl. ¶ 5; Sallie Decl. ¶ 5.

[17] Sallie Decl. ¶¶ 4-5.

[18] Sallie v. State, 269 Ga. 446, 499 S.E.2d 897 (1998).

[19] Sallie Decl. ¶¶ 7-8.

[20] U.S. Census 2000 reported a population of 3,236 in the city possessing 5.8 square miles.

had to prosecute him in Houston County outside of the judicial circuit, several counties to the northwest of Bacon.[21]

136.   Mr. Sallie's retrial commenced on February 16, 2001.  By then, he had spent the bulk of the prior decade confined in Jackson on death row.  He had earned a reputation as a model inmate even while originally confined in Bacon County, where he could not be released into the yard with the other inmates for his jailers' fear that a member of the community would shoot him with a rifle from outside the facility.  Indeed, his former warden traveled from South Carolina in order to testify in behalf of Sallie at the retrial in Houston County.[22]

137.   Also during that first decade of incarceration, Petitioner gathered a rudimentary sense of collateral review for a capital murder conviction simply from living in G-House with the scores of men pouring through the process.  Petitioner understood that, following the conclusion of the direct appeal, the condemned prisoner must pursue constitutional claims in the Georgia state courts.  When state collateral review does not succeed, the prisoner takes his case to the federal courts.

138.   Historically, habeas corpus petitions to federal courts have worked to safeguard against unconstitutional executions by states.[23]  This safeguard has been especially critical in

---

[21] The Waycross Judicial Circuit consists of Bacon, Brantley, Charlton, Coffee, Pierce and Ware Counties.

[22] Declaration of William C. Sallie, dated August 24, 2011 ("Sallie Decl.") ¶ 25.

[23] In 1972, the U.S. Supreme Court issued a single-paragraph per curiam decision in Furman v. Georgia, 408 U.S. 238, 92 S. Ct. 2726 (1972).  It ruled that the death sentences in two Georgia cases and in one Texas case constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution.  Id.  Each of the nine justices also issued his own opinion.  Five concurred with the Court's decision and four dissented.  Promptly after Furman, thirty-five state legislatures amended their death penalty statutes to address the problem of untrammeled discretion.  The resulting amended statutes fell into two basic categories: "guided discretion" and mandatory.  By 1975, a variety of certiorari petitions had been filed in the U.S. Supreme Court from judgments of the courts of those states.  Certiorari was granted in five such cases, including Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909 (1976), wherein two three-justice pluralities combined to rule that the guided discretion variety, as manifested in Georgia's amended statutory scheme, was constitutional.  The amended statute in Gregg, in substance, operates today.

Georgia, among other states, where federal courts had found it necessary to give relief more often than in ordinary cases because the state proceedings had proven to be unusually tolerant of errors.[24]  In Petitioner's years on death row, he observed the grave challenges to obtaining relief from the state courts and gathered the fundamental role of the federal courts, under collateral review, in protecting against unconstitutional sentences.[25]

139.    After the March 5, 2001 death sentence *sub judice*, Petitioner readjusted to conditions in G-House and dealt with his disappointing result.[26]  Mr. Sallie was aggrieved by the strategy choices carried out at his trial.[27]  In the months leading up to the trial, Mr. Sallie had envisioned that his counsel would actively defend him against the State's case concerning the aggravating circumstances.  In the event, defense counsel did not make a meaningful attempt to defend against those circumstances and, instead, essentially limited their case to mitigation in the penalty phase focused solely on the defendant and with no connection to the larger circumstances.[28]

140.    Petitioner's attorneys, chiefly Johnson, sustained the Southern Center's representation during his direct appeal.[29]  The Supreme Court of Georgia affirmed his convictions and sentences on March 24, 2003.[30]  That court denied the Southern Center's motion for reconsideration on April 23, 2003.[31]

---

[24] See infra at fn. 62.

[25] See infra at fn. 227-235 and accompanying text .

[26] Declaration of William V. Cristman, Jr., dated September 23, 2011 ("Cristman Decl.") ¶ 9.

[27] Cristman Decl. ¶¶ 9-13.

[28] Sallie Decl. ¶¶ 9, 24; Cristman Decl. ¶ 6.

[29] Sallie Decl. ¶ 28.

[30] Sallie v. State, 276 Ga. 506, 578 S.E.2d 444 (2003).

[31] Id.

141.    During Mr. Sallie's direct appeals, Johnson left his employment by the Southern Center and relocated to New Hampshire.[32]  He accepted a position with the appellate defender program in Concord and one on the faculty at the state's law school.  Despite these changes, Johnson continued to labor as Petitioner's main appellate attorney.[33]  However, Mr. Sallie's appellate filings were made by the Southern Center.  Singleton filed Mr. Sallie's petition for certiorari review in the U.S. Supreme Court on July 8, 2003.[34]

142.    Mr. Sallie's direct review moved toward conclusion.  He corresponded with Johnson to stay apprised of his appeal and to prepare for seeking collateral review of his death sentence.[35]  Sallie exchanged letters with Johnson asking about his next steps *when*—as he understood it was essentially a certainty[36]—the U.S. Supreme Court would deny his petition for certiorari.[37]  Johnson did not speak concretely about post-conviction litigation.  Instead, Johnson "generally just reassured that my next step would be to go into post-conviction."  Id.

---

[32] Sallie Decl. ¶ 30.

[33] Id.

[34] A copy of the Supreme Court's docket for Sallie's case is annexed to the Declaration of Joseph J. Perkovich, dated September 28, 2011 ("Perkovich Decl.") as Exhibit B.

[35] Sallie Decl. ¶ 32.

[36] Sallie Decl. ¶ 32.

[37] The Harvard Law Review annually publishes statistics of, *inter alia*, the rate at which the Court grants cert. petitions.  Those petitions on the "Appellate Docket" (i.e., "all paid cases") had the sobering success percentage in the Court's 2003 Term of 4.2% granted.  "The Supreme Court, 2003 Term: The Statistics," 118 Harv. L. Rev. 497, 504 (2004)

*In forma pauperis* petitioners—such as Mr. Sallie--fall under the Court's "Miscellaneous Docket." That docket enjoyed success *0.2%* of the time—that is the Court granted certiorari review at a rate of 1 out of every 500 petitions filed by an *in forma pauperis* petitioner.  A paid case thus was 21 times more likely to be taken by the Court in 2003.

Sallie was generally aware of these slender prospects and thus increasingly interested in preparing for post-conviction litigation as the eventual conclusion of his direct review approached.

### b. Denial of Cert. Petition and Filing of Futile Petition for Rehearing

143.     On October 6, 2003, the Supreme Court denied two petitions for certiorari review from men on death row in Jackson.  The Court denied Mr. Sallie's cert. petition.[38]  The Court also denied Leeland Braley's cert. petition that day.[39]

144.     As preordained, Johnson had the Southern Center, again under Singleton's name, file a petition for rehearing on October 29, 2003.[40]  It was distributed for conference on December 5, 2003 and denied on December 8, 2003.  The futility in filing a petition for rehearing is essentially total.[41]

145.     Upon the U.S. Supreme Court's denial of the petition for rehearing, the Georgia Supreme Court transmitted the remittitur to Mr. Sallie's trial court on December 10, 2003.[42]   At some point shortly thereafter, Johnson told Mr. Sallie that his petition for rehearing was denied.[43]  Petitioner recalls learning the following at some point after December 10, 2003:

> Johnson told me that he believed that he and Singleton should not be my lawyers in state or federal habeas because I would need mainly to litigate ineffective assistance of counsel ("IAC") claims against my trial and appellate lawyers and the law had been clear for a long time that a lawyer cannot litigate an IAC claim against himself.[44]

---

[38] Perkovich Decl. Ex. B.

[39] A copy of the Supreme Court's docket for Braley's case is annexed to the Perkovich Decl. as Exhibit A.

[40]  Perkovich Decl. Ex. B.

[41] Commentators consider the grant of a rehearing ( absent any intervening court decision since the initial denial of cert.), to be the rarest of occasions.  Linda Greenhouse, "The Mystery of Guantanamo Bay" (Jefferson Lecture, University of California, Berkeley, Sep. 17, 2008), 27 Berkeley J. Int'l L. 1 (2009).   A petition for rehearing requires a majority vote rather than the typical four votes called for in an ordinary grant of certiorari.  Gressman's *Supreme Court Practice* 821 (9th ed. 2007) identifies just three instances in modern times:  The Al Odah and Boumediene cases concerning detainment of alleged enemy combatants at Guantanamo Bay, and a case in 1947 and one in 1930.

[42] Sallie Decl. ¶ 36.

[43] Sallie Decl. ¶ 37.  The Georgia Department of Corrections has neither telephone records (Perkovich Decl. ¶ 22) nor mail logs (Perkovich Decl. ¶ 21) to permit pinpointing this date.

[44] Sallie Decl. ¶ 38.

146.    When Johnson gave the foregoing explanation, **Sallie**

> **wondered why the lawyers did not point that out in 2001,
> before my second trial, when they pressured me to give up my
> strongly held belief on how I wanted them to conduct my
> defense and signed the Agreement on Legal Representation**.[45]

147.    Sallie and the Southern Center's attorneys, Johnson and Singleton, signed the

Agreement on Legal Representation (the "Agreement") on Saturday, February 10, 2001.[46]  The

selection of Sallie's jury commenced at the start of the week with his retrial beginning on Friday,

February 16, 2001.[47]   The Agreement was born of a fundamental conflict.

148.    As the trial team had channeled its focus on Sallie's mitigation case, they, in

effect, gravitated away from preparing for any substantial defense of the alleged crimes and,

most important, the statutory aggravating circumstances.  This departed diametrically from

Sallie's expectations—and instructions.  Sallie had consistently instructed his counsel to defend

him "vigorously."[48]  He specifically advised them to prepare to cross-examine strongly his

former wife and her sister.[49]  He emphasized that goal early because he knew it was important

but was worried about it being done without planning.[50]  He worried that it would end up

harming the jury's view of him.  Based on what happened at his first trial in 1991, he "feared that

the whole truth would not be told about what [he] did on that truly terrible evening."[51]

---

[45] Sallie Decl. ¶ 39 (emphasis in original).

[46] A copy of the executed agreement is annexed to Petitioner's Appendix as Attachment 1 ("Appx. 1").

[47] Sallie Decl. ¶ 24.

[48] Sallie Decl. ¶ 9.

[49] Id.

[50] Id. at ¶ 11.

[51] Id.

149.    Thus, the client had expressly, unequivocally stated his choices on the basic approach to his defense.  He instructed the attorneys accordingly.  His attorneys held strategic views opposed to those in their client's unambiguous, coherent instructions.

150.    The momentum of the mitigation case within the Southern Center team precipitated their aim to add a third sentencing choice.  Sallie resisted his counsel in their effort to include life without parole as an option for the jury.[52]  He had resisted, again, based on his prior experience.  He feared the effect that using that option would have upon his defense lawyers.[53]  In hindsight, Mr. Sallie's views cannot be considered improvident after review of the cold transcript of his retrial or reflection on the laughing jurors returning to render their verdict after a perfunctory deliberation.[54]  *But whether grounded or unsound, the choice of fundamental trial strategy and objectives was his, the client, to determine.*  He was unambiguous in his determination.

151.    As the trial date got closer, Johnson and Singleton had asked Sallie repeatedly to make life without parole a sentencing option.   The Southern Center had, by the end of its preparation, built a case for mitigation in the sentencing phase.  In effect, whether entirely wittingly or expressly by its design, it abandoned preparation of a defense as to the aggravating circumstances.[55]

---

[52] Id. at ¶ 14.

[53] Sallie Decl. ¶ 12.

[54] Cristman Decl. ¶ 7; Sallie Decl. ¶ 26.

[55] Sallie Decl. ¶ 15.  Of course, the finding of aggravating circumstances sufficient to issue a death sentence is a multilayered inquiry.  The jury must first determine the existence of a statutory aggravating circumstance (a felony committed during the commission of the murder).  The capital jury must then surpass a mere finding that the predicate crime(s) occurred; it must weigh such a finding ("the judge . . . shall include in his instructions to the jury for it to consider") and decide whether, on balance and in the context of the case, it warrants a death sentence.  O.C.G.A. § 17-10-30(B)(2).  The capital sentence of any defendant prosecuted for a death sentence rises and falls on the jury's view of the context.

152.    With the selection of his jury to start in a matter of hours, his counsel forced the

issue.  Sallie recalled the exchanges in the jailhouse conference room:

> Johnson and Singleton continued to pressure me to agree to life without parole.  I continued to tell them that I needed them to defend me against the untruthful testimony that I feared would be given about what I did.
>
> The disagreements got heated.  It reached a point where **I told Johnson and Singleton that I believed that I had no option but to ask the judge to order them to obey my instruction and prepare to defend me the way I had always told them to**.
>
> Singleton told me that if I got the judge to force them to conduct the trial that way, then it would be a disaster because Johnson and he were not ready to defend the case in the guilt phase in the way that I had always asked them to and the judge would not let them withdraw at that late a stage.[56]

153.    Mr. Sallie's building anxiety about his defense counsel thus transformed into

despair.  This was well founded, given the inexperience of Johnson, his *de facto* lead counsel

conducting his first trial of any kind.[57]  Further, despite his broad responsibility for preparing and

conducting the defense at trial, Johnson nonetheless had to defer on critical matters to Singleton.

Singleton, for his part, had done little apparently to aid the preparation.  Nonetheless, Singleton,

at the moment of truth, dictated what would and what would not happen at trial.  Singleton

dictated these terms to Sallie.  In so doing, the Southern Center grossly mishandled the situation

and breached the basic attorney/client relationship.

154.    That grievous mishandling caused doubtless harm to Mr. Sallie.  That harm is not

apposite to the concerns in issue in the present Supplemental Petition.  The effects of that harm,

however, are central to those concerns.

---

[56] Sallie Decl. ¶¶ 13-15 (emphasis in original).

[57] Johnson was nominally appointed as the second chair; in reality, Singleton joined the trial team chiefly to enable Johnson's appointment as *the second chair* so that Johnson, as a reward for his work in Sallie's direct appeal success, could obtain his first substantial trial experience.  Sallie Decl. ¶ 7-8.

155.     Mr. Sallie, under this "extreme pressure" anticipated a bad outcome from the trial. The process of collaborating with his counsel too had been breached.  In the moments following Singleton's imposition of the fundamental terms of the Southern Center's representation, Sallie grasped for some protection for his end-game.

156.     Petitioner's years in Jackson prior to the reversal of his first sentence exposed him to the hard reality of Georgia law governing state habeas corpus.  Georgia did not then (and does not now) require court appointment of an attorney in state collateral review of a capital conviction.[58]  He knew that he would have no means to hire an attorney.

157.     These concerns animated Mr. Sallie's focus immediately following the above-discussed argument with counsel.  He attempted to negotiate some measure of benefit from the essentially hostile posture that his counsel had struck on the matters of basic importance in his imminent trial.  He demanded that the attorneys commit to continue to represent him *after* the present trial.

158.     The Southern Center lawyers agreed to that condition in order, in exchange, to receive Sallie's concession as to defense strategy and his consent to including life without parole as a sentencing option.

159.     Singleton drafted a pithy contract.[59]  The lawyers confirmed "that they got the approval of the director of the Southern Center, Stephen Bright, to sign an agreement with

---

[58] See Declaration of Mary Elizabeth Wells, dated September 28, 2011 ("Wells Decl.") § ¶¶ 7-9 (regarding Resource Center's role in relation to Gibson post-conviction case circa 1995-99); Gibson v. Turpin, 270 Ga. 885 (1999).

[59] Sallie Decl. ¶ 20.

[Sallie] that would trade a guarantee to continue to be [his] lawyers in exchange for permission to use life without parole as a sentencing option."[60]

160.    The text of the resulting "Agreement on Legal Representation" is supplied here (in its entirety):

> Because William Sallie has agreed to allow the use of the life without parole third sentencing option at his retrial, **Christopher Johnson and Palmer Singleton agree to continue to represent William Sallie**, even if he receives a sentence other than death, through direct appeals, **through state and federal habeas,** and at any subsequent re-trial, even if the charges at subsequent re-trials do not carry a possible death sentence.  We also agree that Christopher Johnson and Palmer Singleton will continue to represent William Sallie, if he so desires, for the rest of his life.[61]

161.    Sallie was gravely displeased by the turn of events.  But going into his trial, he at least thought that he had salvaged some modicum of protection for the increasing likelihood that he would need appellate and habeas counsel.  He had secured the Southern Center lawyers—the very firm that had won his first appeal.  But he also understood that such appellate victories are very rare in Georgia,[62] and could not be expected a second time around.  More to the point:  in the worst case, he knew that the State would have to appoint counsel for him to pursue his direct appeals; the State would never appoint counsel for collateral review.  Sallie understood that he would need habeas counsel.  The very impetus for the Agreement, from Mr. Sallie's vantage (as his counsel must have recognized) at the moment the two sides entered into the bargain was the

---

[60] Id. ¶ 21.

[61] Appx. 1 (emphasis in original).

[62] Sallie couldn't help but observe that anecdotally given his residence.  Empirically, it is born out in the work of Liebman et al. in their landmark study:  A Broken System:  Error Rates in Capital Cases, 1973-1995 (2000) [http://www2.law.columbia.edu/instructionalservices/liebman/] and A Broken System, Part II: Why There Is So Much Error in Capital Cases, and What Can Be Done About It (2002) [http://www2.law.columbia.edu/brokensystem2/index2.html].  The study found, *inter alia*, that "federal courts may find it necessary to reverse at relatively higher rates because the courts of that state are unusually tolerant of error.  This may be the case in, *e.g.*, California and Georgia."  A Broken System, Part II, at 65.  See accompanying graph (Figure 5) at 67.

assurance of habeas counsel.  He would not have the means to hire habeas counsel in state court and without counsel he could not make it to federal court with any meaningful claims.

162.    By the time he was witnessing his defense implode in the jailhouse conference room hours before his counsel would start picking his jury, he had seen the basic reality played out for other men confined in G-House.  There would be no hope for bringing viable habeas corpus claims into a federal courthouse without effectively litigating in state post-conviction.[63] Everyone in his position in Jackson knows the reality that there is no way to litigate in state post-conviction without a capital habeas practitioner.

163.    So he secured two lawyers from the preeminent public law office in the field of capital habeas litigation:  It was the "only thing I thought I could get from that rotten situation."[64]

### c. Terms of the Southern Center Lawyers' Agreement With Petitioner

164.    The Southern Center lawyers had prepared and presented to their client a contract with a singular value, as they certainly knew, to that client:  assurance of counsel for collateral review of his death sentence in the event that their trial defense suffered such an outcome from the Houston County jury.  As his attorneys forced him to concede his fundamental right to determine basic decisions in the course of his defense in a capital murder prosecution, Mr. Sallie reached for one thing to attempt to mitigate his grave circumstances in the future. The lawyers also certainly knew that the very element that their client deemed the benefit of the coerced bargain was a covenant that they could not honor.  The lawyers also certainly knew that he could

---

[63] Sallie Decl. ¶ 44.

[64] Sallie Decl. ¶ 20.

not have contemplated the remotest appreciation of this problem at the moment he assented to that Agreement on Legal Representation.

165.   Petitioner's lawyers—especially the draftsman, Singleton, who had practiced in the capital habeas area for two decades by the time of Sallie's trial and convened a course on capital punishment at Georgia State University College of Law[65]— had no illusion that they could conceivably represent Sallie in the event that he would need to seek collateral review of the impending judgment.

166.   Ineffective assistance of counsel ("IAC") is the basic vehicle for the majority of post-conviction claims for relief.  The lion's share of any habeas petition raises issues through the portal of IAC claims.[66]  That an attorney cannot litigate an IAC claim concerning his prior

---

[65] See Cristman Decl. ¶ 2.

[66] Ineffective assistance of counsel ("IAC") claims are the most commonly asserted by capital habeas petitioners and have provided the basis for most successful claims in the modern era of the death penalty (i.e., since 1976). John H. Blume, "The Dance of Death or (Almost) 'No One Here Gets Out Alive:' The Fourth Circuit's Capital Punishment Jurisprudence," 61 S.C.L. Rev. 465, 474-76 (2010); David A. Sklansky & Stephen C. Yeazell, "Comparative Law Without Leaving Home: What Civil Procedure Can Teach Criminal Procedure, and Vice Versa," 94 Geo. L.J. 683, 723 n. 151 (2006). See "Thirty-Ninth Annual Review of Criminal Procedure," 39 Geo. L.J. Ann. Rev. Crim. Proc. 918, 923, fn 2738 (2010). Before referencing to the full discussion of the area in a later section in the article, this most recent annual review cites the following examples in support of the primacy of IAC claims as a basis for habeas corpus relief for state custody inmates: Strickland v. Washington, 466 U.S. 668, 687 (1984) (claim of ineffective assistance of counsel must show that counsel's performance was deficient and errors prejudiced defense to extent that petitioner was deprived of fair trial); see also Knowles v. Mirzayance, 129 S. Ct. 1411, 1420 (2009) (counsel's recommendation to withdraw insanity defense was not ineffective assistance because counsel reasonably believed the claim stood almost no chance of success); see, e.g., Ouber v. Guarino, 293 F.3d 19, 35-36 (1st Cir. 2002) (ineffective assistance because counsel failed to present promised testimony); Bell v. Miller, 500 F.3d 149, 155-56 (2d Cir. 2007) (ineffective assistance because counsel failed to consult medical expert where there was no tactical justification for such failure); Harrington v. Gillis, 456 F.3d 118, 129 (3d Cir. 2006) (ineffective assistance because counsel failed to discuss appeal options or file timely appeal documents when defendant reasonably demonstrated interest in appealing); Glover v. Miro, 262 F.3d 268, 278-79 (4th Cir. 2001) (ineffective assistance because counsel appointed less than 2 weeks before trial, failed to contact potential alibi witnesses, and not familiar with important statute); Sonnier v. Quarterman, 476 F.3d 349, 358 (5th Cir. 2007) (ineffective assistance because counsel failed to conduct in-depth investigation for mitigating evidence); Girts v. Yanai, 501 F.3d 743, 757 (6th Cir. 2007) (ineffective assistance because counsel failed to object to prosecutor's improper and prejudicial statements); Harris v. Cotton, 365 F.3d 552, 556 (7th Cir. 2004) (ineffective assistance because counsel failed to present mitigating evidence that would support defendant's theory of self-defense due to victim's erratic behavior); Duncan v. Ornoski, 528 F.3d 1222, 1239 (9th Cir. 2008) (ineffective assistance because counsel failed to consider potentially exculpatory evidence despite being aware of its existence); Battenfield v. Gibson, 236 F.3d 1215, 1235 (10th Cir. 2001) (ineffective assistance because counsel failed to present mitigating evidence at penalty phase); Davis v. Sec'y for the Dep't

representation was longstanding black letter law.[67]  That law was a fundamental aspect of the very same jurisprudence that both of the Southern Center lawyers who signed the Agreement assuredly taught to future students at their respective law schools.

167.    Petitioner's lawyers prepared the central element of the Agreement on Legal Representation in patent bad faith.  Whatever intentions they had in foisting these terms upon their client on the eve of his capital murder retrial, the coerced agreement and its dishonest terms were grave breaches of the unqualified loyalty owed to a client under the law of lawyers.  With that breach, the question becomes:  How, if at all, did the lawyers mitigate?  Part of that answer is reflected by the necessity that that question, on the facts now before this Court, must be asked repeatedly over the course of years, until Mr. Sallie finally secured habeas counsel.

### 1.    Post-trial Opportunity

168.    The first appropriate juncture to pose that question arose after Mr. Sallie's Houston County jury convicted and sentenced him to death on March 5, 2001.  It was then incumbent on his counsel promptly to alert him to their bad faith in the concord "to continue to

---

of Corr., 341 F.3d 1310, 1316 (11th Cir. 2003) (ineffective assistance because counsel failed to preserve objection to jury strike for appeal). But see, e.g., Lynch v. Ficco, 438 F.3d 35, 49 (1st Cir. 2006) (not ineffective assistance when counsel failed to object to jury instruction because not central to case and unlikely to affect jury verdict); Larrea v. Bennett, 368 F.3d 179, 183-84 (2d Cir. 2004) (not ineffective assistance when counsel failed to object to prejudicial and supplemental charge given to jury because counsel could not have predicted later invalidation of similar supplemental charge); Campbell v. Polk, 447 F.3d 270, 279 (4th Cir. 2006) (not ineffective assistance because counsel's choice to argue no guilt rather than diminished capacity was objectively reasonable); Bower v. Quarterman, 497 F.3d 459, 470 (5th Cir. 2007) (not ineffective assistance when counsel failed to hire independent investigator because all eyewitnesses were interviewed); Daniels v. Lafler, 501 F.3d 735, 738-39 (6th Cir. 2007) (not ineffective assistance when trial court replaced original counsel because defendant not prejudiced and new counsel put forth stronger defense); Cagle v. Norris, 474 F.3d 1090, 1097 (8th Cir. 2007) (not ineffective assistance when counsel failed to object to self-defense jury instruction and exclusion of victim's drug use because defendant not prejudiced); Raley v. Ylst, 470 F.3d 792, 801-02 (9th Cir. 2006) (not ineffective assistance because counsel made reasonable strategic decision not to present mental health expert witness during guilt and penalty phase); Thornburg v. Mullin, 422 F.3d 1113, 1140 (10th Cir. 2005) (not ineffective assistance because counsel made strategic choice to argue that defendant had alibi rather than argue diminished capacity on account of alcohol); Newland v. Hall, 527 F.3d 1162, 1190-91 (11th Cir. 2008) (not ineffective assistance when counsel failed to introduce statements indicating coerced confession because defendant not prejudiced).

[67] Castell v. Kemp, 254 Ga. 556 (1985).

represent [him] through state and federal habeas."[68]  They did not disclose the breach then.  Nor did they take measures to locate qualified volunteer capital habeas counsel.  Nor did they retain counsel on Petitioner's behalf in anticipation of the eventual need for habeas counsel.

### 2.  Opportunity During State Direct Review

169.    The second appropriate juncture arose as the Southern Center, under Johnson's efforts, commenced direct appeal.  To the lawyers' credit, they honored the aspect of the Agreement on Legal Representation that they were able to perform.  Again, however, they failed even to inform Petitioner at any point during the direct review process in state court, which concluded on April 23, 2003 upon the Georgia Supreme Court's denial of his motion for reconsideration of their decision to affirm his judgment. Further, Mr. Sallie had no reason to have suspected that his counsel had committed their act of bad faith in 2001.  During this span, still the Southern Center did nothing to locate counsel to step in upon the conclusion of direct review and the commencement of post-conviction and the running of the federal limitations period.

### 3.  Opportunity During U.S. Supreme Court Direct Review

170.    The third appropriate juncture arose between the conclusion of state direct review and the preparation for filing Mr. Sallie's petition for certiorari review to the U.S. Supreme Court.  Throughout the preceding two years (viz., March 5, 2001 through April 23, 2003), the Southern Center lawyers could have at any point at least informed Mr. Sallie of their breach of their attorney/client obligations to him.  The Southern Center continued to fail to inform Mr. Sallie of their breach and to permit, let alone assist him, in addressing its ramifications.

---

[68] Appx 1.

171.    Further, nothing impeded the Southern Center lawyers from taking bona fide measures in pursuit of mitigating their breach by securing replacement counsel.  No organization would be better poised than the Southern Center to remedy their breach of not providing qualified capital habeas counsel.  At that time, Stephen Bright was still its longstanding executive director.  Doyen of the capital habeas bar and Yale Law School professor, the network of Bright and his center extends perhaps wider than any other in that bar.[69]

172.    In the spring of 2003, Johnson prepared Mr. Sallie's cert. petition.[70]   The Southern Center (with Strickland as counsel of record) filed it on July 8, 2003.[71]   At that stage, Mr. Sallie exchanged letters with Johnson while awaiting the decision.  Mr. Sallie's questions about his next steps upon the denial of cert. review were evaded.  He received reassurance that the next step would be into post-conviction litigation.[72]   He received no suggestion that both Johnson and Singleton would determine that they could not represent him in post-conviction despite having authored and signed the Agreement on Legal Representation.

173.    The Southern Center's failed to pursue mitigation of the breach of their loyalty duty to Mr. Sallie by securing either volunteer counsel or retaining qualified counsel to replace them upon commencement of post-conviction.  That failure to mitigate gravely harmed

---

[69] Indeed, Bright's efforts *after* Petitioner's limitations period started lead to identification of a volunteer counsel—who, however, ultimately backed out of the commitment when he deemed in mid-2005 that he did not have sufficient local support to take the case. The difficulty for even the best placed advocate, such as Bright, to secure a volunteer points to the great imperative to search zealously for replacement counsel.  The Southern Center failed to heed that imperative.

[70] Johnson had ample opportunity to flag Petitioner's impending problem while they waited for the Supreme Court to act in his case.  Instead, Petitioner's counsel chose to avoid raising the issue.  See reflections of Petitioner's correspondence with Johnson such as is reflected in Mr. Sallie's letters to his mother dated July 19, 2003, August 24, 2003, and September 29, 2003 included in Petitioner's Appendix as, respectively, Attachment 2 ("Appx. 2"), Attachment 3 ("Appx. 3") and Attachment 5 ("Appx. 5").

[71] Perkovich Decl. Ex. B.

[72] Sallie Decl. ¶ 32.

Petitioner by the time the federal limitations period, as determined by this Court, began after October 6, 2003.

### 4.   Opportunity Between Denial of Cert. and Petition for Rehearing

174.    On October 6, 2003, the U.S. Supreme Court denied Sallie's cert. petition.[73] Singleton recalls generally that Johnson informed him that the Court denied his cert. petition shortly afterward.  Again, however, neither Johnson nor Singleton took the occasion to communicate that he would not have the lawyers whom he thought he had retained represent him in the next, and last, phase of his pursuit of his rights in the courts of Georgia and the United States.  The Southern Center filed his petition for rehearing on October 29, 2003.[74]  A grant of such a petition is unheard of in modern Supreme Court practice.[75]

175.    In the more than three weeks between denial of cert. and filing his rehearing petition, the Southern Center did not apprise their client that two-and-a-half years prior, they had presented to him and signed a contract in bad faith and that he would need to prepare for its repercussions.  The Southern Center did not alert him at that time that he would need to arrange an alternative approach to pursuing his rights.  As this Court has ruled, the limitations period pursuant to 28 U.S.C. § 2244(d)(1) commenced after denial of certiorari review on October 6, 2003.  Yet Petitioner's appellate counsel carried ahead with an unmistakably futile rehearing petition—one that had no realistic chance at all of succeeding.  Mr. Sallie had no sense of the crisis that his pursuit of redress was thrown into upon the commencement of his federal

---

[73] Perkovich Decl. Ex. B.

[74] Id.

[75] See supra at fn. 41.

limitations period.  From his vantage in G-House, Mr. Sallie had no reason to think that the Southern Center would stop representing him after having done so for the prior decade.

176.    During the period from denial of his cert. petition to the December 8, 2003 denial of his petition for rehearing, Mr. Sallie's correspondence to Johnson received only "vague responses that assured me basically that I would need to go into state habeas."[76]

177.    While representing him in his direct appeal and in seeking the inherently unlikely review of the U.S. Supreme Court—which was granted to one out of every five hundred *in forma pauperis* petitions filed in that year's term[77]—and then the, for all practical purposes, impossibility of rehearing from that Court, the Southern Center perpetuated this grave disloyalty to their client.  Apart from not disclosing the bad faith terms of his agreement with them, they failed to mitigate their breach of their responsibility by seeking replacement counsel either in the form of a volunteer or by retaining such counsel.

178.    By the time the federal limitations period had conceivably—and, this Court would later determine, in actuality—commenced, the Southern Center had two-and-three-quarter years to arrange for qualified attorneys to take over for them.

179.    Upon absorbing Johnson and Singleton's renunciation of their agreement, Petitioner proceeded to pursue his right to access the courts for collateral review of his 2001 judgment.  During the course of 2004 and most of 2005, Petitioner pursued this right by (1) reaching out to everyone he could enlist to support his search for volunteer counsel (family, friends, lawyers who previously represented him, ostensible outlets for legal assistance); and (2)

---

[76] Sallie Decl. ¶ 35.

[77] See supra at fn. 37..

repeatedly urging Johnson and Singleton to honor their agreement either by assisting him or finding suitable replacements.

### 2.   Pursuit of Right to Collateral Review After Attorneys' Renunciation

#### a.  *Efforts Channeled Through Outside Supporters*

180.    A Southern Center intern, William Cristman, attended Mr. Sallie's 2001 retrial.[78] While finishing law school, Cristman maintained contact with Mr. Sallie.  Cristman visited Sallie in Jackson with some regularity as he began his career in 2002, practicing with a criminal defense firm in Atlanta.  In or around 2003, Cristman introduced to Sallie a fellow attorney in his firm, Paul Bartels.[79]  Both Cristman and Bartels maintained contact with Mr. Sallie over the years and each continued to visit him from time to time.[80]

181.    After Petitioner learned that his retained lawyers were renouncing his Agreement on Legal Representation, he sought the help of Cristman and Bartels to find volunteer counsel to replace those lawyers.[81]  Unfortunately, neither Cristman nor Bartels were in a position to help directly.  Notwithstanding that they were members of the Georgia bar and worked in a criminal defense firm, neither had the requisite experience in the highly complex area of the law.[82] Petitioner understood that post-conviction practice was a very complex area of law.[83]  He further

---

[78] Cristman Decl. ¶ 3; A copy of a September 2, 2003 dated letter from Mr. Sallie to his mother is annexed to Petitioner's Appendix as Attachment 4 ("Appx. .4").

[79] Sallie Decl. ¶ 43; Declaration of Paul E. Bartels, dated September 26, 2011 ("Bartels Decl.") ¶ 2.

[80] See, e.g., discussion of Cristman's routine visits in letters to Petitioner's mother. A copy of Mr. Sallie's August 25, 2004 and October 5, 2004 letters are annexed to Petitioner's Appendix as, respectively, Attachment 22 ("Appx. 22") and Attachment 24 ("Appx. 24").

[81] Bartels Decl. ¶¶4-5, 9-12; Cristman Decl. ¶¶ 19-20, 23-25.

[82] Bartels Decl. ¶ 8; Cristman Decl. ¶ 18.

[83] Sallie Decl. ¶ 45.

recognized this when Cristman and Bartels each expressed that the area was beyond their experience.

182.    Cristman and Bartels each corresponded with and visited Petitioner frequently, at times together, during the period when Petitioner lacked capital habeas counsel upon conclusion of the direct review of his 2001 judgment.  On every occasion, Sallie raised his concern about being able to pursue his rights in habeas courts and sought the help of these lawyers.[84]

183.    Cristman called on law offices in behalf of Petitioner, including contacting King & Spalding, LLP's Atlanta office, through a law school classmate, to seek their involvement.[85]

184.    Upon Petitioner's urging, Bartels provided Sallie with a list of law firms that he identified from his research as having "active *pro bono* practices conceivably including capital habeas work."[86]  Petitioner wrote to the firms that Bartels listed.[87]  None considered volunteering to represent him.

185.    Bartels sought assistance from the Multi-County Defender Program in identifying volunteer candidates for Sallie's post-conviction representation.[88]  Bartels even cold called Jack Martin, a prominent criminal defense attorney in Atlanta to ask if he could take Sallie's case.[89]

186.    Petitioner also wrote the Georgia Legal Services Program and the Atlanta Legal Aid Society.  Each organization responded with the policy that they did not generally assist death

---

[84] Bartels Decl. ¶ 5; Cristman Decl. ¶ 23 (see generally ¶ 16).

[85] See Cristman Decl. ¶ 24.

[86] Bartels Decl. ¶ 10.  Copies of letters from Mr. Sallie to his mother are annexed to Petitioner's Appendix.  The dates of these letters and their corresponding Attachment numbers are grouped:  Feb. 2, 2004 (Appx. 7); Feb. 12, 2004 (Appx. 8); Feb. 24, 2004 (Appx. 9).

[87] Sallie Decl. ¶ 47; Appx. 7.

[88] Bartels Decl. ¶ 11; Appx. 9.

[89] Bartels Decl. ¶ 12.

row inmates.  The organizations indicated that other resources were available to meet the legal needs of Georgia's condemned.[90]  Mr. Sallie presumed that Legal Services and Legal Aid must have meant the Georgia Resource Center.[91]

### b.  *Efforts to Enlist Former Counsel Rosenthal*

187.    In May 2004, Petitioner also began to solicit the help of his former attorney during the direct appeal from his first judgment in 1991.[92]

188.    Seth Rosenthal had a pivotal role in the work when the Southern Center first took on Mr. Sallie's representation following his convictions and sentences in 1991.[93]  Rosenthal worked with the Southern Center as a Skadden Public Interest Fellow from 1993 through 1995.[94]

189.    By a letter dated May 17, 2004, Petitioner requested his mother to seek Rosenthal's contact details.[95]  Specifically, Mr. Sallie sought his mother's help pursuant to the following instructions:

> Need for you to get the address for Seth Rosenthal and call Chris Johnson. (Oh and phone# also.)  Tell Chris to call Seth and have him find me a lawyer.  Follow-up and ask if you need to call Seth.  Seth was my lawyer before Chris.  When Seth left Southern Center for Human Rights, he passed the case on to Chris.  Seth already wrote most of my appeal.[96]

---

[90] Sallie Decl. ¶ 53.

[91] See discussion of Petitioner's efforts in relation to the Resource Center *infra* at ¶¶ 208-221.

[92] Sallie Decl. ¶¶ 57-58; Rosenthal Decl. ¶ 6. Copies of relevant letters from Mr. Sallie to his mother are annexed to Petitioner's Appendix.  The dates of these letters and their corresponding Attachment numbers are grouped:  May 17, 2004 (Appx. 14); June 16, 2004 (Appx.15); Jul. 9, 2004 (Appx. 17); and July 28, 2004 (Appx. 20).

[93] Sallie Decl. ¶ 4; Rosenthal Decl. ¶¶ 3-4.

[94] Rosenthal Decl. ¶ 2. Johnson inherited Rosenthal's role in Sallie's direct appeal from his first state court judgment.

[95] Declaration of Evalee Bohlmann, dated August 25, 2011 ("Bohlmann Decl.") ¶ 17; Appx. 14.

[96] Bohlmann Decl ¶ 17 (emphases in original correspondence).

190.    Petitioner's mother, Mrs. Bohlmann, proceeded to call Chris Johnson, as her handwritten notes on her son's May 17th letter reflect.[97]  Petitioner's June 16, 2004 letter to his mother thanked her for calling Johnson and supplied Rosenthal's address at the Justice Department, which he wrote out in the body of that letter for Mrs. Bohlmann's future use.[98]  By mid-2004, Rosenthal was a prosecutor in the Criminal Section of the Civil Rights Division of the Department of Justice in Washington, DC.[99]

191.    Petitioner had written Rosenthal earlier in June to solicit his help in post-conviction.  Mr. Sallie explained to his mother that he "[i]ncluded Chris Johnson [sic] address just in case he had any questions."[100]  Mr. Sallie did not get a response from Rosenthal for several weeks.  He wrote his mother on July 9, 2004 and asked her "[d]o you think you should call him?"[101]  He supplied Rosenthal's address and telephone number.  Id.  He said:  "I'm not sure if I should write him again.  Or wait a little longer?"[102]  In a letter dated July 28, 2004, Petitioner apprised his mother of the response received from Rosenthal.[103]  Due to his employment as a federal prosecutor, Rosenthal was not available to consider representing Petitioner at that stage.[104]  Rosenthal, upon receiving Petitioner's letter, called Singleton to inquire about the Southern Center's representation.[105]  According to Petitioner, Rosenthal was

---

[97] Bohlmann Decl ¶ 18 (marginalia provides Johnson's telephone number).

[98] Appx. 15.

[99] Rosenthal Decl. ¶ 6.

[100] Bohlmann Decl. ¶18; Rosenthal Decl. ¶ 6; Appx. 15.

[101] Bohlmann Decl. ¶ 19; Appx. 17.

[102] Id.

[103] Bohlmann Decl. ¶ 20; Rosenthal Decl. ¶ 7; Appx. 20; see also Mr. Sallie's August 10, 2004 letter to his mother annexed to Petitioner's Appendix as Attachment 21 ("Appx. 21").

[104] Rosenthal Decl. ¶ 7.

[105] Sallie Decl. ¶ 61; Appx. 20.

told that the Georgia Appellate Practice and Educational Resource Center (the "Georgia Resource Center" or the "Resource Center"),[106] had picked up Mr. Sallie's case files.[107]

192.    Petitioner responded to Rosenthal's rejection by writing him again, supplying a letter that Mr. Sallie had received from Singleton earlier that month reflecting the woeful condition of his pursuit of collateral review.  (Singleton had replied to Mr. Sallie's July 13, 2004 letter.)[108]  Petitioner solicited Rosenthal to canvass the Washington, DC bar for his capital habeas representation.[109]   This pursuit ended on that note.

### c.  Pursuit of Mitigation From Lawyers' Renunciation of The Agreement

193.    After Johnson informed Petitioner at some date after December 10, 2003[110] that neither he nor Singleton could represent him in post-conviction, Sallie "wrote Singleton to demand that he honor the Agreement on Legal Representation and be my lawyer in state habeas."[111]  Sallie further expressed that he "was concerned about the statute of limitations running out in federal habeas."[112]  Singleton responded to Sallie to convey the position that Johnson had earlier set forth.  Singleton repeated that they could not represent him due to the

---

[106] The Georgia Resource Center was founded in 1988 with responsibilities to monitor the legal status of post-conviction death penalty cases, recruit and support volunteer counsel for post-conviction death penalty litigation, and provide direct representation in some post-conviction death penalty cases.  See Declaration of Mary Elizabeth Wells, dated September 28, 2011 ("Wells Decl.") §§ 2-3; see also Declaration of Stephen C Bayliss ("Bayliss Decl.") § 2.

[107] Id.

[108] That exchange is discussed below (¶¶ 195-197) in relation to Petitioner's persistence in seeking mitigation from the Southern Center lawyers for their gross violations of their professional responsibility owed to Mr. Sallie, certain ethics canons and their written Agreement on Legal Representation.

[109] Bohlmann Decl. ¶ 20; Rosenthal Decl. ¶ 8; Appx. 20.

[110] See supra at fn. 43.

[111] Sallie Decl. ¶ 40.

[112] Id.

need to litigate IAC claims.  They would be unable to do that given their role as trial and appellate counsel.[113]

194.   Petitioner continued to respectfully demand the two lawyers to honor the Agreement, which they had drafted and pressured him to accept.[114]  A few months after Johnson and then Singleton renounced their attorney/client relationship in post-conviction, Petitioner received an introductory visit from a staff attorney of the Georgia Resource Center, Brian Kammer.[115]  Singleton apprised Mr. Sallie that the Resource Center was monitoring his case and that Kammer would contact him about it promptly.[116]  Petitioner would neither hear from (by telephone or mail) nor see Kammer again, despite his efforts to contact him and press him into action on his behalf, until more than a half-year later.[117]

195.   Petitioner received a letter from Johnson dated April 21, 2004 explaining that he was "still on the look out [sic] for a good lawyer for you" and "[p]lease do keep me posted on what is happening in your case."[118]  Petitioner "felt that [Johnson] was pretending that we never signed the Agreement on Legal Representation but I kept telling him that he was still my lawyer and that I needed him to step up and do the right thing in the end."[119]  Several weeks later, Petitioner wrote his mother to instruct her to call Johnson, which she carried out, and urge him to call his former attorney, Seth Rosenthal, to ask him to take Johnson and Singleton's place in

---

[113] Id. ¶ 41.

[114] Sallie Decl. ¶ 47.

[115] Sallie Decl. ¶ 54.  A copy of the GDCP's visitation form for the March 19, 2004 visit is annexed to the Perkovich Decl. as Exhibit C.

[116] Sallie Decl. ¶ 54.

[117] Sallie Decl. ¶¶ 54, 65.

[118] Sallie Decl. ¶ 56.  A copy of a May 2, 2004 dated letter from Mr. Sallie to his mother enclosing a letter from Johnson to Salliie dated April 21, 2004 is annexed to Petitioner's Appendix as Attachment 12 ("Appx. 12").

[119] Sallie Decl. ¶ 56.

post-conviction.[120]  Petitioner does not know whether Johnson attempted to contact Rosenthal.

Petitioner was aware that his mother called Johnson in his behalf numerous times in the

aftermath of the Southern Center attorneys' renunciation of his Agreement on Legal

Representation.[121]  On July 13, 2004, Petitioner wrote Singleton to continue to insist that the

Southern Center lawyers honor their Agreement.[122]

196.    Petitioner also emphasized his concern about missing any filing deadlines,

although he had no understanding of any particular filing requirements in order to maintain his

pursuit of his rights in capital habeas corpus proceedings.[123]  Singleton wrote to Petitioner,

carbon copying Kammer.[124]  On July 19, 2004, Singleton stated to Sallie:

> I received your July 13 letter.  Yesterday, **I emailed Brian
> Kammer, an attorney at the Resource Center, and he assured
> me that they are well aware of the relevant time deadlines.**
> They did get all the materials that we have concerning your cases
> several weeks ago.
>
> This office will continue to seek volunteer counsel to represent you
> in conjunction with the Resource Center.  We have notified the
> ABA counsel project concerning your case, but to date no one has
> stepped forward to do the case.  We will also continue to try and
> interest the lawyers we know to take on your case.
>
> Please contact the Resource Center and keep me posted.
>
> Sincerely,[125]

---

[120] See supra at ¶¶ 187-192.

[121] Sallie Decl. ¶ 58; see, e.g., Appx. 6 (letter from Mr. Sallie to his mother, dated Jan. 8, 2004); Appx. 15 (May 17, 2004 letter); and Appx. 16 (June 16, 2004 letter).

[122] Sallie Decl. ¶ 59. A copy of a July 13, 2004 dated letter from Mr. Sallie to his mother is annexed to Petitioner's Appendix as Attachment 18 ("Appx. 18").

[123] Id.

[124] A copy of the July 19, 2004 letter from Singleton to Mr. Sallie, copying Kammer is annexed to Petitioner's Appendix as Attachment 19 ("Appx. 19").  The copy is unsigned and it appears to be the carbon copy of this letter, as the c.c. line is circled in pen.

[125] Appx. 19.

197.    The response was in keeping with his prior communications and that of his former co-counsel, Johnson.  It refrained from giving any information that might have addressed Sallie's concerns and enable him to better monitor the fate of his pursuit of collateral review.  Instead, it gave assurances that the Resource Center was fit to monitor the status of his case.  It jibed with prior communications from Singleton to Mr. Sallie signaling that the Resource Center was, in effect, helping the Southern Center in now attempting to mitigate the latter office's breach in 2001 of their basic duties to Sallie.

### d.  Georgia Resource Center's Responsibility to Monitor Petitioner's Predicament

198.    Kammer visited Petitioner in Jackson on March 19, 2004 in order to introduce himself as a staff attorney for the Georgia Resource Center.[126]  Kammer indicate to Petitioner that the Southern Center lawyers had discussed his case and his need to obtain volunteer counsel for his capital habeas litigation.[127]  Weeks passed with no follow up regarding prospective volunteer counsel.[128]  Petitioner wrote Kammer on April 26, 2004 to learn the status of the Resource Center's efforts to get volunteer counsel.[129]  Mr. Sallie never received a response to that letter to Kammer.[130]

---

[126] Sallie Decl. ¶ 54; Perkovich Decl. Ex. B.

[127] Id.

[128] A copy of an April 20, 2004 letter from Mr. Sallie to his mother is annexed to Petitioner's Appendix as Attachment 10 ("Appx. 10"). .

[129] Sallie Decl. ¶ 55.  A copy of Petitioner's April 26, 2004 letter to Kammer is annexed to Petitioner's Appendix as Attachment 11 ("Appx. 11"); ("Appx. 12").

[130] Sallie Decl. ¶ 55; see copy of May 6, 2004 letter from Mr. Sallie to his mother is annexed to Petitioner's Appendix as Attachment 13 ("Appx. 13").

199.    After the fruitless conclusion of his efforts to enlist the assistance of his former

attorney, Seth Rosenthal, Petitioner again sought Kammer's attention.[131]  Petitioner wrote his

mother, betraying his grim outlook in the aftermath of the Southern Center attorneys'

renunciation of their Agreement:

> Haven't heard from Chris [Johnson] or Palmer [Singleton].  Nor
> from Seth, abut my request to help find a lawyer.  I have a feeling,
> the Resource Center will file for me.  Not good, considering they
> haven't come talk to me about errors.[132]

200.    Petitioner then instructed his mother to reach out to the Resource Center:

> Why don't we do this?  Call the Resource Center and ask for Tom Dunn.
> He's the director.  Tell him who you are and ask about my case and his
> office, in searching for a lawyer, outside his office.  And what's up, in
> picking up my case files?[133]

201.    Petitioner provided a telephone number for the Resource Center in that letter and

his mother, Mrs. Bohlmann noted "Tom Dunn" next to it.[134]  Mrs. Bohlmann recalls calling the

Resource Center in or around late August 2004 in order to speak with Mr. Dunn, then the

Executive Director of the Resource Center and Brian Kammer's superior.[135]  Id. at ¶ 22.  Mr.

Dunn did handle Mrs. Bohlmann's call.  Id.[136]  Mrs. Bohlmann does not recall specifically who

she spoke with at the Resource Center instead of Mr. Dunn.  Id. at ¶ 23.  She asked that person

---

[131] Sallie Decl. ¶ 63.  A copy of Mr. Sallies August 26, 2004 letter to his mother is annexed to Petitioner's Appendix
    as Attachment 23 ("Appx. 23").

[132] Appx. 23; see Sallie Decl. ¶ 63 (punctuation from original).

[133] 150.  Bohlmann Decl. ¶ 21; Appx. 23.

[134] Id.

[135] Dunn resigned as the Resource Center's Executive Director in or around 2009.  Sallie Decl. ¶ 103.  Kammer took
    over that role.  Id.

[136] Mrs. Bohlmann subsequently encountered Mr. Dunn directly, in addition to observing him in the courtroom:  "I
    believe that I did not speak with Mr. Dunn and that another representative of the Resource Center spoke to me
    in that call.  I believe that I have spoken with Mr. Dunn just once, years later, with my husband at the Flying J
    truck stop near the prison in Jackson.  He was representing my son then."  Bohlmann Decl. ¶ 22.

the questions that her son had instructed her to pose.  Id.   During that call, Mrs. Bohlmann took

notes directly on her son's August 26, 2004 letter to her.  Appx. __#.  Specifically, I wrote:

> Atlanta will visit Cary [my son].
> ABA  Looking for an attorney
> Got to Jan to file
> Resource Center had files to
> keep Attorney General from picking them up[137]

202.    Mrs. Bohlmann, as reflected in her notations, was told by the Resource Center

"that my son had until January 2005 to file a habeas petition."[138]   Of course, Petitioner's mother

supplied him with this information from the Resource Center.[139]

203.    The Resource Center ignored Petitioner's direct effort to gain their assistance and

his indirect approach through their collaborating peer office, the Southern Center, also failed to

yield any responsiveness.  Increasingly desperate, Mr. Sallie had to again enlist the aid of his

mother.  The resulting information—the only information he had been able to get from anyone

touching his predicament—was patently wrong under any conceivable understanding of the

procedural law.  There was simply no way to have calculated Mr. Sallie's limitations period in an

arguably cognizable way and determine that he would not need to file a petition, whether state

habeas or federal, until January 2005.


*e. Southern Center Lawyers' Lack of Mitigation—After Renouncing the Agreement*

204.    The foregoing discussed Petitioner's multiple and persistent efforts to pursue his

right to access state and federal habeas courts following Johnson and Singleton's renunciation of

---

[137] Bohlmann Decl. ¶ 24.

[138] Bohlmann Decl. ¶ 26; see Sallie Decl. ¶ 64.

[139] Id. at ¶ 27.

their Agreement.[140]  While Petitioner made the foregoing efforts, the Southern Center lawyers

did not take obvious steps to mitigate usefully the grave harm that resulted from their

renunciation of the bad faith Agreement on Legal Representation.[141]

205.    Neither Johnson nor Singleton provided *any counsel or assistance at all* in

connection to Petitioner's basic statute of limitations concerns.  Nor did they explain to Petitioner

steps that he would need to take in order to file a state habeas petition *pro se* in order to toll the

federal statute of limitations.  It was very well within the reach of either man to explain and/or

write a simple letter to Petitioner setting forth the need to file a state habeas petition relatively

well in advance of the federal limitations period.[142]

206.    Similarly, the basic contours of a skeleton habeas petition could have been

conveyed simply in just a letter to Petitioner.  It would not have been burdensome to provide an

example petition for Mr. Sallie to use as a model.  None of these steps was taken.  The two

lawyers failed to act even though it was unmistakable, as the summer of 2004 wound down, that

the Resource Center was faltering and not stepping into the breach that Johnson and Singleton

had created.

207.    Further, it would have been appropriate for the Southern Center lawyers simply to

have prepared a shell petition for Mr. Sallie to file *pro se* in state habeas court.  In other words,

the lawyers should have done what the Resource Center would have done had it not broken down

---

[140] Supra at ¶¶ 193-197.

[141] See supra at ¶¶ 168-179 for discussion of Singleton and Johnson's failure to mitigate *prior* to their renunciation.

[142] In the first place, the attorneys could have explained an obvious source of confusion stemming from the sequence of habeas review from state to federal courts.  State habeas proceeding must precede any federal proceeding (and exhaust any and all issues to be raised in a subsequent federal proceeding).  Paradoxically, the federal limitations period begins to run the moment direct review has completed and thus before the state habeas proceeding starts.  The common sense expectation would be that first the state habeas litigation is finished then the federal statute of limitations would start to run.  This view would be especially dangerous in a state such as Georgia, where state collateral review for a capital case has no statute of limitations.  Ga. Code Ann. § 9-14-42(c).

at that juncture.  Either Johnson or Singleton could have readily prepared such a petition and provided it to Mr. Sallie with clear handling instructions to file well in advance of the one-year anniversary of the denial of his cert. petition on October 6, 2003.

208.    As the federal limitations period was vanishing, the Southern Center should have contemplated measures to represent Mr. Sallie in their office notwithstanding its lawyers' prior representation of Mr. Sallie as trial and appellate counsel.  The office could have established an ethical wall and taken on the case as a stopgap in order to protect Petitioner from the grievous harm that would—and did—befall him upon their abandonment.

209.    Finally, either Johnson or Singleton (or both) could have taken Mr. Sallie's petition into state habeas and, upon the first court conference, explain the serious problem caused by their handling of Petitioner's representation *prior to his trial* and advise the state habeas court that it initiated the proceedings in order to protect Petitioner against further harm that would surely befall him if he failed to commence state habeas proceedings in a timely manner as contemplated by the federal statute.  This likely would have been a painful step for the Southern Center lawyers to have needed to take.  It is nonetheless an option that should have been carried out rather than the course of action that the two lawyers actually allowed—which was to permit their client to face denial of his access to a federal habeas court.

**3.      Events Leading to Filing Sallie's State Habeas Petition**

210.     On August 27, 2002, a Clayton County jury found Richard Sealey guilty of, *inter alia*, two counts of malice murder and sentenced him to death.[143]  The Supreme Court of Georgia affirmed the conviction in an opinion published on March 1, 2004 wherein Justice Thompson, explained that the jury found "Sealey guilty of the malice murders of John and Fannie Mae Tubner and 17 related crimes."  Sealey had "tortured Ms. Tubner with a heated fire poker in an effort to force her to reveal where she kept her money. … Sealey struck Ms. Tubner multiple times in the head with the ax [supplied by an accomplice] and then went downstairs and did the same to Mr. Tubner, who had crawled a short distance across the living room."[144]  Mr. Sealey did not petition the U.S. Supreme Court for certiorari review.

211.     On Monday, October 4, 2004, Hon. Matthew O. Simmons (Superior Court, Clayton Judicial Circuit), issued the Judgment and Sentence of Death in Sealey's case.[145]  This manner of order, known as a 'baby warrant,' ordered the execution of Mr. Sealey within the period between October 15, 2004 and October 22, 2004.[146]

212.     As of October 4, 2004, Mr. Sealey was not represented by counsel.[147]  On Friday, October 8, 2004, Gretchen Stork, a staff attorney of the Federal Defender Program officed in

---

[143] A copy of the October 4, 2004 ordered Judgment and Sentence of Death in State v. Sealey, Indictment No. 2001 CR217-8 (Clayton County) is an exhibit to Sealey's signed Motion for Stay of Execution dated October 12, 2004. A copy of Sealey's signed Motion is annexed to the Perkovich Decl. as Exhibit F.

[144] Sealey v. State, 277 Ga. 617, 617, 618 (2004).

[145] .  Perkovich Decl. Ex. F.

[146] Id.

[147] Sealey remained without counsel into 2005, as he was featured, along with Petitioner and Mr. Braley, in the January 18, 2005 edition of the Atlanta Journal Constitution as among the seven men on death row in post-conviction without counsel.  A copy of the article is annexed to the Perkovich Decl. as Exhibit R.

Atlanta,[148] scheduled to visit Mr. Sealey and another Jackson inmate, Christopher Lewis, the following Tuesday.[149]  On October 12, 2004, Ms. Stork in fact visited Mr. Sealey at the GDCP during the 9:00 AM visitation period (arriving at 9:10, it is noted).[150]  Also on October 12th, Mr. Sealey moved, *pro se*, for a stay of his execution.[151]

213.    In addition to his signature on his Motion for Stay of Execution, Ms. Stork obtained Mr. Sealey's signature, dated October 12, 2004, to a fifteen page document title "*Pro Se* Petition for a Writ of Habeas Corpus."[152]  However, the drafting of that *Pro Se* Petition is attributable to the Georgia Resource Center, as stated in footnote 1 affixed to the title of the pleading.[153]  The Federal Defender Program (the "FDP") has a longstanding collaborative relationship with the Resource Center, dating even to before the advent of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),[154] when the two law offices were located in

---

[148] Georgia Bar records reflect that Ms. Stork has practiced at the Federal Defender Program's office in Atlanta at least since 2000.  A copy of the Bar's records reflecting this are annexed to the Perkovich Decl. as Exhibit E.

[149] A copy of GDCP Visitation Record for Ms. Stork's visit is annexed to the Perkovich Decl. as Exhibit D.

[150] Id. (Handwritten notation in the upper right corner reflects arrival time.)

[151] Perkovich Decl. Ex. F.

[152] A copy of Richard L. Sealey's Pro Se Petition for a Writ of Habeas Corpus, signed October 12, 2004, is annexed to the Perkovich Decl. as Exhibit H.

[153] Id.  That footnote to the title states:  Mr. Sealey files his state petition for writ of habeas corpus at this time so as to avoid being executed pursuant to the trial court's execution warrant, issued October 4, 2004.  Because the **Georgia Resource Center** cannot competently and thus, ethically, undertake the representation of more capital habeas petitioners at this time, Mr. Sealey files this petition *pro se* (*see* Introduction, *infra*).  However, Mr. Sealey requests that copies of any pleadings and orders in his case be served on the Georgia Resource Center at 303 Elizabeth Street, NE, Atlanta, Georgia 30307, so that it can effectively carry out its duty of monitoring the case. (emphasis added).

[154] In the two centuries of the Great Writ in this country before AEDPA, the federal courts had known no temporal limitation on its invocation.  AEDPA's one-year limitations period for filing a federal petition for a writ of habeas corpus for those, such as Petitioner, who are in custody and under sentence of death pursuant to the judgment of a State court, runs from the latest of four dates enumerated in the act.  The origin of AEDPA's changes to the availability of the writ to those sentenced to death by state courts traces to Chief Justice Rehnquist in his capacity as chief judicial officer of the Judicial Conference.  In 1988, Chief Justice Rehnquist appointed the Ad Hoc Committee on Federal Habeas Corpus in Capital Cases, headed by Justice Powell, to examine "the necessity and desirability of legislation directed toward avoiding delay and the lack of finality" in federal habeas corpus proceedings in capital cases." Ad Hoc Committee on Federal Habeas Corpus in Capital Cases (the "Powell Committee"), Report on Habeas Corpus in Capital Cases, 45 Crim. L. Rep. (BNA) 3239.  After the bombing of the Murrah Federal Building in Oklahoma City on April 19, 1995 that killed 168 people

adjacent floors as the Resource Center moved into the FDP's space at 101 Marietta Street, NW in Downtown Atlanta.[155]

214.    The next day, on Wednesday, October 13, 2004, Kammer visited two condemned men in Jackson during the 2:00 PM visitation period.[156]  Kammer visited Leeland Braley and Petitioner in order to obtain their signatures on versions of the *Pro Se* styled state habeas corpus application ("*Pro Se* Petition") signed by Mr. Sealey the day before.[157]

215.    Thus, Kammer, who had visited Petitioner once before, seven months earlier on March 19, 2004, and had not returned his correspondence, apparently assembled, and obviously very hastily so,[158] two skeleton petitions.  Neither provided substantive claims particular to Petitioner's or Braley's habeas corpus grounds.  That Tuesday afternoon in Jackson, Kammer entered the narrow visiting bullpen.  On his right were the series of counters beneath mounted telephones for non-contact visits with prisoners in the adjacent room.  The counters stretched the length of the room, partitioned and equipped with small stools bolted to the floor, one after another over about twenty-five feet.  On his left, the series of chairs lined the wall where the men awaiting attorney visits had chosen spots for their meetings.  Kammer spoke long enough to

---

and injured hundreds more, congressional proponents rolled proposals made by the Powell Committee in 1990 and 1991 into the emergent "terrorism prevention bill" developed in reaction to that tragedy.   President Clinton signed AEDPA into law on April 24, 1996.  Justice Souter, among the first to opine on the statutory impingement of the Great Writ, reflected that, "in a world of silk purses and pigs' ears, the Act is not a silk purse of the art of statutory drafting."  Lindh v. Murphy, 521 U.S. 320, 336 (1997).

[155] See Wells Decl. ¶ 20.

[156] A copy of a GDCP Special Visitation Privilege sheet, dated October 13, 2004 is annexed to the Perkovich Decl. as Exhibit xx-06__#.

[157] The only differences between the version that each of these three men signed are (i) the captions, (ii) the specific text of footnote 1; and (iii) a one-page procedural history specific to each man's case.

[158] Footnote 1 from Mr. Sealey's version (supra at fn. 152) appears to have been adapted:  Sallie's petition reads: "Mr. Sallie files his state petition for writ of habeas corpus at this time so as to comply with the privisions [sic] of [sic] Because the Georgia Resource Center cannot competently and thus, ethically, undertake the representation of more capital habeas petitioners at this time, Mr. Sallie files this petition *pro se* ."

Footnote 1 in Mr. Braley's version of this *Pro Se* Petition has the identical errors.  A copy of Leeland Braley's Pro Se Petition for a Writ of Habeas Corpus is annexed to the Perkovich Decl. as Exhibit I.

move the first meeting to the nearest unoccupied stool in order to use the short counter to set

down a version of the *Pro Se* Petition and collect a signature.  He repeated this with the next

man.  Kammer memorialized the signing and filing of each man.  Each man received such

correspondence, Mr. Braley's dated on October 21, 2004[159] and Petitioner's one week

thereafter.[160]

      216.    Before that visit, Petitioner had never seen any document resembling the *Pro Se*

Petition for Writ of Habeas Corpus.[161]  Further, as Petitioner had put it:

> no attorney from the Southern Center nor anyone from the
> Resource Center had suggested that I file *pro se*.  No lawyer,
> librarian, inmate law clerk or anyone else had given me advice
> about how I might do that.  I had never filed anything *pro se* in any
> court before and had no experience in representing myself.  I am
> also not aware of any manual, instructions, guidelines or even a
> simple form being available to the death row inmates at Jackson at
> that time.[162]

      217.    On Thursday, October 14, 2004, Kammer filed Petitioner's *Pro Se* Petition.[163]

Braley's *Pro Se* petition, which is virtually identical to the application filed for Petitioner and

also the one served and filed for Sealey, was also filed that day, October 14, 2004.[164]  Sealey's

---

[159] Perkovich Decl. ¶ 14.

[160] A copy of a November 1, 2004 letter from Mr. Sallie to his mother, enclosing Kammer's October 28, 2004 letter to Sallie, is annexed to Petitioner's Appendix as Attachment 26 ("Appx. 26").

[161] Sallie Decl. ¶ 67.

[162] Sallie Decl. ¶ 68.  See also Sallie Decl. ¶ 52:  "During 2003 and 2004, the prison did not provide legal forms (such as a state habeas petition) or legal research assistance.  I could not get any necessary resource from the prison to allow me to represent myself in post-conviction litigation."  See also Bayliss Decl. ¶ 6:  "To the best of my knowledge, the prison has never made assistance available to inmates that could reasonably be expected to contribute to their own pro se preparation of meaningful legal papers."

[163] Sallie Decl ¶ 75.  A copy of William C. Sallie's Pro Se Petition for a Writ of Habeas Corpus, signed October 13, 2004, is annexed to the Perkovich Decl. as Exhibit J.  See also a copy of Mr. Sallie's October 19, 2004 letter to his mother is annexed to Petitioner's Appendix as Attachment 25 ("Appx. 25").

[164] Perkovich Decl. Ex. I.

virtually identical state habeas petition, dated October 12, 2004, was served on October 14, 2004.[165]

218.     That flurry of activity in Atlanta and Jackson in the middle of October 2004 manifests a chain reaction originating on October 4, 2004 from the Clayton County Superior Court's baby warrant.

219.     It is apparent that Sealey's warrant precipitated Ms. Stork of the FDP to act in Jackson.  The order of execution made the steps to take regarding Sealey readily apparent to a capital habeas lawyer:  move for a stay of execution and file a state habeas petition.  Sealey was without counsel, having concluded direct review in the state courts on March 1st of that year (and having not petitioned the U.S. Supreme Court for certiorari review before the allotted 90 days).  Thus, there was no question regarding the tolling effect that filing his petition would have upon the running of Sealey's federal limitations period under 28 U.S.C. § 2244(d)(1).

220.     Sealey's scheduled execution sounded an alarm bell that cascaded to ring others.  It is apparent that it precipitated the FDP, presumably, to give a rudimentary assessment of the dockets of other death row inmates who had concluded their direct review yet had not commenced state habeas.  That review—presumably by the office dedicated to *federal capital habeas practice*, not Georgia state court collateral review (the Resource Center's bailiwick since its inception in 1988)—doubtless identified that two inmates who had their cert. petition's denied on October 6, 2003 should have filed state habeas petitions well before October 7, 2004 in order

---

[165] Perkovich Decl., Ex. H.

to avoid any controversy in relation to benefiting from statutory tolling of the AEDPA limitations period.[166]

221.   On October 19, 2004, the Tuesday following the signings and filings of the three state petitions of Sealey, Braley and Sallie, Petitioner updated his mother in a letter.[167]   Petitioner wrote that

> Kammer visited last Wednesday. (13th) First Time in about eight months. He brought some paperwork for me to sign.  His office, Resource Center still isn't representing me.   Nor has an other [sic] attorney.  I signed the papers and the next day, he filed them.  The judge signed them.  **That stopped the statute of limitations**.  Here's the catch, I filed 'Pro Se.' Meaning I'm representing myself.  No attorney.[168]

222.   As reflected above, the Resource Center had several weeks earlier (in or around the end of August 2004)[169] explained to Petitioner's mother that he would not need to file a petition before January 2005.[170]   As shown in Petitioner's above excerpted letter written days after Kammer's visit, Kammer did not suggest that there was any issue concerning the timeliness of the *pro se* state petition in relation to Mr. Sallie's federal habeas corpus limitations period.

223.   The foregoing chain of events leaves room for a single view of the Resource Center's conduct.  The Resource Center must have recognized—either by having the fact pointed out to them by a peer or surmising it upon their own look at their files—that they had failed to monitor the Braley and Sallie cases and had caused grievous harm to each condemned man.  The rash of actions (beginning on October 8, 2004 when Ms. Stork, not a Resource Center attorney,

---

[166] Declaration of Mary Elizabeth Wells, dated September 26, 2011 ("Wells Decl.") at ¶¶ 13-15, 20-24.  As stated above, Mr. Sallie's petitioner for rehearing was denied on December 8, 2003.  Mr. Braley's was denied on December 1st (see Perkovich Decl. Ex. B).

[167] Sallie Decl. ¶ 75; Bohlmann Decl. ¶ 28; Appx. 25.

[168] Appx. 25 (parenthetical and capitalization in original; emphasis added).

[169] See supra at fn. 138, and related text.

[170] Bohlmann Decl. ¶ 26.

scheduled her visit with Mr. Sealey to stay his ordered execution) betrayed such recognition.
The Resource Center had failed to ensure the filing of the respective state petitions well before
October 7, 2004, the anniversary of their common date when the U.S. Supreme Court denied
their respective cert. petitions.  Of course, by October 8th it was too late for the Resource Center
to have avoided that problem.  The timing of Petitioner's state habeas filing would, ultimately,
permit the State of Georgia to move effectively (save the present Supplemental Petition), to
dismiss as untimely Mr. Sallie's federal petition prepared by the Resource Center.  By October 8,
2004, the Resource Center could only attempt to lessen the degree of the timeliness problem.

224.    The Resource Center had been completely derelict in its basic monitoring role for
Georgia's death row.  That failure in performing its most basic function within Georgia's scheme
for imposing the death penalty was not a matter of miscalculating Petitioner's deadlines.  Indeed,
it was apparent that they had not even looked at his barebones procedural history and that of his
cohort, Mr. Braley, even to calculate their filing schedule.

225.    Rather, the Resource Center effectively abandoned its fundamental role, in the
words of its then Executive Director, Thomas H. Dunn written to Braley's state habeas judge,
Hon. James L. Cline (Ocmulgee Judicial Circuit), "as monitor of Georgia's post-conviction death
penalty cases."[171]  Indeed, that role is expressly submitted in the skeleton *Pro Se* Petitions filed
for Sealey, Braley and Petitioner in the footnote affixed to the petition's title on page one, as
shown here in Braley's version:   "However, Mr. Braley requests that copies of any pleadings

---

[171] A copy of Dunn's December 11, 2004 letter to Judge Cline in re: <u>Braley v Schofield</u> is attached to the Perkovich
       Decl. as Exhibit __#[Dec. 11 04]

and orders in his case be served on the Georgia Resource Center at 303 Elizabeth Street, NE, Atlanta, Georgia 30307, *so that it can effectively carry out its duty of monitoring the case*."[172]

226.    Further, these *Pro Se* Petitions state that the Resource Center "monitors death penalty cases as they proceed through the direct appeal process" and that, "[h]istorically, the Resource Center has assumed a critical role in the post-conviction representation of virtually every death-sentenced inmate in Georgia."[173]

227.    The capital habeas bar has recognized since the advent of AEDPA that the conclusion of direct review of state judgments from various jurisdictions, including Georgia, necessitate a final step of the issuance of a mandate of some manner from the state's highest court to the trial court (in Georgia's law, a "remittitur"[174]) in which the judgment sentencing the given petitioner to death was rendered.  Interpretation of that aspect of 28 U.S.C. § 2244(d)(1) is pending before the U.S. Supreme Court in Gonzalez v. Thaler.[175]  Notwithstanding the merit of the view that state law is relevant in determining finality, prudent practitioners have always realized the peril in not interpreting that element of the statute in the most constrained fashion.[176] Practitioners realized that, until, in all likelihood, the U.S. Supreme Court had ruled on the relevance of state law in determining the finality of direct review, it would be beyond reckless "not to calculate the 1-year period in the most conservative fashion, *i.e.*, by identifying the date

---

[172] Perkovich Decl. Ex. I (emphasis added).

[173] See, e.g., Ex. J at 3, ¶ 9.

[174] See Horton v. Wilkes, 250 Ga. 902, 903 (1983); see generally Yetman v. Gilbert Corp. of Delaware, 483 S.E.2d 878, 881 (Ga. Ct. App. 1997).

[175] See supra at fn. 3.

[176] Wells Decl. ¶ 23.

of denial of the inmate's petition for a writ of certiorari (or the lapsing of his 90-day filing period) by the U.S. Supreme Court and disregarding finality pursuant to Georgia law."[177]

228.    As it happened, Petitioner had the grave misfortune of the courts concluding direct review of his 2001 judgment in the last quarter of 2003, amid a period when the Resource Center failed to function in its most basic role.  This unprecedented office failure acutely harmed Petitioner, as reflected in the earlier proceedings and ruling of this Court.  This unprecedented failure of the Georgia death penalty scheme has, in the form of this Court's June 9, 2011 order, yielded the only capital case "since the advent of the AEDPA in which a federal court has been moved actually to rule that a Georgia capital habeas petition was filed out of time under the federal statute of limitations."[178]

229.    How the Resource Center could have advised Petitioner's mother that her son had until January 2005 to file his state habeas petition in order to toll the federal limitations period remains inexplicable,[179] absent recognition of the untenable burdens upon that historically under resourced public law office.[180]

---

[177] Id.

[178] Wells Decl. ¶ 26.

[179] Given that the Supreme Court of Georgia issued the remittitur to the trial court on December 10, 2003 and that the U.S. Supreme Court denied Mr. Sallie's petition for certiorari review on October 6, 2003, undersigned counsel cannot conceive of an interpretation of 28 U.S.C. § 2244(d)(1) that would point to a date in 2005 for filing a state application in order to statutorily toll the federal limitations period.

[180] For discussion of the office's history in this regard, see Wells Decl. ¶¶ 2-10.

4.      **Georgia Resource Center's Monitoring Role in State's Death Penalty Scheme**

230.    It is well chronicled that Georgia is singular among death penalty states in not

providing counsel for indigent condemned inmates in state habeas corpus proceedings.[181]

Georgia's scheme for imposition of the death penalty has, since the late 1980s, [182] depended upon

the Georgia Resource Center in certain critical aspects to sustain its constitutionality in relation

to the Fourteenth Amendment right of the imprisoned to the access to courts.

231.    With whatever budget the Resource Center has from year to year,[183] it carries the

very considerable responsibilities of recruiting volunteer counsel, assisting those attorneys, and

maintaining their own caseload of direct representations.[184]  Since Congress did not renew

funding for the various state-based death penalty resource centers in 1995,[185] the State of

Georgia has perennially underwritten the Resource Center's operations in fulfillment of its

crucial roles in the State's lawful imposition of the death penalty.[186]

---

[181] Wells Decl. ¶¶  3, 10; see also, e.g., Am. Bar Ass'n, Evaluating Fairness and Accuracy in State Death Penalty Systems:  The Georgia Death Penalty Assessment Report, (Jan. 2006) 196-97. (https://www.americanbar.org/content/dam/aba/migrated/moratorium/assessmentproject/georgia/report.authche ckdam.pdf.).

[182] Wells Decl. ¶¶ 4-5.

[183] As reflected in the Wells Decl. ¶¶ 5-9, the state and national political tides and associated funding vicissitudes have affected the office gravely, at certain moments. Notably, when Congress abruptly ceased to fund state resource centers, the Georgia Resource Center's budget was effectively cut by 70% to just $300,000 annually.

[184] Bayliss Decl. ¶ 2.

[185] On January 5, 1996, Congress passed HR-1358, which was signed into law on January 6, 1996, and called for a budget of $262,217,000 for the Federal Judiciary's Defender Services.  Those funds would be provided to the Defender Services only if no funds were expended on Death Penalty Resource Centers after April 1, 1996 (to provide for an orderly termination of the program).  Act of Jan. 6, 1996, Pub. L. No. 104-91, 110 Stat. 7.

[186] See Wells Decl. ¶ 5. See also, Kammer's representations in Petitioner's Feb. 1, 2005 state habeas hearing: Kammer explained to the court that "[r]ight now we are unable to take Mr. Sallie's case, but that is not going to be the case if we end up getting funding for our office during this winter's legislative session."  Perkovich Decl. Ex __# at 4:25-5:4

232.    However, the Resource Center's most basic function in the State's capital punishment scheme is, as its Executive Director had put it, the office's "capacity as monitor of Georgia's post conviction death penalty cases."[187]

233.    Since the advent of AEDPA in 1996, the Resource Center had upheld the office's most fundamental role—that of monitor—without harming the right to the courts of any death sentenced inmate as he navigated post-conviction litigation (whether with or without counsel).[188] In fact, "the new concerns" resulting from AEDPA's passage prompted the Federal Defender Program and the Resource Center to conduct a joint plenary training session for their staffs in 1996.[189]  The two offices held the training in order, *inter alia*, to communicate concretely the implications of the new limitations period.

234.    Significant attention was paid to the mechanical steps that should be undertaken in connection to post-conviction litigation for each man on Georgia's death row.[190]  Beth Wells, Co-Director of the Resource Center at that time presented that specific session to the two offices:

> I underscored the steps that each practitioner must take in order to calculate and keep track of the federal statute of limitations pursuant to the AEDPA.  I have used some version of those steps in my practice since enactment of this time limit. . . .  **[S]uch a systematic approach is a baseline standard of service for any**

---

[187] Perkovich Decl. Ex. K; Wells Decl. ¶ 3.

[188] See Wells Decl. ¶ 26.

[189] Wells Decl. ¶ 20

[190] Id.  Wells presented on the one-year statute of limitations.  ¶ 22.  Her presentation "explained the timing mechanisms and the legislation's ambiguity with respect to key trigger dates.  The most important of those was, and remains, the 'conclusion of direct review.'  Her "presentation emphasized how dangerous it would be not to calculate the 1-year period in the most conservative fashion, *i.e.*, by identifying the date of denial of the inmate's petition for a writ of certiorari . . . . by the U.S. Supreme Court *and disregarding finality pursuant to Georgia law*.  We had discussed this at length in the death penalty bar, and my presentation reflected the consensus of the death penalty bar, in that we should not include the filing of the motion for rehearing off of a petition for certiorari off of direct appeal in our tolling calculations."  ¶ 23 (emphasis added).

**lawyer or organization responsible for monitoring the legal status of a death row inmate.**[191]

235.    Wells hired Brian Kammer as a staff attorney in 1996 and submits that he "would have been in attendance at that seminar."[192]

236.    The Resource Center's collapse at the time that Mr. Braley and Petitioner were concluding direct review and entering post-conviction status caused a singular occurrence in Georgia's death penalty history.[193]  These two condemned men have squarely faced denial of access to a federal habeas court due to a procedural failure.  That failure is due to the Research Center's failure to monitor their legal status.

237.    This anomalous breakdown in the State's scheme places in relief the Resource Center's function within it.  Georgia's scheme relies on the Resource Center to ensure that the State's condemned have meaningful access to collateral review of state court judgments.  To that end, Petitioner is aware from his periods at Jackson, beginning over twenty years ago, that "the Resource Center has written and filed every state and federal habeas petition for an inmate not represented by other counsel."[194]

238.    Without the Resource Center, Jackson's G-House is a legal information *terra nullius*.  A failure of the Resource Center to perform its function leaves those confined in G-House with "no remotely meaningful access to sources of legal knowledge, such as an

---

[191] Id. at ¶ 24 (emphasis added).

[192] Wells Decl. ¶¶ 12, 20.

[193] Wells Decl. ¶ 26.

[194] Sallie Decl. ¶ 73.

adequately staffed and resourced law library, much less institutional lawyers to assist in preparing petitions."[195]

239.    Petitioner, who was first confined in Jackson in G-House from 1991 through 1998 before returning there in 2001, avers that

> [s]ince I have been at the prison, there has been no library to go to. Inmates cannot go to a room with books, legal documents or any other printed resources.  There is no law librarian, paralegal or other person affiliated with the institution available to consult about the law and their case.  Because death row has no actual room for a library, the inmates cannot even try to get help from other inmates.[196]

240.    The understandings of longtime Georgia capital habeas practitioners confirm Petitioner's averment of these conditions.[197]  The basic method for men in G-House to get rudimentary library service has been "to place requests with a counselor to review a specific case citation.  The inmate's counselor would then typically retrieve the case (if it were in the prison's collection) and eventually deliver it to the inmate's cell."[198]

241.    Petitioner, in fact, had unavailingly

> asked about books or other materials on state habeas procedure; federal civil procedure and habeas procedure; and legal forms, including federal habeas petitions.  A death row inmate cannot get such books.  Procedural rules or statutes were not available.  The rules that you would use to learn about limitations periods were not available.[199]

---

[195] Wells. Decl. ¶ 18.

[196] Sallie Decl. ¶ 48.

[197] Bayliss Decl. ¶ 7:  "I believe that during the entire span that I have practiced in the capital habeas area in Georgia death row inmates have never had access to any room resembling a library, or otherwise possessing reference or research materials."  Bayliss was co-director of the Resource Center with Beth Wells when AEDPA took effect, in 1996.  Id. ¶ 3.  See also Wells Decl. ¶ 18.

[198] Bayliss Decl. ¶ 9.  See also Sallie Decl. ¶ 50.

[199] Sallie Decl. ¶ 51.

242.     It must be noted that the GDCP has supplied G-House with a computer, located in its own 6' x 9' cell.[200]  The computer has contained files of appellate decisions from state and federal courts, updated periodically.[201]  The room contains no printed materials or any other legal information, references or guides.[202]  It contains the computer, its table, and a chair.[203]  Thus, no rules of court or criminal, civil or habeas procedure resources are supplied in the computer room.[204]  The institution has provided no personal legal assistance (either by a law librarian or an attorney or person otherwise trained in legal research) for use of the computer.[205]  The GDCP allows only one inmate in the computer cell at a time, thus a user cannot consult another inmate to seek legal help.[206]  A computer containing appellate opinions, by itself (in its own cell), could never be expected to afford meaningful access to the sort of legal knowledge necessary to inform a condemned man—who is not a capital habeas lawyer—of his status in post-conviction.[207]

243.     The only viable source of legal information for those confined in G-House and facing the complexity of habeas corpus litigation has been, and remains, a properly functioning Resource Center.  Without the Resource Center's activity on behalf of, or at least in assistance to, those confined there, the conditions in G-House grossly fail to provide a constitutionally tenable scheme.  During the relevant timeframe for Mr. Braley and Petitioner, the Resource Center clearly was not functioning properly.

---

[200] Sallie Decl. ¶ 49.

[201] Id.

[202] Id.

[203] Id.

[204] Id.

[205] Id.

[206] Id.

[207] Wells Decl. ¶ 19; Bayliss Decl. ¶ 11.

244.    At the juncture when Mr. Braley and Petitioner's federal limitations periods were running out, basic access to legal knowledge and/or assistance was grossly inadequate if not, in reality, foreclosed.  That inadequacy impeded Petitioner's pursuit of his rights to collateral review in state and federal habeas courts.  Due to the State's handling, over the course of decades, of its specific Fourteenth Amendment burden to ensure that its inmates have meaningful access to the courts, the Resource Center's breakdown left the condemned men in a void.  This circumstance stems from Georgia's general corrections department policy responses and, critically, the basic exclusion of G-House from those policies.

245.    The following discussion of Georgia's policy choices in regard to that Fourteenth Amendment obligation necessarily considers the basic constitutional law informing those actions of the State.  It relates the key authorities developing from Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491 (1977) to the relevant Georgia Department of Corrections policies.  The actions of the State of Georgia (especially its Department of Corrections), recounted below bear directly upon the nature and level of access available to Petitioner in the relevant period.  Those policies result from the State's express intention, repeated over the years, to meet its Fourteenth Amendment obligations to its imprisoned population.[208]

---

[208] The constitutional law is thus considered here in that limited manner and for that purpose alone:  to examine the actions of the State, especially in the form of the Georgia DOC, with reference to its purported impetuses.  Those actions are examined in order to posit the factual bases of Petitioner's grounds for ruling his federal petition timely filed, which is the purpose of this Supplemental Petition.

**5.** **The DOC's History of Outsourcing Legal Assistance Pursuant to Bounds**

246.    In 1974, inmates who were (or had been) incarcerated in "H-House" of the
Georgia Diagnostic & Classification Center (as the GDCP was then known) brought a suit
against the State.  The plaintiffs in Hardwick v. Ault, 477 F. Supp. 116 (M.D. Ga. 1978), alleged
suffering "extreme restrictions and severe deprivations" in H-House, which was designated for
"[p]roblem prisoners and incorrigibles from Georgia's entire prison system."[209]  The Hardwick
prisoners sought redress and remediation of a range of prison conditions and institutional
conduct.

247.    In early 1978, at the time of the Hardwick opinion, H-House consisted of four
cellblocks, H-1 thorugh H-4.[210]  The Hardwick litigation expressly did not include H-1, the
precursor to G-House.  "H-1, which has become an extension of death row at Reidsville, houses
only prisoners awaiting the death sentence and is not a part of this lawsuit."[211]

248.    While Hardwick was pending in the Middle District of Georgia, the U.S. Supreme
Court decided Bounds v. Smith, 430 U.S. 817 (1977).  The prisoners in Bounds, incarcerated in
several North Carolina State institutions, sought meaningful access to the courts in the manner of
access to "law libraries or alternative sources of legal knowledge."[212]  Writing for the Court in a
6-3 decision, Justice Marshall determined

---

[209] 477 F. Supp. at 119.

[210] Id. at 120.

[211] Id.  For those sentenced to death since the 1980s, Jackson has been the place of confinement for the span of their
incarceration.  By the late 1970s, Georgia had begun to relocate to Jackson those condemned inmates who had
been confined 150-odd miles away on the death row in at the Georgia State Prison Reidsville.  See generally,
Potts v. Zant, 638 F.2d 727 (5th Cir. 1981).  This relocation of death row followed the DOC's relocation of the
state's mechanism for execution, then abeyant for many years prior, in June 1980.  That abeyance ended on
December 15, 1983 when it was used to execute John Eldon Smith by electrocution in the GDCP's death
chamber.

[212] 430 U.S. at 817, affirming Younger v. Gilmore, 404 U.S. 15 (1971) (per curiam).

> that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.[213]

249.    The <u>Hardwick</u> opinion, in light of <u>Bounds</u>, thus tacked on, in effect,[214] an addendum endorsing a proposed plan contemplating "quarterly reports to the court by the Prisoner Legal Counseling Project (the 'PLCP'), beginning April 1, 1978.  These reports shall inform the court about the frequency of visits by the PLCP lawyers to the various institutions and shall provide the court with information about the adequacy of the current plan."[215]  The opinion then enumerated the list of materials that "shall be included in each of the four proposed libraries."[216]  This plan, like the other aspects of the opinion, did not encompass Georgia's death rows (then at Reidsville and also Jackson).

250.    In 1979, prisoners in Jackson brought another prison conditions suit, this time including not only the certified class of "incorrigible prisoners" in the <u>Hardwick</u> litigation, but also the men on death row.[217]  <u>Daniels v. Zant</u> concluded with a consent decree ordered on June 5, 1981.[218]  It contemplated terms for "Access to the Courts."  It provided, *inter alia*, that "[t]wo days a week a person trained in the use of the law library shall go to G-house a minimum of two times in the morning and two times in the afternoon in order to transport law books between the GDCC law library and G-house."[219]  It further provided that "[a] list of books in the GDCC law

---

[213] 430 U.S. at 828 (citations omitted) (emphasis added).

[214] A section covering this aspect of the suit follows the main body of the opinion, which was so ordered on Jan. 12, 1978.  The <u>Bounds</u> addendum was so ordered on Jan. 18, 1978.  477 F.Supp. at 133-134.

[215] <u>Id.</u>

[216] <u>Id.</u>

[217] <u>See generally</u>, <u>Daniels v. Zant</u>, 494 F.Supp. 720 (M.D. Ga. 1980).

[218] A copy of the consent decree is annexed to the Perkovich Decl. as Exhibit N.

[219] <u>Id.</u> at 8-9 (of 12).

library shall be posted in each cellblock in G-house and in the G-house law library.  Class

members also shall be permitted to make written requests for law books to the correctional

counselors."[220]  Whatever the merits of the 1981 decree in <u>Daniels</u> (which had a one-year sunset

clause), the G-House law library was dismantled not long afterward.[221]

### a.   PLCP Contracts: 1977 through 1996

251.    Shortly following <u>Bounds</u> in 1977, the Georgia DOC contracted with the PLCP in

order to outsource that opinion's "access to the courts" obligations for the State's prison

system.[222]  The PLCP began in the early 1970s at the University of Georgia School of Law.[223]  It

was a law clinic and service project that started as a grant-funded program.  By the late 1970s, it

continued as a Georgia DOC funded enterprise.[224]

252.    By 1987, the PLCP's revised contract with the DOC "mandated that the PLCP

would visit each state prison every thirty days and interview inmates who had signed up.  The

PLCP would provide representation in habeas corpus cases that had potential merit."[225]

253.    In the 1970s and 1980s, the PLCP had litigated a few capital habeas cases "but

starting in 1987 [the PLCP] undertook no new death row habeas cases, and wound down [its]

involvement in cases already open.  All death penalty habeas litigation was done by volunteer

---

[220] <u>Id.</u>

[221] Declaration of Thomas J. Killeen, dated September 20, 2011 ("Killeen Decl.") ¶ 6.

[222] <u>Id.</u>

[223] Killeen Decl. ¶ 2.

[224] <u>Id.</u>

[225] <u>Id.</u> at ¶ 3.

counsel."[226]   The following year, the Supreme Court of Georgia, the State Bar of Georgia, the

Georgia Attorney General, and the federal judiciary formed the Georgia Resource Center.[227]

254.    At around the time the PLCP was drawing down its capital habeas caseload and

the State was bringing on line the Resource Center, the U.S. Supreme Court revisited Bounds.

Murray v. Giarratano, 492 U.S. 1 (1989) decided a 42 U.S.C. § 1983 litigation brought by

inmates on Virginia's death row seeking increased legal assistance in state post-conviction

proceedings.  The Court's 5-4 decision came from a four-justice plurality (written by Chief

Justice Renquist)[228] and a narrower—and thus controlling[229]—concurrence by Justice

Kennedy.[230]

255.    Kennedy's very brief opinion began from the premise that "[i]t cannot be denied

that collateral relief proceedings are a central part of the review process for prisoners sentenced

to death.  As Justice Stevens observes, a substantial proportion of these prisoners succeed in

having their death sentences vacated in habeas corpus proceedings."[231]  Kennedy, *writing before

the advent of AEDPA*, further underscored that "[t]he complexity of our jurisprudence in this

area, moreover makes it unlikely that capital defendants will be able to file successful petitions

for collateral relief without the assistance of persons learned in the law."[232]  In finding that

Virginia's capital punishment scheme did not violate the Constitution, Justice Kennedy pointed

out that Bounds permits that the obligation to provide "meaningful access can be satisfied in

---

[226] Id. at ¶ 5.

[227] Bayliss Decl. ¶ 2

[228] 492 U.S. at 3.

[229] See O'Dell v. Netherland, 521 U.S. 151, 162 (1997); Marks v. United States, 430 U.S. 188, 193 (1977).

[230] Id. at 14.

[231] Id. (citation omitted).

[232] Id.

various ways."[233]  Kennedy's opinion was based on the following view of Virginia's scheme in early 1989:[234]

> [1] no prisoner on death row in Virginia has been unable to obtain counsel to represent him in postconviction proceedings, and [2] Virginia's prison system is staffed with institutional lawyers to assist in preparing petitions for postconviction relief.[235]

256.     There is no indication that, after <u>Giarratano</u>, the Georgia DOC adjusted or otherwise addressed its contractor's duties in relation to death row in Jackson.  Apparently, the State did not seek to rise to the low baseline (in comparison to other death penalty states), of the two basic features of Virginia's scheme.[236]

257.     Without explanation, the DOC notified the PLCP on March 1, 1996 that its "contract was cancelled effective April 1, 1996."[237]  The PLCP complied with their orders to transfer by that cancellation date all files to an entity named the "Center for Prison Legal Assistance" (the "CPLA").[238]

**b.   CPLA Contracts:  1996 through 2003**

258.     In or around spring 1996, the Georgia DOC awarded a contract for the supply of a range of legal services to its unrepresented inmates systemwide.  The DOC awarded this broad

---

[233] <u>Id.</u>, <u>citing</u> <u>Bounds</u>, 430 U.S. at 97.

[234] The case was argued on Mar. 22, 1989.

[235] <u>Giarratano</u>, 492 U.S. at 14-15.

[236] <u>Id.</u> at 14:  "Virginia has not adopted procedures for securing representation that are as far reaching and effective as those available in other States," yet Justice Kennedy was "not prepared to say that this scheme violates the Constitution."  <u>Id.</u> at 15.

[237] Killeen Decl. ¶ 7.

[238] <u>Id.</u>

contract to the private law office principally of an attorney named Craig L. Cascio.[239]  Cascio, was admitted to practice in Georgia on June 1, 1995 and is currently inactive.[240]

259.    Mr. Cascio's law office, which would become known as the Center for Prison Legal Assistance but remain a privately owned, for-profit law firm,[241] contracted to serve the entire population of unrepresented prisoners in the State's corrections system with between four and seven attorneys over the years.[242]

260.    Thus, "the DOC outsourced to the CPLA Georgia's responsibility for ensuring that state prison inmates had meaningful access to the courts in the form of 'sources of legal knowledge,' pursuant to the First and Fourteenth Amendments and the line of authorities emanating from Bounds v. Smith, 430 U.S. 817 (1977)."[243]

261.    However, despite the holding in Giarratano, the CPLA was never instructed or requested to dedicate specific resources to assist the unique access needs of the G-House population.[244]

262.    At around this period of transition in Georgia's death penalty scheme and the Georgia DOC's approach to meeting its obligations pursuit to Bounds, the U.S. Supreme Court decided Lewis v. Casey, 518 U.S. 343, 116 S.Ct. 2174 (1996).  Seven years and a day after the

---

[239] Declaration of Marcus C. Chamblee, dated September 20, 2011 ("Chamblee Decl.") ¶ 4.

[240] Perkovich Decl. ¶ 23.

[241] Chamblee Decl. § 4.

[242] Id. ¶¶ 7, 10.

[243] Id. at ¶ 6.

[244] Id. at ¶ 12.  Mr. Chamblee (a former staff attorney of the CPLA from February 1998 to November 2003), is "not presently aware of any specific circumstance in which the CPLA provided legal information, such as a copy of a case, or other legal support to a condemned inmate in relation to his conviction and/or sentence." (¶ 14.) Like the PLCP, its predecessor, the CPLA staff visited prisons throughout the Georgia penal system and also provided a case copying service available to all unrepresented inmates either in follow ups after prison visit meetings or through correspondence. (¶¶ 7, 10.)

narrow result in <u>Giarratano</u>, Justice Scalia, joined by four justices, wrote for the Court, creating "[t]he requirement that an inmate alleging a violation of <u>Bounds</u> must show actual injury."[245]

263.     After renewing the CPLA's contract annually since 1996, the Georgia DOC informed the CPLA at some point in 2003 that it would not renew the contract for 2004.[246]  The CPLA's DOC contract thus concluded at the end of 2003.[247]  It was "understood that the DOC planned to rely on computer-stored files of legal opinions to perform the role that the CPLA had carried out."[248]

264.     The negligible, at best, level of service available to Georgia's death row pursuant to the State's duties arising under the <u>Bounds</u> line of cases thus disappeared at the moment, during the end of 2003, that Petitioner found himself without counsel and with no resources to navigate capital habeas litigation due to the Resource Center's breakdown.  The DOC terminated the legal assistance resources just as Petitioner was learning that his retained capital habeas counsel, despite his protestations that would carry on into the latter part of 2005, renounced their bad faith agreement and abandoned the representation.  Thus, the State thereby phased out an at best very remote and attenuated resource—but the only one available to death row inmates other

---

[245] The <u>Casey</u> Court reversed and remanded the Ninth Circuit Court of Appeals decision affirming the District Court of Arizona's ruling in civil rights action brought by inmates.  The district court found certain constitutional violations and granted injunctive relief against the Arizona Department of Corrections.  The Court held that "[b]ecause <u>Bounds</u> did not create an abstract freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense. . . . Insofar as the right vindicated by <u>Bounds</u> is concerned, 'meaningful access to the courts is the touchstone,' <u>id.</u>, at 823 . . . (internal quotation marks omitted), and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to purse a legal claim.  He might show, for example . . . that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint." 518 U.S. at 351.

[246] Chamblee Decl. ¶ 15.

[247] <u>Id.</u>

[248] <u>Id.</u>

than the Resource Center—at the moment when Petitioner's needs for basic assistance emerged

upon the loss of his counsel.

### c.  *DOC Access to Court Policy Circa 2004*

265.    The GDCP's Chief Counselor, Wesley Baker, filed a December 13, 2006 dated

affidavit in connection to an unsuccessful contempt motion made by a death row inmate against

the GDCP's Warden ("Baker Affidavit").[249]  That affidavit articulated what appears to have been

the access to courts policy applicable to G-House circa 2003 and 2004.

> 17.  B.  Access to Courts
>
> Trained law librarians
>
> John Young is the Media Resource Specialist at GD & CP.  He has
> attended formal training in the use of the computerized Legal
> Reference Library.  Counselors B.J. Murphy and Larry Truit were
> instructed on the use the [sic] system by Mr. Young.  There are
> limited books available in the main Legal Reference Library which
> is maintained in accordance with DOC policy.  (See attached SOP,
> titled "Access to Courts").
>
> 18.  There is a satellite computer station in the G-Cellhouse
> containing the Legal Reference Library information that is
> available to inmates under the death sentence upon request.  The
> DOC, via a vendor, updates the computer twice a year.  The
> software if [sic] updated as soon as the date is [sic] received.
>
> 19.  Inmates in G-Cellhouse may request use of the Legal
> Reference Library by filing a request.  The legal reference books
> are allowed in the living unit upon request, however few requests
> are made.[250]

266.    In addition to those three paragraphs, Baker's affidavit attached the DOC's

fourteen page Standard Operating Procedures ("SOP") for "Access to Courts" with the effective

---

[249] A copy of the Baker Affidavit is annexed to the Perkovich Decl. as Exhibit O.  See generally, Mize v. Zant, 2007 WL 2225806 (M.D. Ga. Aug. 1, 2007).

[250] Baker Affidavit provides that Mr. Baker assumed his role as Chief Counselor on August 1, 2004 and had been a DOC counselor continuously since 1993.

date of September 1, 2004 (more than a month prior to the filing date of Petitioner's state habeas petition).  Paragraph 17 of the Baker Affidavit (quoted above) references the SOP in connection to the "limited books available in the main Legal Reference Library which is maintained in accordance with DOC policy."   That reference concerns a portion of just one of the nine sections that makes up the SOP.[251]

267.    It is apparent that central elements of the SOP otherwise did not apply at all to G-House in or around the period relevant to Petitioner's filing of his state habeas petition in connection to the running of his federal limitations period.

268.    The SOP manifests the differences between, on the one hand, resources accessible to Georgia's condemned and, on the other hand, those available to the general prison population systemwide.  The SOP states under section "D. Legal Assistants" that "1. The Department has employed legal assistants to assist inmates in researching and filing their conviction appeals, habeas petitions, and conditions of confinement cases."  As set forth above, nothing remotely resembling that has been available to Georgia's condemned within at least the last two decades, if ever during the modern era of the death penalty, since Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909 (1976).[252]

269.    Under section "C.  Inmate Reference Libraries," paragraph 3 states:

> Each facility covered by this SOP shall provide a supply of state
> and federal habeas corpus forms, a supply of pleading forms under
> 42 U.S.C § 1983, a supply of the state inmate action forms as
> provided in O.C.G.A. § 9010-14, a supply of application for leave

---

[251] Ex. O at 29-32.

[252] Former Resource Center co-director and longstanding state habeas litigator Stephen Bayliss has averred that "the prison has never provided death row inmates with even the most basic assistance from licensed attorneys (even ones untrained in state or federal collateral review or constitutional law), trained law librarians, or even inmate law clerks (or jailhouse lawyers) to aid inmates in determining procedural requirements and filing deadlines, much less to aid inmates in preparing and filing meaningful legal papers." Bayliss Decl. ¶ 10.

> to file second or successive habeas corpus petition forms under 28
> U.S.C. § 2244(b), and a supply of application for leave to file
> second successivemotion to vacate, set aside or correct sentence
> forms under 28 U.S.C. § 2255.[253]

270.    As reflected above,[254] when Petitioner's federal limitations period was running

during 2003 and 2004, he did not have access to such forms from his confinement in G-House.[255]

271.    The SOP further states in section "B. Access to the Electronic Law Library,"

under paragraph 9:

> Where the inmate has a specific research question they shall
> complete the Research Assistance Form (Att. 7) and turn it in to
> the Media Resource Specialist or designee.
>
> a. The Media Resource specialist or designee shall contact the
> vendor's help line. The Media Resource Specialist or designee
> shall complete the Research Assistance Form by recording the
> information received from the help line. The Media Resource
> Specialist or designee shall advise the requesting inmate of the
> results by the inmate's next scheduled visit.[256]

272.    In 2011, the Georgia DOC revised the foregoing Access to Courts SOP. The

current SOP has an effective date of April 1, 2011.[257] The April 1, 2011 Access to Courts SOP

excluded the "Legal Assistants" section in the prior version (Sec. D in the Sep. 1, 2004 SOP).[258]

It is not apparent whether the provision of Legal Assistants ceased prior to the implementation of

the current Access to Courts SOP.

273.    The current SOP also possesses six attachments whereas the prior version

provided none. Among those attachments is a "Research Assistance Request" form that provides

---

[253] Perkovich Decl. Ex O at 29-30.

[254] See supra at fn. 199 and accompanying text.

[255] Sallie Decl. ¶ 51.

[256] Perkovich Decl. Ex. O (Access to Courts SOP, at 4 (of 12)).

[257] A copy of the Access to Courts SOP, Apr. 1, 2011 Effective Date, is annexed to the Perkovich Decl. as Exhibit P.

[258] Perkovich Decl. Ex. O at 32-33.

a "WestGroup Legal Research Response" section.  The current SOP does not indicate that inmates confined in G-House may now use such a form.  There has been no prior indication that a death row inmate could have such a manner of access to research assistance.

6.      **Search for Volunteer Counsel—*After* Filing Pro Se State Habeas Petition—In Order to Pursue Collateral Review in State and Federal Courts**

274.    The foregoing sections (§§ 4 and 5) set forth, respectively, the Resource Center's integral role in the lawfulness of the Georgia death penalty scheme and the State's approach, chiefly through the operation of  the Georgia Department of Correction, to its constitutional obligation to provide access to the courts for all whom it imprisons, including its condemned.

275.    The facts relating to those elements of Georgia's death penalty scheme and the State's provision of access to the courts are highly material to this Supplemental Petition.  Those facts relate to the grounds upon which Petitioner is entitled to an order ruling his petition timely filed (or, alternatively to an evidentiary hearing for the purpose of supplying the Court with further proof of his entitlement to such a ruling).

276.    The balance of the discussion of Petitioner's factual grounds for that relief follows.  The discussion concerns (a) the circumstances bearing upon Petitioner's unflagging pursuit of state and federal collateral review of his 2001 judgment *after the filing of his state habeas petition* on October 14, 2004, and (b) Petitioner's vigilance in those pursuits.

277.    Upon the filing of his state habeas petition, Mr. Sallie's application was assigned to Hon. Albert B. Collier (Clayton County, Superior Court).  As he entered his state collateral review without counsel, Petitioner continued to realize he had a dire predicament.  He continued

to seek counsel so that he could have a chance for meaningful pursuit of collateral review of his judgment by state and then federal courts.[259]

278.    Initially, the state habeas court had, upon the Resource Center's motion, ordered the State to serve a copy on the Resource Center of filings in Petitioner's case.[260]  The State moved for reconsideration, whereupon the state habeas court vacated its initial order.[261] Petitioner recognized his state of affairs:

> Soon I'll need to start filling up my notebook with errors from the trial.  Still need a law firm to step up.  I think the court really is going to make me represent myself.  Not good.  Georgia Supreme Court has all ready [sic] ruled on this issue.  **I still must receive representation, even though the law doesn't require it.  The court knows death penalty cases require a lawyer**.[262]

279.    Petitioner kept seeking a volunteer attorney as he approached his next hearing before Judge Collier.[263]  Kammer wrote Petitioner on December 5, 2004 to indicate that he would attend that hearing.[264]  It was not clear whether Kammer "would participate in the hearing or 'just advise.'"[265]  Petitioner continued to send unsolicited letters to attorneys, even to Clive Stafford Smith (a famous former Southern Center lawyer), [266] seeking their help.  Petitioner, in his own words, solicited attorneys "who I thought might take on my case and not act like he was

---

[259] Sallie Decl. ¶ 79.

[260] Sallie Decl. ¶ 79; A copy of Mr. Sallie's November 9, 2005 letter to his mother is annexed to Petitioner's Appendix as Attachment 27 ("Appx. 27").

[261] Sallie Decl. ¶ 77; Appx. 27.

[262] Appx. 27 (emphasis added).

[263] A copy of Mr. Sallie's November 28, 2005 letter to his mother is annexed to Petitioner's Appendix as Attachment 28 ("Appx. 28").

[264] Sallie Decl. ¶ 80; Appx. 29.

[265] Id.

[266] Stafford Smith, a U.K. national, currently heads the Reprieve charity: http://www.reprieve.org.uk.

*not* my lawyer or, even if he could not represent me, might give some guidance about my next steps."[267]

280.    Petitioner was featured, along with Messrs. Braley, Sealey and four more condemned men,[268] on the front page of the January 18, 2005 edition of the Atlanta Journal Constitution.[269]  The story, titled "Prisoners on death row face appeals alone," discussed the plight of these seven men who had concluded the direct review of their respective judgments and were by then into their respective post-conviction periods and facing state and federal capital habeas litigation without counsel.[270]  Of those seven men, only Mr. Braley and Petitioner failed to file state habeas petitions by a date that avoided any colorable argument by the State that the filings failed to toll the federal habeas corpus limitations period pursuant to 28 U.S.C. 2244(d)(1).[271]

281.    In the days leading up to Petitioner's February 1, 2005 status conference before Judge Collier, Petitioner spoke with Kammer.[272]  Petitioner told Kammer that he wanted to show the court the Agreement on Legal Representation that he had signed with the two Southern Center lawyers four years earlier on February 10, 2001.[273]  Petitioner wanted to point out to Judge Collier that the Agreement states that Johnson and Singleton agreed to represent him in

---

[267] Sallie Decl. ¶ 81; Appx 29.

[268] Those men were:  Robert Earl Butts, Gerald Patrick Lewis, Gregory Lawler and Daniel Lucas.  See Sallie Decl. ¶ 82.

[269] Sallie Decl. ¶ 82; A copy of Mr. Sallie's February 1, 2005 letter to his mother, enclosing a copy of the January 18, 2005 Atlanta Journal Constitution front page story, is annexed to Petitioner's Appendix as Attachment 30 ("Appx. 30").

[270] Appx. 30.

[271] Perkovich Decl. ¶ 25.

[272] Sallie Decl. ¶ 83.

[273] Sallie Decl. ¶ 83; Appx. __# [xx-24]

"state and federal habeas,"[274] and ask the judge to call the two attorneys to court to explain why they were not representing him or had not at least found suitable lawyers to replace him.[275]

282.    Kammer placed a call to Sallie in G-House the day before the hearing.[276] Kammer explained that he had spoken with Singleton, who represented he was in serious discussions with an attorney in New York and the King & Spalding firm.[277]

283.    On February 1, 2005, Petitioner appeared *pro se*.   Kammer attended on behalf of the Resource Center.[278]   At the hearing, Kammer told the judge that Petitioner had given him "permission to sort of talk on his behalf, to sort of update the Court on the status of our search for volunteer counsel."   Kammer also told the court that he appeared in order to speak about "our ability, as well, to represent Mr. Sallie, if necessary."[279]

284.    Kammer explained to the court that "[r]ight now we are unable to take Mr. Sallie's case, but that is not going to be the case if we end up getting funding for our office during this winter's legislative session."[280]   Kammer also represented that Singleton and Stephen Bright of the Southern Center had been looking for volunteer counsel and that Bright was "in serious talks with an attorney based in New York City who would work with attorneys at King and Spalding who could conceivably take Mr. Sallie's case.  That is in the works."[281]   Kammer

---

[274] Sallie Decl. ¶ 83.

[275] Appx. 30.  Petitioner wrote:  "I'm in state habeas.  I could show the judge my contract and ask the judge to order them to appear before the court.  To explain their absence.  Could ask for contempt of court for not filing their representation of me."

[276] Sallie Decl. ¶ 84; Appx. 30.

[277] Appx. 30.

[278] A copy of the Feb. 1, 2005 transcript of the state habeas hearing before Judge Collier is annexed to the Perkovich Decl. as Exhibit L (see 4:5-8).

[279] Sallie Decl. ¶ 85; Perkovich Decl. Ex.L at 4:10-11.

[280] Id. at 4:25-5:4.

[281] Id. at 6:5-8.

continued:  "we hope to have a volunteer counsel secured within the next 30 to 45 days.  And if

that doesn't happen and if we get re-funded, we will take Mr. Sallie's case directly.  And I will

be the one responsible for his case at that point."[282]

285.     On the heels of those representations—first by Kammer to Petitioner on January

31, 2005 and then by Kammer to the state habeas judge—Petitioner wrote Singleton on February

6, 2005 to apprise him of the February 1, 2005 hearing.  Petitioner, in his own words, pleaded

with Singleton yet again "that you honor our agreement and that you represent me."[283]  Singleton

replied to Petitioner a couple of weeks later to say that he was still talking with a New York

lawyer named Noah Kinigstein.[284]  Singleton explained that Kingistein would work on

Petitioner's case but only with help from a Georgia attorney.[285]

286.     On March 1, 2005, the U.S. Supreme Court published its opinion in Roper v.

Simmons, 543 U.S. 551 (2005), whereupon it became unconstitutional to subject minors to the

death penalty.  As a result, two of the Resource Center's cases were resolved.[286]  The added

capacity could enable them finally to take on Petitioner's case.[287]

287.     Petitioner received an April 18, 2005 letter from Kingstein, the New York

practitioner, stating that he had been asked to work on his case and had "agreed to represent"

---

[282] Id. at 6:13-17.

[283] Sallie Decl. ¶ 88; A copy of Mr. Sallie's February 6, 2005 letter to Singleton is annexed to Petitioner's Appendix
   as Attachment 31("Appx. 31").  Petitioner also alerted Singleton to the next scheduled hearing (Mar. 21, 2005).
   See also Appx. 30: Petitioner conveyed in his letter to his mother that he hoped to "light a fire under" the
   lawyers that had abandoned them, realizing that they were not going to resume representation but that they
   needed to do everything in their power to replace themselves.  See also a copy of Mr. Sallie's February 10, 2005
   letter to his mother annexed to Petitioner's Appendix as Attachment 32 ("Appx. 32").

[284] Sallie Decl. ¶ 89.

[285] Id.

[286] Sallie Decl. ¶ 90.

[287] Id.

him.[288]  Kingistein stated that, in addition to himself, "there are several other people that [sic] will be assisting me, including lawyers from the Southern Center for Human Rights, and individual lawyers and law students here in New York City."[289]

288.    Kinigstein, in the end, failed to return calls or mail from Kammer or Petitioner.[290] Kinigstein ignored scheduled court hearings and, as quickly as he emerged, faded away.[291] The King & Spalding firm, which Singleton and Bright (through Kammer's representations) had averred were seriously considering involvement in Petitioner's post-conviction case, never contacted or, as far as Petitioner was made aware, inquired any further about a role in his case.[292]

289.    Petitioner continued his struggle for adequate, reliable counsel for his active habeas litigation.  By the fall of 2005, roughly a year after his skeleton state habeas petition was filed, Mr. Sallie's defense was in disarray.[293]  In late October 2005 (with an important motion due in November), Kammer informed Petitioner that he would be leaving the Resource Center to take a job in Pennsylvania.[294]  On October 26, 2005, Petitioner filed a grievance report with the

---

[288] Sallie Decl. ¶ 91; A copy of Mr. Kinigstein's April 18, 2005 letter to Mr. Sallie is annexed to Petitioner's Appendix as Attachment 33("Appx. 33")

[289] Appx. 33.

[290] Sallie Decl. ¶ 93.  A copy of Mr. Sallie's June 27, 2005 letter to his mother reflecting Kinigstein's absence is annexed to Petitioner's Appendix as Attachment 34 ("Appx. 34"); see a copy of Sep. 19, 2005 letter from Petitioner to Singleton is annexed to Petitioner's Appendix as Attachment 35 ("Appx. 35").

[291] Id.

[292] Sallie Decl. ¶ 92.

[293] Sallie Decl. 94.

[294] Sallie Decl. 94.  A copy of Mr. Sallie's October 27, 2005 letter to his mother is annexed to Petitioner's Appendix as Attachment 37 ("Appx. 37").  Kammer's absence would be short lived; he returned months later and resumed his role in Petitioner's case in state habeas.  As this Court is aware, he represented Petitioner in the present proceedings before his office needed to withdraw.  See Sallie Decl. ¶ 103.

State Bar of Georgia against Singleton for abandoning him in state habeas despite the Agreement

on Legal Representation (the "Grievance Report").[295] Petitioner stated in his Grievance Report:

> Mr. Singleton feels it is in my best interest that he doesn't continue
> to represent me in state habeus [sic].  I guess, it's pretty much
> assumed in death penalty appeals to state habeus [sic], ineffective
> assistance of counsel is an issue that's frequently raised.  Since an
> attorney can't raise this issue on himself, someone else must do so.
> []  It's this someone else, that bothers me.  My contract with Mr.
> Singleton specifically states representation in state habeus [sic].
> However, Mr. Singleton has taken it upon himself to step-a-side
> [sic].  I feel in doing so, Mr. Singleton should have found effective
> representation to take his place.  And this replacement
> representation needed to be approved by all parties.[296]

290.    Petitioner's Grievance Report set forth for the State Bar the abandonment at the

heart of the travails in pursuing his right to collateral review of his judgment:

> I feel it's Mr. Singleton's responsibility to find effective representation in
> which [sic] to replace himself with.  His contract states, "representation
> through all levels of appeals process."  Yet he failed to notify me in
> advance of the possible conflict issue, "ineffective assistance of counsel."
> I feel Mr. Singleton has abandoned me in the middle of my appeal
> process.  And has pawned off ineffective counsel (Mr. Kinigstein) for his
> replacement.  Thus creating two issues of ineffective assistance of
> counsel.[297]

291.    Petitioner further stated:

> The appeal process has time frames which must be met.  (statute of
> limitations)  If the time frame is not met, I lost [sic] my appeal and
> possibly my life.  Doesn't the bar have a rule against attorney's
> [sic] leaving their clients in the middle of the case?  (If the attorney
> leaving causes harm to their client.)  If this doesn't qualify, what
> does?[298]

---

[295] Sallie Decl. ¶ 95.  A copy of Petitioner's October 26, 2005 Grievance Report is annexed to Petitioner's Appendix
    as Attachment 36 ("Appx 36").

[296] Appx. 36 at 2 of 5 of the handwritten grievance.

[297] Id. at 5 of the handwritten grievance (emphasis added).

[298] Id. (emphasis added).

292.    On November 1, 2005, Ms. Carmen R. Rafter, Grievance Counsel for the State Bar, wrote Singleton about Petitioner's grievance.[299]  On November 18, 2005, Singleton wrote a one-page response to the State Bar.[300]  Singleton did not respond at all to the terms of the contract that he drafted and, along with Johnson, signed with Petitioner.  Singleton spent the bulk of his response speaking to his personal misgivings regarding Georgia law:  "I also know that our state supreme court has seen fit to rule that our laws and constitution do not require that counsel be made available to people without resources in post-conviction proceedings even when they have been sentenced to death.  *See Gibson v. Turpin*, 513 S.E.2d 186 (Ga. 1999)."[301] Singleton went on to cite 1985 Georgia authority for the point that his role as Petitioner's trial and appellate counsel preclude him from serving as habeas counsel.  Of course, Singleton and his co-counsel were patently aware of that law when they conceived of the terms of the Agreement on Legal Representation and, in bad faith, disloyalty and dishonesty pressured their client to sign it hours before jury selection in his capital murder retrial.

293.    The State Bar of Georgia wrote Petitioner on December 15, 2005 to convey that his grievance against Singleton was closed.[302]  Ms. Rafter wrote:  "Though you are obviously dissatisfied with matters related to your case, I do not see any evidence in the file to suggest that Mr. Singleton has acted unethically."[303]

---

[299] Appx. 36.

[300] Id.

[301] Id.

[302] Sallie Decl. ¶ 101; Appx. 36.

[303] Id.

294.    Petitioner wrote the State Bar again to urge it not to ignore the Agreement on Legal Representation and not to close the process.[304] The process remained closed.[305]

295.    Petitioner, when he filed his October 26, 2005 Grievance Report, was still completely unaware that he had a most grave statute of limitations problem due to the failure to have filed the state petition before October 7, 2004.

296.    Not only had Kammer and the Resource Center mislead him at the time they hastily assembled his skeleton state petition (precipitated by Ms. Stork of the Federal Defender Program's prompt handling of Mr. Richard L. Sealey's baby warrant), rushed it to Petitioner for his signature (October 13, 2004) and filed it (October 14, 2004).  The Resource Center continued to keep Petitioner in the dark on this point while his case moved through state habeas proceedings.[306]  During 2006, Thomas H. Dunn, the Resource Center's Executive Director at the time, became directly involved in Petitioner's state habeas proceedings.[307]  When Dunn resigned and retired from the practice of law in 2009,[308] Kammer resumed his primary responsibility for Petitioner's case.[309]  The state proceedings did not begin to wind down until June 22, 2009, when Judge Collier denied Mr. Sallie's state petition by adopting, verbatim, the State's proposed order. On August 26, 2009, Mr. Sallie filed an Application for Certificate of Probable Cause to appeal that denial.

---

[304] Id. at 101.

[305] Id.

[306] Sallie Decl. ¶ 102.

[307] Id. at ¶ 103.

[308] Wells Decl. ¶ 11.

[309] Sallie Decl. ¶ 103.

8.    **Braley's Federal Habeas Petition and Consequences Unanticipated by Sallie**

297.    Upon the denial of his Application for Certificate of Probable Cause, Leeland Braley's state habeas proceedings concluded in 2009 and, on October 1, 2009, his attorneys at the Federal Defender Program in Atlanta (the "FDP") filed a 167-page federal habeas petition in the United States District Court for the Northern District of Georgia (Newnan Division).[310]  On October 6, 2009, the State moved to dismiss the petition as untimely.[311]

298.    On December 2, 2009, the FDP moved to withdraw due to a conflict of interest.[312] On December 23, 2009, prior to any ruling on their motion to withdraw, the FDP filed an amended petition (also 167 pages in length).[313]  On New Year's Day 2010, Leeland Braley was found dead in his cell in G-House.[314] He had hanged himself.[315]

299.    In the weeks that followed Braley's suicide, Kammer visited Jackson to reveal to Petitioner—after more than five years since the hurried filings of Braley and Sallie's state petitions in 2004—that Mr. Sallie faced the identical statute of limitations problem that afflicted Braley's case and prompted the State's motion to dismiss Braley's petition as untimely.[316]  As Petitioner has put it:  "In all the years of struggling to get a lawyer and to understand what was happening in my case, I never expected to hear this news."[317]

---

[310] Braley v. Upton, Index No. 3:09-cv-00109-JTC (Doc. 1).

[311] Id. (Doc. 3).

[312] Id. (Doc. 11)

[313] Id. (Doc. 15)

[314] Sallie Decl. ¶ 104; see also Braley v. Upton, Index No. 3:09-cv-00109-JTC (Doc. 16)

[315] Sallie Decl. ¶ 104.

[316] Sallie Decl. ¶ 105.

[317] Sallie Decl. ¶ 106.

300.    On January 14, 2011, the Supreme Court of Georgia issued its one sentence order denying Mr. Sallie's Application for Certificate of Probable Cause to appeal the denial of his state habeas petition's denial by Judge Collier in 2009.  The court issued its remittitur to the trial court on February 7, 2011.

### III.   GROUNDS FOR RULING THE PETITION TIMELY FILED

<u>GROUND A</u>

PETITIONER'S ATTORNEYS' DISLOYALTY, DISHONESTY, AND
BAD FAITH, COMPOUNDED BY THEIR FAILURE TO MITIGATE
THEIR GRAVE MISCONDUCT OVER THE COURSE OF YEARS,
BROADLY       SURPASSED       THE       EXTRAORDINARY
CIRCUMSTANCES   NECESSARY   TO   WARRANT   EQUITABLE
TOLLING   WHEN   PETITIONER   DEMONSTRATED   GREAT
DILIGENCE IN PURSUING HIS RIGHTS EVEN PRIOR TO THE
COMMENCEMENT   OF   THE   LIMITATIONS   PERIOD   AND
CERTAINLY WELL PAST THE FILING OF HIS STATE PETITION

Petitioner's attorneys committed grievous breaches of their basic duties to Petitioner when they coerced him to accept their Agreement on Legal Representation.  The Southern Center attorneys did not merely pressure their client, hours away from jury selection in his capital murder retrial, to acquiesce his right to control fundamental decisions in his representation.  They pressured their client to sign an agreement that they could not, in its most critical respect (and the one that is before this Court), honor.  Whatever their motivations, the Southern Center attorneys proposed a bad faith agreement dishonestly and in obvious breach of their loyalty to their client.

From February 10, 2001, the date of that Agreement, until October 6, 2003, the conclusion of direct review of the judgment *sub judice*  (as this Court has ruled), the Southern Center attorneys compounded these most serious breaches by failing to take any steps to mitigate Petitioner's great harm resulting from their misconduct.   At a minimum, the attorneys should have promptly, upon the conclusion of Petitioner's trial on March 5, 2001, commenced the effort to find volunteer counsel comparable in experience to their office.

Once the limitations period pursuant to 28 U.S.C. § 2244(d)(1) commenced after October 6, 2003, Petitioner's attorneys severely compounded their neglect to mitigate the foregoing harm.

The attorneys had a number of readily conceivable measures at their disposal, in addition to the aforementioned one, yet they refrained from taking such sensible steps that their canon of ethics clearly required.  The Southern Center attorneys should have, at a minimum, done one of the following in the event that no suitable volunteer counsel was timely identified to take Petitioner's case:

- Retained counsel on Mr. Sallie's behalf and pay a suitable firm to conduct his post-conviction litigation in the place of the Southern Center; or

- Taken all available measures to establish an ethical wall between Mr. Singleton, the remaining attorney from Mr. Sallie's prior representation, and any investigators then employed by the Southern Center who worked on Mr. Sallie's case, and assign attorneys and investigators with no prior dealings with Mr. Sallie's representation to conduct his post-conviction litigation until establishing a suitable transition of the engagement to a separate law office; or

- Filed a state habeas petition well in advance of the end of the one-year limitations period in order to establish statutory tolling and brief the state habeas court on their unwaivable conflict, inability to litigate the application, and Petitioner's resultant need for non-conflicted counsel to represent him before the matter moved forward;

At a bare minimum and in last resort, counsel should have:

- Extensively counseled Mr. Sallie as to his federal limitations period and the most prudent timetable to undertake in filing a state petition if he were unable to secure suitable counsel in the near term; and

- Prepared a basic shell petition—like, the one *actually filed* by Mr. Sallie on October 14, 2004 that the Georgia Resource Center had drafted entirely—or supplied a model to replicate and provided detailed guidance on the applicable filing procedures and prudent timing for such filing.

In the end, the Southern Center attorneys did none of these things and instead improvidently relied on the Georgia Resource Center, a clearly overstretched organization, to attend to their responsibilities.

While the Southern Center was committing the foregoing grievous misconduct, Petitioner vigilantly pursued his right to collateral review in state and federal courts.  He was mindful of this pursuit *even before his trial*, sought to prepare to pursue these rights before his direct review

concluded, and diligently inquired about the status of his collateral litigation up until his

attorneys renounced the Agreement on Legal Representation that he had not only expected, but

needed, them to honor in order meaningfully to pursue his rights.  After his attorneys abandoned

their Agreement, Petitioner remained single mindedly vigilant in his pursuit of his right to

collateral review until he secured competent capital habeas representation.


### GROUND B

THE FAILURE OF GEORGIA'S DEATH PENALTY SCHEME DURING THE RELEVANT PERIOD FOR THE FILING OF PETITIONER'S FEDERAL APPLICATION PRESENTED EXTRAORDINARY CIRCUMSTANCES BEYOND PETITIONER'S CONTROL THAT WARRANT EQUITABLE TOLLING OF THE STATUE OF LIMITATIONS

The State has depended on the Georgia Resource Center to monitor the legal status of all

death penalty cases in post-conviction.  The lawfulness of Georgia's death penalty scheme has

depended on this monitoring capacity.  In Petitioner's circumstances, the Resource Center

completely broke down in respect to its most basic role.  As a result, Petitioner was left to

operate in a void of information and had no meaningful way to pursue his rights.  Nonetheless,

Petitioner pursued every conceivable avenue available to him in order to sustain his ability to

have collateral review of his death sentence by a federal court.

This singular event in the history of Georgia's modern death penalty manifests

extraordinary circumstances outside Petitioner's control.  These circumstances warrant equitable

tolling of the statute of limitations so that Petitioner's Original Petition can be ruled timely.

## GROUND C

GEORGIA IMPEDED PETITIONER'S FILING OF A FEDERAL PETITION AND THEREBY PRECLUDED THE ONE-YEAR LIMITATIONS PERIOD FROM COMMENCING UNTIL THE MOMENT THAT THE RESOURCE CENTER TOOK ITS AFFIRMATIVE STEPS LEADING TO THE SIGNING AND FILING OF PETITIONER'S STATE HABEAS PETITION

The circumstances reflected in Ground B also require ruling Petitioner's application timely filed as a matter of the operation of 28 U.S.C. § 2254(d)(1)(B).  Georgia's failure to provide Petitioner with meaningful access to the courts in the manner of sources of legal information and assistance caused direct, grave actual harm.  The State's impediment to Petitioner's pursuit of his right to collateral review requires that his limitations period run from the date on which the impediment was lifted.  That impediment was not lifted until the Resource Center, essentially by happenstance, came to prepare and file his state habeas petition.

Thus, the proper determination of Petitioner's limitations period pursuant to § 2254(d)(1) would be at the moment when the Resource Center began to prepare his state petition and took steps to have it signed and filed.

WHEREFORE, Petitioner respectfully prays that this Court:

(a) Issue an order to have him brought before it, to the end that he may be discharged from the unconstitutional confinement and restraint on the bases set forth in his Corrected Petition;

(b) Issue an order ruling his Original Petition timely filed;

(c) Conduct a hearing at an appropriately scheduled time where proof may be offered and argument advanced concerning the allegations set forth in this Supplemental Petition;

(d) Permit him because of his indigence to proceed without payment of costs; and

(e) Grant such other relief as may be necessary and appropriate

Respectfully submitted,

JOSEPH J. PERKOVICH
90 Church Street Station, No. 2171
New York, NY 10008-2171
Tel: (212) 400-1660
Fax: (888) 543-4964
jjp@jos.perkovich.name

By /s/ Joseph J. Perkovich
Counsel for Petitioner

September 28, 2011

## **VERIFICATION**

I verify under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

/s/ Joseph J. Perkovich
Joseph J. Perkovich

## <u>CERTIFICATE OF SERVICE</u>

    This is to certify that a correct copy of the foregoing document, the Supplemental Petition of Habeas Corpus by a Person in State Custody, was filed electronically.  Notice of this filing will be provided by cooperation of the court's electronic filing system.  Parties may access this filing through the Court's CM/ECF system.

Dated:  September 28, 2011
   New York, New York

         <u>/s/ Joseph J. Perkovich</u>
         Joseph J. Perkovich

         JOSEPH J. PERKOVICH
         90 Church Street Station, No. 2171
         New York, NY 10008-2171
         Tel: (212) 400-1660
         Fax: (888) 543-4964
         jjp@jos.perkovich.name