IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

WILLIAM C. SALLIE,                          :
                    *Petitioner*,           :
                                            :     No.:  5:11-CV-75 (MTT)
        v.                                  :
                                            :
CARL HUMPHREY, Warden, Georgia              :
Diagnostic and Classification Prison,       :
                    *Respondent*.           :
_____         :


**PETITIONER'S MERITS BRIEF OF CLAIMS FOR HABEAS CORPUS RELIEF
AND BASES FOR EVIDENTIARY HEARING**

**THIS IS A CAPITAL CASE.**

Joseph J. Perkovich
 White and Williams LLP
 One Penn Plaza
 250 W. 34th St., Ste 4110
 New York, NY 10119-4115
 (212) 400-1660 (Tel.)
 jjp@jos.perkovich.name

John R. Martin
 Martin Brothers, P.C.
 500 Grant Building
 44 Broad Street, N.W.
 Atlanta, GA 30303
 (404) 522-0400 (Tel.)
 Jack@Martinbroslaw.com

Counsel for William C. Sallie

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT .................................................................................2

II. STATEMENT OF THE CASE .................................................................................6
    A. Case history .......................................................................................................6
    B. The first trial, in 1991, its direct appeal, and the Supreme Court of
       Georgia's reversal and remand in 1998 ............................................................7
    C. The retrial in 2001, the conviction and death sentence, the direct appeal,
       and finality.........................................................................................................8
    D. Federal habeas corpus statue of limitations and eventual state post-
       conviction proceedings.....................................................................................13
        i.   Initial-Review Collateral Proceedings With No Counsel or Legal
           Assistance ................................................................................................13
        ii.  The Agreement on Legal Representation.................................................14
        iii. Georgia Resource Center's Role in Pro Se State Habeas Petition...............22
        iv.  Petitioner's First State Habeas Court Conference, Without IRCP
           Counsel ....................................................................................................24
        v.   Resource Center Becomes Counsel, Further Suppresses Agreement on
           Legal Representation Evidence................................................................27
    E. Federal habeas corpus application, timeliness and equitable tolling
       litigation..........................................................................................................33

III. PROCEDURAL DEFAULT & CAUSE AND PREJUDICE ANALYSIS
RELEVANT TO CLAIMS FOR RELIEF PURSUANT TO 28 U.S.C. § 2254 ...........................34
    A. Comity Informs Exhaustion Doctrine and Its Procedural Default Corollary.....................34
    B. Cause and Prejudice Provides Equitable Exception to Procedural Default ........................36
    C. Initial-Review Collateral Proceedings Ineffectiveness May Provide Cause
       for Defaulted Trial-COUNSEL-Ineffectiveness Claims ....................................................38
        i.   Tandem Circumstances for IRCP Cause..................................................39
        ii.  Substantial Claim Test for Trial-Ineffectiveness Claims............................41

IV. INITIAL-REVIEW COLLATERAL PROCEEDINGS' CAUSE TO
EXCUSE DEFAULT OF NEW SIXTH AMENDMENT CLAIMS...................................................41
    A. Transformation of the IAC Plea Bargaining Claim Based on Facts Never
       Aired in State Court...........................................................................................44
    B. Factual Bases for IRCP Cause Relating to New Sixth Amendment Claims
       of (1) Trial-Counsel-Ineffectiveness Regarding Plea Negotiation and (2)
       Denial of the Assistance of Counsel..................................................................51
        i.   Petitioner's IRCP Status .........................................................................52
        ii.  Petitioner Commenced State Collateral Review Without Counsel:
           Georgia Does Not Appoint Counsel for Indigent Prisoners—Even
           Those Under a Death Sentence—to Pursue Constitutional Remedies in
           State Habeas Corpus Proceedings...........................................................53
        iii. Petitioner's Pro Bono, IRCP Counsel Were Deficient in Failing to
           Present Any Evidence Relating to the Agreement on Legal
           Representation, Including Its Devastating Consequences for District
           Attorney Currie's Attempt to Reach a Plea ............................................56

V.   PETITIONER'S NEW SIXTH AMENDMENT CLAIMS FOR RELIEF ............................58
  A.  "Independent Judgment" Analysis of New Claims ............................................58
  B.  Grounds for Relief due to New Sixth Amendment Claims ................................60
    GROUND ONE:  PETITIONER'S RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL
    COUNSEL, AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS
    TO THE UNITED STATES CONSTITUTION, WAS VIOLATED WHEN COUNSEL
    FORECLOSED THE PROSECUTION'S EFFORT TO SETTLE HIS CASE WITHOUT A
    TRIAL, FAILED TO COMMUNICATE THE PROSECUTOR'S OBJECTIVE TO HIM, AND
    MISREPRESENTED HIM TO THE PROSECUTOR ..............................................................60
      i.   Applicable principles ............................................................................60
      ii.  Application of Strickland to Trial Counsel Conduct in Plea
           Negotiation ..........................................................................................64
    GROUND TWO:  PETITIONER'S RIGHTS PURSUANT TO THE ASSISTANCE OF
    COUNSEL CLAUSE OF THE SIXTH AMENDMENT AND GUARANTEED BY THE
    FOURTEENTH AMENDMENT TO THE UNITED SATES CONSTITUTION WERE
    VIOLATED WHEN COURT-APPOINTED COUNSEL BREACHED THEIR FIDUCIARY
    DUTIES, FAILED TO PERFORM AS COUNSEL DURING THE CRITICAL STAGE OF HIS
    CASE, AND MANUFACTURED A CONFLICT OF INTEREST DUE TO COUNSEL'S
    PROFESSIONAL AND PERSONAL INTERESTS ................................................................70
      i.   Attorney's Misconduct Deprived Petitioner of Counsel at Critical Plea
           Negotiation Stage .................................................................................71
      ii.  Counsel's Conflict of Interest Deprived Right to Counsel Irrespective
           of Stickland Showing ...........................................................................73
  C.  Evidentiary Hearing Pursuant to § 2254(e)(2) ...............................................75
      i.   Evidentiary Hearing Availability for Faultless Petitioner ..........................75
      ii.  Sallie's Frustrated Efforts to Introduce Trial Counsel Evidence in State
           Collateral Proceedings ........................................................................79
      iii. "Independent Judgment" to be Exercised in Hearing .................................82
  D.  Prospective witnesses in evidentiary hearing ..................................................82

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

WILLIAM C. SALLIE,      :
      *Petitioner*,   :
            :  No.: 5:11-CV-75 (MTT)
  v.         :
            :
CARL HUMPHREY, Warden, Georgia :
Diagnostic and Classification Prison, :
      *Respondent*. :
_____ :

**PETITIONER'S MERITS BRIEF OF CLAIMS FOR HABEAS CORPUS RELIEF
AND BASES FOR EVIDENTIARY HEARING**

**THIS IS A CAPITAL CASE.**

Petitioner, William C. Sallie, by and through undersigned counsel and pursuant to the Court's February 14, 2012 scheduling order (Doc. 92),[1] submits this brief to address the merits of his claims for habeas corpus relief from his State court judgment and before this Court pursuant to 28 U.S.C. § 2254, and to address contentions set forth in the Answer-Response on Behalf of Respondent to Amended Petition for Writ of Habeas Corpus (Doc. 87), including, *inter alia*, contentions concerning exhaustion and procedural default. With respect to petitioner's entitlement to an evidentiary hearing in relation to certain issues, the implications of *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011) (as identified in the Court's aforementioned scheduling order), (*Michael*) *Williams v. Taylor*, 529 U.S. 420 (2000) (unanimous) (Kennedy, J.) and other authorities are also discussed in regard to the present claims that necessitate an evidentiary hearing.

_____

[1] Dates revised, pursuant to an April 16, 2012 order (Doc. 98).

# I.    **PRELIMINARY STATEMENT**

Petitioner's court-appointed trial counsel had carried on as his counsel through his direct appeal. Georgia law recognizes, in such cases, that counsel cannot litigate in the direct appeal any claim of ineffective assistance of trial counsel because such a claim emanates from the attorney's own performance. *Gibson v. Turpin*, 270 Ga. 855, 868, 513 S.E.2d 186, 196 (1999) (citing *Castell v. Kemp*, 254 Ga. 556, 558, 331 S.E.2d 528, 530 (1985)). Thus, the given petitioner's first place to attack his state court judgment on ineffective assistance of counsel grounds is in his state habeas corpus litigation. *White v. Kelso*, 261 Ga. 32, 401 S.E.2d 733 (1991).[2]

As coined in Justice Kennedy's opinion for the Court in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) (7-2 decision), "initial-review collateral proceedings" refers to a petitioner's "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *Id.* at 1315 (construing *Coleman v. Thompson*, 501 U.S. 722, 755 (1991)). In the case *sub judice*, Sallie's initial-review collateral proceedings ("IRCP") were his state habeas corpus proceedings.

Georgia (unlike Arizona in Mr. Martinez's case), provides no right to the appointment of an attorney in collateral review of its courts' judgments—even of its death sentences. *Gibson*, 270 Ga. 855, 513 S.E.2d 186. Petitioner, who is indigent, became counsel-less upon the finality of the direct review of his judgment. As set forth herein, that came as a great surprise to him. Petitioner then struggled to find an attorney

---

[2] "In *Johnson v. State*, 259 Ga. 428 (1989), we held that the [ineffective assistance] claim *may* be raised for the first time in the direct appeal if the direct appeal marks the first appearance of new counsel. The rule is consistent: New counsel must raise the ineffectiveness of previous counsel at the first possible stage of post-conviction review." *White v. Kelso*, 261 Ga. 32, 401 S.E.2d 733 (emphasis added).

to take on his case.  Simultaneously he sought to enlist the attorneys who had abandoned him in post-conviction.  In the end, those attorneys failed to mitigate their harm to him.

 As set forth below, ultimately, Sallie entered state habeas court with no counsel—only the Georgia Resource Center interposed itself in its "monitoring" role as the litigation proceeded.  An unexpected reduction in its caseload enabled the Resource Center, the stopgap in Georgia's makeshift death penalty scheme, to step in later to represent him as his volunteer counsel (and also to represent another death row inmate, with whom he shared an identical post-conviction procedural posture).

Thus, after belatedly entering his case, the Georgia Resource Center's performance as petitioner's state habeas counsel during his IRCP was error-laden.  Crucially, his IRCP lawyers erred in relation to petitioner's Sixth Amendment claims surrounding the assistance of his trial counsel.  Immediately prior to the critical point in his prosecution for capital murder—when the prosecutor sought to plea bargain on the eve of jury selection—petitioner's court-appointed trial counsel had committed egregious misconduct that precipitated the attorneys' failure to function on his behalf in any meaningful way.  This information and its consequences for petitioner's trial representation have been effectively suppressed through the entirety of petitioner's state proceedings, notwithstanding Sallie's individually diligent pursuit of redress.  Once the case left the hands of his trial counsel, lawyers at the Resource Center steered his case— even before they were acting as his attorneys—away from any airing of the misconduct. This was to his grave detriment during the state proceedings.

The history of this case points out the profoundly undesirable results that may flow from a state death penalty system that, aberrantly, opts not to provide court-

appointment of counsel in collateral review for its inmates. *Cf.,* Ariz. Rule Crim. Proc. 32.4(c)(2) (2011) (collateral review appointment provided for substantial IAC claims (not limited to death penalty cases)); N.C. Gen. Stat. Ann. §7A-451(a)(2) (2009) (same); Tenn. Code Ann. §8-14-205(2011) (same), *cited (among others) in Martinez*, 132 S. Ct. at 1319. The equitable ruling in *Martinez* assumes the normal circumstances, as reflected in Arizona, within a state's collateral review system, *viz.*, that states ordinarily appoint collateral review attorneys for material claims of ineffective assistance of counsel. The *Martinez* ruling recognizes that there are "a variety of systems for appointing counsel in initial-review collateral proceedings. And it permits a State to elect between appointing counsel in initial-review collateral proceedings or not asserting a procedural default and raising a defense on the merits in federal habeas proceedings." *Martinez*, 132 S. Ct. at 1319-20. The equitable ruling in *Martinez* thus "allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Id.* at 1320. Further, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* at 1320.

For Georgia, where no court-appointment is permitted, the conduct of post-conviction proceedings for *pro se* or *pro bono* represented death row inmates alike is very susceptible to providing cause and prejudice in relation to the ability of the federal courts to entertain constitutional claims that may otherwise face procedural hurdles coming from the state court record. Such cause and prejudice is manifest in petitioner's case. Since *Martinez*, Georgia's choice not to provide attorneys to petitioners in the collateral

review of its death sentences "is not without consequences for the State's ability to assert a procedural default in later proceedings." *Id.* at 1318.

As shown below, the procedural effects and the implications for this Court's analysis of petitioner's Sixth Amendment claims require review of the state proceedings, especially the collateral-review, to a significant degree. Such rehearsal of this case, first tried in 1991 and retried in 2001, will also permit the necessary analysis for determining that certain new evidence, in connection with a new claim—and also a transformed ones—requires an evidentiary hearing in this Court as a result of petitioner's diligence in the face of the cause and prejudice in the record at bar, which, importantly, includes the material submitted in connection with the Supplemental Petition (Doc. 66).

Indeed, the State, as set forth herein, is unable to rely on its procedural framework in specific respects and must address the merits of petitioner's ineffective assistance of trial counsel claims emanating from certain evidence not on the state record. Because of the cause and prejudice to petitioner in connection with his claims based on his trial counsel's conduct and performance and first presented to this Court in his Supplemental Petition, there is no statutory or other limitation upon the Court's power to review these new claims independently (*i.e.*, *de novo*) and thus *not* pursuant to the requirements of § 2254(d). *See Pinholster*, 131 S. Ct. at 1401, n. 10, (recognizing hypothetical scenario in Justice Sotomayor's dissenting opinion, at 1417-18, "may well present a new claim"). Because of petitioner's faultless effort in connection with (i) the denial of assistance and ineffective assistance of counsel at critical points, (ii) the state procedural framework and (iii) the broader circumstances of these claims, this Court, pursuant to § 2254(e)(2) has no impediment to entertaining "new evidence when deciding claims that were not

adjudicated on the merits in state court." *Id.* at 1401, *citing (Michael) Williams*, 529 U.S. at 427-29.

## II.    STATEMENT OF THE CASE

## A.    CASE HISTORY

In 2001, Sallie was retried for the crimes surrounding the killing in 1990 of his estranged wife's father.  Shortly after midnight on March 29, 1990, petitioner fatally shot John Moore and also injured Linda Kay Moore, his wife, in their bedroom during a botched invasion of the Moores' home on the outskirts of Alma.  After firing the shots at the Moores, Sallie exited their house, where he had previously resided with his wife and toddler son.  He fired two more shots through the master bedroom window but did not hit anyone.  An extended discussion between the family in the house and Sallie then followed.  Sallie said that he was confused and he threatened suicide.  After a lengthy period, according to testimony from the Moore family, Sallie decided to flee.  He left with his estranged wife, Robin Moore, and her sister, April, leaving behind Linda Kay Moore and her son Justin after handcuffing them to a bedframe.  Sallie also left his son, Ryan, who was sleeping on a bed.

Sallie stopped the vehicle twice to attempt to telephone for help for Mr. Moore. Sallie, Robin and April arrived at a trailer that Sallie had rented in Liberty County under an assumed name, where they remained until nightfall.  The prosecution alleged that, during the day spent at the trailer, Sallie raped both women.  Sallie and Robin recorded an audiotape in the trailer, addressed to their son, in which Sallie apologized for the events of the day.  The trial court, however, did not admit evidence about it in the guilt phase.  In the months leading up to that day, Robin caused divorce papers to be served

upon Sallie and took physical custody of their son.  Sallie later took him back during a scheduled visit at the Moores' and returned to his hometown in Illinois, where he had also lived with Robin and their son earlier in the marriage.  After Sallie filed divorce papers in Illinois, a court there determined that the divorce and custody matters should be determined in Bacon County and granted temporary custody of Ryan to Robin, who then returned to Georgia.

Upon nightfall, Sallie returned to Bacon County to let the women out in front of the home of an uncle.  As he did so, Sallie gave them a bag containing notes he had written apologizing for the harm he had done, over $500 in cash, a small television, and the tape recorder.  Shortly thereafter, Sallie was heading back in the direction of the trailer in Lincoln County when he was arrested without incident in Screven.

**B.      THE FIRST TRIAL, IN 1991, ITS DIRECT APPEAL, AND THE SUPREME COURT OF GEORGIA'S REVERSAL AND REMAND IN 1998**

The Waycross Judicial Circuit District Attorney in 1991 was Harry D. "Donnie" Dixon, Jr.  In the first prosecution of Sallie, Dixon determined to seek the death penalty. At that time, Georgia law provided two sentencing options in a death penalty case: life imprisonment and death.[3]  On March 30, 1991, a Bacon County jury convicted Sallie of murder and various other crimes and sentenced him to death.

Wendell Boyd English had been Sallie's court-appointed lead trial counsel.  At the time of Mr. Sallie's 1991 trial, Mr. English, however, was also the law clerk of the Waycross Judicial Circuit—more specifically, the clerk of the chief judge of that circuit—where Sallie was prosecuted.  Sallie's appeal was handled by lawyers from the

---

[3] The 1993 Act amended chapter 10 of title 17 of the O.C.G.A. to provide for the imposition of life imprisonment without parole in a new Code section, 17-10-16.

Southern Center for Human Rights, a venerated public interest law office in Atlanta focused largely on capital defense and capital habeas corpus.

Various Southern Center lawyers handled Sallie's appeals process as it worked through the state courts for over seven years. Upon the departure in 1995 of one of the first lawyers on Sallie's team, Seth Rosenthal, a newly hired staff attorney and recent law school graduate, Chris Johnson, assumed a key responsibility for Sallie's appeal.

The Supreme Court of Georgia found the conflict of interest besetting Sallie's trial counsel to have been singular: "We have never before addressed a conflict of interest that arises from a lawyer's simultaneous role as criminal defense attorney and law clerk in the same court where he is trying the case. We have also not uncovered any cases in other jurisdictions that present the same issue." *Sallie v. State*, 269 Ga. 446, 449, 499 S.E.2d 897, 899 (1998).

The high court ruled that English had labored under an unwaivable conflict and that the court "cannot allow such a conflict of interest to exist in a death penalty case." *Id.* (citations omitted). Thus, Sallie's judgment could not stand and was remanded to Bacon County for a new trial. *Id.*

C.    **THE RETRIAL IN 2001, THE CONVICTION AND DEATH SENTENCE, THE DIRECT APPEAL, AND FINALITY**

On remand to Bacon County for a new trial, Sallie's attorneys succeeded in changing the venue due to the notoriety of the crime, the small size of the community and its established opprobrium for the defendant, an outsider to Alma.

The success of Sallie's direct appeal led to Chris Johnson taking on the primary responsibility for his retrial. However, Johnson was not qualified to obtain court-appointment as the lead attorney. His trial experience, of any kind, was insufficient.

Thus, the Southern Center had a very experienced staff attorney, Palmer C. Singleton III, obtain appointment as the nominal first chair. However, Johnson, by all accounts, had the burdens of the first chair and its responsibilities. Singleton was clear that he "wasn't a lead counsel" in petitioner's retrial. (Doc. 75-1, Resp't Ex. 85A at 68 (Tr. 14)).

In the years leading to the retrial, the first major event was the change of venue to Houston County, several counties to the northwest of Bacon and vastly more cosmopolitan than it,[4] was then home to over 110,000 inhabitants and covered nearly 380 square miles.[5] Also, by the time petitioner's case was remanded for retrial, Donnie Dixon was no longer the District Attorney of the Waycross Judicial Circuit. His successor, Richard E. Currie, inherited the case—and his predecessor's choice to seek a death sentence. (Doc. 75-1, Resp't Ex. 85A at 63-64 (Tr. 9-10)).

At some point soon after reversal of the first trial, Currie reached out to petitioner's court-appointed counsel in pursuit of adding the third sentencing option of life without parole and in pursuit of a plea bargain in order to resolve the case without a trial. (Doc. 75-1, Resp't Ex. 85A at 85-87 (Tr. 31-33)). These early overtures, years before the actual retrial took place in February and March 2001, were rebuffed. (*Id.*). As the trial grew nearer, however, Currie plainly recognized that, given "the facts of the case," especially that it was "not a stranger-on-stranger killing," pleading to life without the possibility of parole "was something we should explore," given that it was then a statutory option whereas it had not been one at the time of Sallie's first trial. (*Id.* at 99-100 (Tr. 45-46)).

---

[4] According to the 2000 Census, Alma, the county seat and place of the courthouse had 2,236 inhabitants in an area just less than six square miles.

[5] 2000 Census.

The Southern Center staff—especially the non-lawyer mitigation specialists who researched and conducted numerous interviews in formulating 'a case for life' for petitioner—prepared for the retrial with mitigation providing the overarching purpose. The mitigation aspect was clearly essential to any effective trial preparation and Sallie's case warranted the marshaling of evidence, such as from Linda Kay Moore's sister, Wanelle Parker (who testified at trial in his behalf), to reflect that the actions in question were a complete aberration and to show Sallie's achievement, for instance, in the military. At trial, a retired Lieutenant Colonel described Sallie, a missile electronics repairman during his service, as the best soldier ever detailed to him.

Petitioner, however, as things moved forward, grew unsettled by what seemed to be a lack of meaningful focus on putting the prosecution's case, especially concerning the aggravators, through vigorous testing. This view was a product of his experience through his first trial. He was clear that the testimonies of his ex-wife and her sister were very harmful and contained considerable inaccuracies. He felt that those witnesses, if left unchecked, could perjure themselves and thereby damn him in his retrial. (Doc. 42, at 2).

Days before voir dire began, Singleton reached out to Currie to attempt to resuscitate the latter's offer in relation to adding the life without parole sentencing option. Although Currie's effort on that front was rejected years earlier, he agreed to prepare a joint document to enable presentation of that third option to the eventual jury. (Doc. 73-21, Resp't Ex. 76B at 91 (Tr. 215)).

Struck by this changed position, Currie wanted to explore plea bargaining to avoid the trial altogether. (*Id.* at 91-92 (Tr. 215-16)). Singleton told Currie that he would

advise his client about the possibility. (*Id*.). Singleton never informed Sallie prior to his trial. Singleton later told Currie: "He won't take it." (*Id*.).

The trial proceeded as scheduled in Warner Robins, in the Superior Court of Houston County located at Perry. A jury was selected, including a juror who was not struck for cause although she stated during voir dire that she would follow "the principles contained in the Bible" in the event that she perceived a conflict with the law of Georgia. (Doc. 70-10, Resp't Ex. 21A at 91 (Tr. 1995)). That juror, Gina Dawson, also averred, as did another of petitioner's jurors, Thomas Gootee, not to have been acquainted with anyone in the venire. The jury, which was sequestered over the defense's objection, convicted petitioner of murder and, having found that the statutory aggravators were not outweighed by mitigating factors, sentenced him to death on March 5, 2001. On March 13, 2001, the trial court sentenced Sallie to life imprisonment for each conviction of kidnapping with bodily injury, to twenty years for burglary and to twenty years for aggravated assault.

Several days after the jurors rendered their verdicts and sentences, the trial court received a call from Mr. Gootee's wife asking when the trial would be over and her husband free to return home. (Doc. 73-21, Resp't Ex. 76B at 86-87 (Tr. 230-31)). The court then dispatched a bailiff to Dawson's home to alert Gootee to his wife's investigation.

The Southern Center, primarily Chris Johnson, continued to represent petitioner in his direct appeal. However, Johnson left his employment by the Southern Center in or around October 2001. (Doc. 73-20, Resp't Ex. 76A at 96 (Tr. 96)). He relocated to New Hampshire in order to accept a position with the appellate defender program in Concord

and one on the faculty of the state's law school. Despite these changes, Johnson continued as petitioner's appellate attorney. (Doc. 42, at 4). However, the Southern Center continued to file petitioner's appeals even after Johnson left the office. The Supreme Court of Georgia affirmed petitioner's judgment on March 24, 2003. *Sallie v. State*, 276 Ga. 506 (2003).

Johnson also drafted Sallie's petition for certiorari review in the U.S. Supreme Court. Singleton, in fact, filed it on his behalf on July 8, 2003. (Doc. 44-2). Johnson maintained correspondence with petitioner. As petitioner awaited the decision on his cert. petition, he sought concrete guidance from Johnson on post-conviction litigation. (Doc. 42, at 4).

On October 6, 2003, the Supreme Court denied Sallie's cert. petition.[6] As preordained, Johnson had the Southern Center, again under Singleton's name, file a petition for rehearing on October 29, 2003. It was distributed for conference on December 5, 2003 and denied on December 8, 2003. Upon the U.S. Supreme Court's denial of the petition for rehearing, the Georgia Supreme Court transmitted the remittitur to petitioner's trial court on December 10, 2003. (Doc. 42, at 5).

At some point shortly thereafter, Johnson informed Sallie that the U.S. Supreme Court had, as the Court has virtually always done in modern times, denied the petition for rehearing.[7]

---

[6] On that same date, the Court also denied the cert. petition of another man on death row in Jackson, Leeland Braley. Doc. 44-1; *see generally* Supplemental Petition (Doc. 66, at 11, 36-44, and 70-71).

[7] *See* Doc. 66, at 11, n. 43.

**D.  FEDERAL HABEAS CORPUS STATUE OF LIMITATIONS AND EVENTUAL STATE POST-CONVICTION PROCEEDINGS**

> **i.  *Initial-Review Collateral Proceedings With No Counsel or Legal Assistance***

As set forth at length in his Supplemental Petition,[8] petitioner entered the post-conviction stage in dire straights.  His situation quickly worsened.  Some time in December (after the December 8, 2004 denial of the petition for rehearing and more than two months after the October 6, 2003 denial of Sallie's cert. petition), Johnson informed petitioner that he could not represent him in the collateral review of his judgment.  This was extremely detrimental to petitioner because Georgia remains the only state that imposes the death penalty without providing, or at least permitting, court-appointment of counsel for state post-conviction proceedings.  Petitioner thus—after two months had lapsed on the twelve-month federal limitations period pursuant to 28 U.S.C. § 2254(d)(1)[9]—learned that his attorney since 1995, Chris Johnson, would not represent him in post-conviction.  It must be noted, though, that petitioner, at that moment, had no idea that his *federal* limitations period was running; he simply understood that he was in the *state post-conviction* phase with no counsel, no apparent prospect of getting new counsel and, at that point, no plausible chance of emerging from state habeas corpus with any viable claims for federal habeas corpus proceedings.  (It would not be until early 2010 that petitioner would learn of the gravity of his statute of limitations issue at that juncture in December 2003.)  The origin of petitioner's unique predicament traced back almost three years from that moment in late 2003.

---

[8] *See generally* Doc. 66 at 11-44.

[9] *See generally Gonzalez v. Thaler*, 132 S. Ct. 641 (2012).

### ii.    *The Agreement on Legal Representation*

On February 10, 2001, the Saturday before jury selection for petitioner's capital

murder retrial in the Superior Court of Houston County, petitioner had signed a contract.

(Doc. 40-1).  It was drafted by Singleton and countersigned by both Johnson and

Singleton under the purported approval of their law office's executive director, Professor

Stephen Bright.  On its face, the Agreement on Legal Representation seemed to

contemplate that Johnson and Singleton would not only represent petitioner in his direct

appeals but also "through state and federal habeas," and, it should be noted, "for the rest

of [petitioner's] life," "if he so desire[d]."  (Doc. 40-1).[10]  The court-appointed attorneys

gave that guarantee in exchange for petitioner's permission for Singleton to hedge their

bet on receiving in Houston County—*Georgia's Most Progressive County*[11]—a life

sentence.  Singleton summed it up years later:

> This is a winnable case.  I mean I think even Rick Currie thought this
> wasn't a death case, so *it's more than winnable* and I think we
> underestimated some of the members of the jury.

(Doc. 75-1, Resp't Ex. 85A at 118 (Tr. 64)) (emphasis added).

For the apparent sake of this hedge, Singleton had hoped to resuscitate Currie's

offer, made years earlier following the first judgment's reversal in 1998, to opt-into the

third sentencing option of life without the possibility of parole.  The attorneys forced the

---

[10] The Agreement on Legal Representation, a copy of which was included in Petitioner's Appendix in
support of his Supplemental Petition (Doc. 40-1), states in its entirety:

> Because William Sallie has agreed to allow the use of the life without parole third
> sentencing option at his retrial, Christopher Johnson and Palmer Singleton agree to
> continue to represent William Sallie, even if he receives a sentence other than death,
> through direct appeals, through state and federal habeas, and at any subsequent re-trial,
> even if the charges at subsequent re-trials do not carry a possible death sentence.  We also
> agree that Christopher Johnson and Palmer Singleton will continue to represent William
> Sallie, if he so desires, for the rest of his life.

[11] *See* http://www.houstoncountyga.com.

issue of opting-in as the time had come to prepare the verdict forms. The attorneys had to determine whether just two forms were needed. They wanted a third. To petitioner, this confirmed that he was heading toward failure.

Petitioner's anxiety about his defense counsel transformed into despair. The inexperienced *de facto* first chair leading his first trial of any kind had an almost unbounded focus on mitigation. This was at the expense of fundamental adversarial testing, especially of the aggravating circumstances at the center of the State's case. The first chair's travel to Illinois with staff and retained mitigation expertise reflected the excessive attention to elements of the defense far removed from the core aspect of putting the State's case—which was highly unusual in terms of its aggravating factors *not* being tied to the murder victim—through its paces. Johnson's observation that "I would say I don't recall having a great deal of hope of success in the guilt phase of [petitioner's] trial," reflects the perspective that imbued the preparation effort. (Doc. 75-4, Resp't Ex. 86A, at 25 (Tr. 24)). This view was not lost on the distressed petitioner. The mitigation predominance was reflected in not only what was done, *e.g.*, out of state travel to meet face to face with prospective mitigation witnesses, but in what was *not* done. Johnson did not entertain preparing for, nor handling, the most important witnesses in the case. That responsibility (namely, to cross-examine the Moores' daughters) was delegated to Singleton, who neglected to prepare in any meaningful way until the "eve of trial." (Doc. 73-20, Resp't Ex. 76A at 43 (Tr. 43)). This patent disregard for what was very likely the decisive element of the case deeply troubled petitioner. (Doc. 42, at 2-3).

Singleton's position on the Southern Center's team further undermined Johnson's efficacy. Despite his broad responsibility for the whole case, Johnson nonetheless had to

defer on critical matters to the generally disengaged, but very senior, Singleton. However, when relations with the client boiled over, it was Singleton who determined what would—and what would not—happen at trial. Singleton quite literally dictated these terms to Sallie. (*Id.*)

Petitioner recalls Singleton showing up with Johnson—he had not met with him previously during the years leading up to the retrial—at one of their last contacts before trial. In that tense context, they pressure Sallie to give them the authority to seek to restore the district attorney's LWOP sentencing option offer began to derail their appointment. After some discussion, Sallie told Johnson and Singleton that he had "no option but to ask the judge to order them to obey [his] instruction" on his defense strategy. (Doc. 42, at 2). He recalls Singleton telling him that if he tried to get "the judge to force them to conduct the trial  [the way petitioner had instructed, with a strong cross-examination of key witnesses], then it would be a disaster." (Doc. 42, at 2). This was so, according to Singleton, "because [counsel] were not ready to defend the case in the guilt phase in the way that [petitioner] had always asked them to and the judge would not let them withdraw at that late stage." (*Id.*).

Singleton's recollection of that moment during the habeas proceedings was sanitized but still telling: "What's crystallized in my mind is the discussions we had over the verdict forms and was it going to go over life, life without, and death. And once that decision was made by everybody concerned it seemed to me completely irrational to not try to settle the case out." (Doc. 73-20, Resp't Ex. 76A at 43 (Tr. 43)). Singleton's actions immediately following that decision, however, belied this perplexity about failing

to settle the case.  Settlement, after Singleton broached the third sentencing option with Currie, fell squarely in Singleton's court.  Yet nothing was done.

In any event, petitioner's face-to-face encounter with Singleton left him resigned to the arc of his attorneys' strategic choices imposed against his repeated, basic instructions.  Petitioner anticipated a bad outcome from the trial.  Looming in his future, he feared, was the need to navigate post-conviction proceedings in state and federal courts.  He sought some protection with the little leverage—the fact that he could seek the court's intercession—that he still had in the relationship with his appointed attorneys.

Petitioner's years in Jackson prior to the reversal of his first sentence exposed him to the hard reality of Georgia law governing state habeas corpus.  Georgia law did not then (and still does not) provide a right to an attorney in state collateral review of a capital conviction.  *Gibson v. Turpin*, 270 Ga. 855 (1999).  Sallie thus attempted to negotiate a concession from his attorneys in light of their hostile posture on the matters of fundamental importance in his defense.  He demanded that the attorneys commit to continue to represent him *after* his trial.  The Southern Center lawyers agreed to that condition in order, in exchange, to receive Sallie's concession as to defense strategy and his consent to include the third sentencing option.  Singleton wrote the terms.  Both attorneys confirmed to petitioner "that they got the approval of the director of the Southern Center, Stephen Bright, to sign the Agreement."  (Doc. 42, a 3).  Petitioner capitulated to the attorneys' trial demands.

The lawyers who had duped their client into that bargain certainly knew they could not fulfill their end of it in the event that petitioner's retrial transpired as he feared it would.  Petitioner feared that counsel's failure to prepare to subject the prosecution's

case to adversarial testing would give dangerous license to the State's key witnesses. When, years after the death sentence, Johnson broke the news that he could no longer represent him upon the finality of direct review, he explained to petitioner that the most viable—and certainly most successful—habeas claims in death penalty cases relate to ineffective assistance of counsel.  Petitioner's problem became that an attorney cannot litigate such a claim against himself.  That is black letter law and very surely a point that petitioner's trial counsel, capital habeas experts Singleton and Johnson, fully appreciated at the time Singleton drafted the Agreement on Legal Representation (hereinafter also the "Agreement") and they both countersigned it.  For reasons that have never been aired in court, neither Johnson, nor Singleton (nor Bright), aborted the fraud perpetrated on their indigent client hours before the start of his trial proceedings.

That fraud would have very negative consequences for petitioner as he struggled for years to navigate collateral review.  It would play a heavy part in the procedural default circumstances leading to the withdrawal of his initial attorneys in this Court.  The most grievous harm to petitioner from this Agreement, however, was the immediately resulting collapse of the relationship between the court-appointed attorneys and their client.  The breakdown of that attorney/client relationship came at the worst time.  That is, it came at *the* critical point in the entire prosecution:  the moment for pre-trial plea bargaining.

In light of his defense's loss of control of the case and the dim prospects as they approached the trial date, petitioner would have been shocked by Currie's opportunity to settle his case and would have welcomed taking the death sentence off of the table.  From his cell, he had no awareness of the prosecution's willingness to pursue resolution.  He

was not informed of Currie's desire to plea bargain until long after his conviction. (Doc. 42, at 3).

Both Singleton[12] and Johnson[13] gave depositions and hearing testimony in petitioner's state habeas proceedings in 2006 and 2007, respectively. Both had testified repeatedly to the circumstances surrounding the third sentencing option and Currie's effort to advance plea bargaining. Yet neither attorney mentioned or even alluded to the Agreement on Legal Representation brokered in tandem with petitioner's LWOP verdict form. The testimony of his lawyers studiously avoided that troubling, unseemly Agreement. Its absence from their testimony goes further to explaining why they cannot intelligently account for failing to speak to the client about a plea deal than any explanation passed off during state habeas proceedings. The relationship was in terrible disarray and, perhaps more telling, the attorneys apparently calculated that getting a sentencing option hedge was sufficient protection for a case, given its facts, the background of the defendant, and, perhaps most important, the venue of the trial, that was eminently "winnable." (Doc. 75-1, Resp't Ex. 85A at 118 (Tr. 64)).

When he approached Currie on the eve of trial, Singleton, of course, had no way of knowing whether the prosecutor would even entertain the request to resuscitate the opt-in for life without parole pursuant to O.C.G.A 17-10-16(a) (via the 1993 Act). Currie's original overture was made years prior to the retrial. As it happened, Currie was once again amenable to the sentencing option. (Doc. 75-1, Resp't Ex. 85A at 95-96 (Tr.

---

[12] Singleton's deposition testimony and exhibits are found in Doc. 75-1, Resp't Ex. 85A, at 55-135; Doc. 75-2, Resp't Ex. 85B; and Doc. 75-3, Resp't Ex. 85C. His hearing testimony is in Doc. 73-20, Resp't Ex. 76A.

[13] Johnson's deposition testimony and exhibits are found in Doc. 75-4, Resp't Ex. 86A; Doc. 75-5, Resp't Ex. 86B; and Doc. 75-6, Resp't Ex. 86C. His hearing testimony is in Doc. 73-20, Resp't Ex. 76A; and Doc. 73-21, Resp't Ex. 76B.

41-42)). Further, he expressed to Singleton that the case warranted plea bargaining. (*Id.*) In Currie's mind, it would be appropriate to resolve it without the trial. As Currie would testify in petitioner's state habeas proceedings, his colleagues had given him the strong impression that he would not obtain a death sentence given the circumstances of the case and the changed venue to Houston County. (*Id.* at 88-89 (Tr. 34-35)). Currie had felt that a plea bargain "was something we should explore," especially "given the facts of the case." (*Id.* at 99-100 (Tr. 45-46)).

Singleton had "known Mr. Currie for a long time," prior to the retrial. (*Id.* at 79 (Tr. 25)). In his aforementioned deposition, Singleton was asked if he had discussed a plea bargain with the prosecution. Singleton responded that he considered that his contribution to petitioner's defense was that he managed to broker the agreement with Currie to include the third sentencing option. (*Id.* at 121 (Tr. 67)). In connection with that eleventh hour LWOP sentencing option, Currie and Singleton "talked [about a plea] and he never said no. No formal offer was extended. My reading of the situation was it could have been settled. It should have been settled." (*Id.*).

For Currie's part, the district attorney testified that, when Singleton came back to resuscitate the offer for the LWOP sentencing option, Currie recalled having said: "Well, if he's willing to have that third option as to the jury, and there's a good possibility with any jury they may offer the life without parole, why won't he plead to it?" (*Id.* at 96 (Tr. 42)).

But Singleton would *"never" mention to his client* the prosecutor's desire to explore resolution (and only later would mention it to Johnson).[14] Unilaterally, Singleton

---

[14] "And I never had a single conversation even in a general way with Mr. Sallie, I remember that." (Doc. 73-20, Resp't Ex. 76A at 86).

returned to Currie and told him that petitioner "won't take it." (Doc. 73-21, Resp't Ex. 76B at 217 (Tr. 216)).   Although Currie felt that "the facts of the case," and that it was "not a stranger-on-stranger killing" warranted the pursuit of a plea, Singleton's failure to do anything left Currie with no recourse but to carry on with the prosecution.  In so doing, Currie encountered no meaningful adversarial testing of his case centered upon the unusual aggravating circumstances only collaterally related to the victim's killing.

When asked in 2006 whether he thought Sallie would have agreed to a plea deal, Singleton said:  "I don't know.  I had very little contact with him.  I would hope that he would.  Anybody that was rational."  (Doc. 75-1, Resp't Ex. 85A at 121-22 (Tr. 67-68)). Of course, Singleton, as well as Johnson, had myriad opportunities to address Currie's desire to plea bargain in the hours and days after the district attorney expressed it.  But their inability even to raise this with petitioner reflected, in the aftermath of the forced Agreement, the total breakdown in the attorney/client relationship at that juncture.

Thus, in late 2003, petitioner was profoundly shocked to learn that on the eve of his retrial nearly three years earlier, his court-appointed lawyers had kept him from gaining the intercession of the court in his imploded attorney/client relationship and, rather than having gotten something in exchange for that forbearance, he had simply been betrayed, misled to think that he would have something of use at a crucial stage later on. Under those circumstances, petitioner was aggrieved to lose his longstanding counsel as he exited his direct appeals. (Doc. 42, at 5).

As chronicled in his Supplemental Petition, Sallie struggled to recover from his misfortune.  He sought the help of various attorneys with whom he had become acquainted over the years.  Many people attempted to help him secure counsel.  But his

flailing was fruitless. He gave his Southern Center lawyers every opportunity to mitigate the harm from their betrayal of him. For instance, petitioner wrote to Singleton in the winter of 2004 respectfully asking that he honor the Agreement. He corresponded with Singleton again in July 2004 worried about deadlines, whereupon the latter informed petitioner that "Brian Kammer, an attorney at the Resource Center . . . assured me that they are well aware of the relevant time deadlines." (Doc. 40-18). The Southern Center lawyers, despite having countless opportunities, never gave petitioner any information for him to channel his effort to protect his right to collateral review.

### iii.    Georgia Resource Center's Role in Pro Se State Habeas Petition

Beginning in the spring of 2004, petitioner entreated the Georgia Resource Center's lawyers to step in to take his case. After his efforts were ignored, he had his mother call that office in late August 2004 in his behalf, whereupon she received reckless misstatements about the circumstances of petitioner's post-conviction case, specifically, his federal statute of limitations period.[15]

By early October 2004, events in a death penalty case unrelated to petitioner's triggered a flurry of activity in Jackson. By mid-October, three nominally *pro se* state habeas corpus petitions had been filed for unrepresented inmates on Georgia's death row.

A lawyer from the Federal Defender's office in Atlanta had obtained a signature for Richard Sealey on October 12, 2004.[16] (Doc. 44-8). Kammer obtained signatures and

---

[15] Petitioner's mother's contemporaneously taken notes reflect that whoever fielded her call to the executive director at the time, Mr. Dunn, advised her that petitioner did not need to file anything until January 2005. No conceivable calculation of his statute of limitations could have permitted a view that filing in 2005 would have been timely. *See* Doc. 66, at 32-33; Doc. 45.

[16] A Clayton County Superior Court issued Sealey's baby warrant on October 4, 2004. Sealey's 90 days for filing a U.S. Supreme Court cert. petition had lapsed not long beforehand (he had no attorney and was not pursuing that review). Gretchen Stork, the abovementioned attorney from the Federal Defender, visited Sealey to have him sign a motion for a stay of execution and his *pro se* styled

filed on October 14, 2004, both a petition for Sallie (Doc. 44-10) and one for the previously mentioned Leeland Braley (Doc. 44-9), whose cert. petition had been denied on October 6, 2003, the same day that the U.S. Supreme Court denied Sallie's.

Petitioner would not be informed until early 2010 that his state habeas petition was filed a week *after* the conclusion of his *federal* habeas statute of limitations period in 2004. In fact, at the time of its filing, petitioner understood that that action had "stopped the statute of limitations." (Doc. 40-25).

Although filing the *pro se* styled state habeas petition commenced those proceedings, petitioner still had no attorney in his arcane and complex litigation. His petition was assigned to Hon. Albert B. Collier (Clayton County, Superior Court) and an initial status conference was set for February 1, 2005.[17] Since the office's inception in the 1980s after the initial post-*Gregg* spike in executions,[18] Georgia's scheme for the imposition of the death penalty has depended considerably upon the Georgia Resource Center.[19] On the heels of the office's above-mentioned collapse in the fall of 2004, the

---

petition. As set forth in the Supplemental Petition, it appears that the alarm in Sealey's case triggered the realization of the statute of limitations predicaments for Braley and petitioner. Doc. 66, at 36-40.

[17] A fortnight before then, the Atlanta Journal Constitution ran a story chronicling that seven men in Jackson on death row had concluded their direct appeals and now languished in post-conviction without legal representation. Petitioner, Leeland Braley and Richard Sealey were among those seven men.

[18] Promptly after *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726 (1972), wherein the Court issued its famous single-paragraph *per curiam* decision (and each of the nine justices also wrote their own opinion) ruling that the death sentences in two Georgia cases and in one Texas case constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution, thirty-five state legislatures amended their death penalty statutes to address the problem of untrammeled discretion. The resulting amended statutes fell into two basic categories: "guided discretion" and mandatory. By 1975, a variety of certiorari petitions had been filed in the U.S. Supreme Court from judgments of the courts of those states. In *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909 (1976), two three-justice pluralities combined to rule that the guided discretion variety, as manifested in Georgia's amended statutory scheme, was constitutional. The amended statute in *Gregg*, in substance, operates today.

[19] *See* Doc. 66, at 45-47.

organization persisted in trying to fulfill its various and great burdens, including that of "monitor of Georgia's post-conviction death penalty cases," as asserted in a letter from the organization's executive director, Tom Dunn, to the state habeas judge presiding over Braley's petition.[20]  Like Sallie, Braley was at that time not represented by the Resource Center because the office, grossly underfunded and understaffed, had no capacity to add cases to its overloaded docket.

### iv.  Petitioner's First State Habeas Court Conference, Without IRCP Counsel

In a December 5, 2004 letter to petitioner, Brian Kammer indicated that he would attend the conference before Judge Collier.  Petitioner was not clear from that letter whether Kammer "would participate in the hearing or 'just advise.'"  (Doc. 40-29).  Petitioner continued to pursue retention of an attorney for state habeas as his first conference neared.  (Doc. 40-29; *see also* Doc. 42, at 10).

On Friday, January 27, 2005, Kammer spoke with petitioner about his imminent appearance before his judge.  Petitioner told Kammer that he wanted to show the court the Agreement on Legal Representation that he had signed with the two Southern Center lawyers four years earlier on the eve of his retrial.  (Doc. 40-30; *see also* Doc. 42, at 10).  Petitioner wanted to point out to Judge Collier that the Agreement states that Johnson and Singleton agreed to represent him in "state and federal habeas," and ask the judge to call the two attorneys to court to explain why they were not representing him or had not at least found suitable lawyers to replace them. (Doc. 40-30).  Obviously, this alerted

---

[20] Thomas H. Dunn, in a December 11, 2004 letter to Hon. James L. Cline (Ocmulgee Judicial Circuit) wrote that "as monitor of Georgia's post-conviction death penalty cases," the Resource Center should receive service of all papers in Braley's case *even though it was not appearing as his counsel in those proceedings*.  (Doc. 44-11.)

Kammer to petitioner's focus on his trial counsel's conduct at a critical point of his prosecution and, prospectively, their obligations—legal and moral ones—to him in his current, desperate position. Kammer reached out to Palmer Singleton. (*See* Doc. 40-30).

On Monday, January 31, 2005, Kammer spoke to petitioner on the phone to explain that he had talked with Singleton. Singleton, petitioner was told, was in serious discussions with the King & Spalding firm and an attorney in New York. The next day, Sallie appeared before Judge Collier in the small courtroom at Jackson and Kammer attended on behalf of the Resource Center.[21] At the hearing, Kammer told the judge that petitioner had given him "permission to sort of talk on his behalf, to sort of update the Court on the status of our search for volunteer counsel." Kammer also told the court that he appeared in order to speak about "our ability, as well, to represent Mr. Sallie, if necessary." (Doc. 44-12, at 4). Kammer explained that "[r]ight now we are unable to take Mr. Sallie's case, but that is not going to be the case if we end up getting funding for our office during this winter's legislative session." (*Id.* at 4-5). Kammer further represented on the record, albeit on behalf of his organization rather than petitioner, that Singleton and Bright of the Southern Center had been looking for volunteer counsel and that Bright was "in serious talks with an attorney based in New York City who would work with attorneys at King and Spalding who could conceivably take Mr. Sallie's case. That is in the works." (*Id.* at 6). Kammer continued: "we hope to have a volunteer counsel secured within the next 30 to 45 days. And if that doesn't happen and if we get re-funded, we will take Mr. Sallie's case directly. And I will be the one responsible for his case at that point." (*Id.*).

---

[21] Doc. 44-12 is a copy of the Feb. 1, 2005 transcript of the state habeas hearing before Judge Collier.

Five days after the foregoing court conference, petitioner wrote Singleton to plead with him yet again to address his Agreement to represent him. (Doc. 42, at 10). A couple of weeks later, Singleton replied that he was still talking with a New York attorney who would work on petitioner's case if, and only if, he had help from a Georgia attorney. (*Id.*).

On March 1, 2005, the US. Supreme Court decided *Roper v. Simmons*, 543 U.S. 551 (2005), whereupon it became unconstitutional to subject to the death penalty individuals who were minors at the time of their crimes. This effectively resolved two of the Resource Center's cases and gave them more capacity. As a result, the office ultimately took on Braley's representation.[22]

Petitioner received an April 18, 2005 letter from the New York practitioner Singleton had pointed out previously. (Doc. 40-33). The lawyer stated that he had "agreed to represent" petitioner in state court. (*Id.*). He stated "there are several other people that [sic] will be assisting me, including lawyers from the Southern Center for Human Rights, and individual lawyers and law students here in New York City." (*Id.*). Thereafter, that attorney failed to return calls or mail from petitioner and also Kammer on behalf of the Resource Center. (*See* Doc. 42, at 11; Doc. 44-34; Doc. 40-35). He ignored scheduled court hearings. As quickly as he emerged, he faded away. (Doc. 40-35). The King & Spalding firm, which Singleton and Bright (through Kammer's various representations) had averred were seriously considering involvement in petitioner's post-conviction case, never contacted or, as far as petitioner was made aware, inquired any further about a role in the case. (Doc. 42, at 11).

---

[22] Later, lawyers in the Federal Defender Program in Atlanta represented Mr. Braley in federal habeas proceedings in the Northern District of Georgia.

##### v.    Resource Center Becomes Counsel, Further Suppresses Agreement on Legal Representation Evidence

Ultimately, as it had done for Braley, the Resource Center stepped in to represent petitioner.  However, shortly after doing so, petitioner's state habeas case was in crisis. (Doc. 42, at 1).  In late October 2005 (with an important motion due in November), Kammer informed petitioner that he would be leaving the Resource Center to take a job in Pennsylvania.[23]  (Doc. 42, at 11).

On October 26, 2005, anticipating the loss of legal representation yet again, petitioner lodged a grievance with the State Bar of Georgia against Singleton.[24] Petitioner's Grievance Report stated that Singleton abandoned him in state habeas despite the Agreement on Legal Representation.  Petitioner stated in his Grievance Report:

> Mr. Singleton feels it is in my best interest that he doesn't continue to represent me in state habeus [sic].  I guess, it's pretty much assumed in death penalty appeals to state habeus [sic], ineffective assistance of counsel is an issue that's frequently raised.  Since an attorney can't raise this issue on himself, someone else must do so.  []  It's this someone else, that bothers me.  My contract with Mr. Singleton specifically states representation in state habeus [sic].  However, Mr. Singleton has taken it upon himself to step-a-side [sic].  I feel in doing so, Mr. Singleton should have found effective representation to take his place.  And this replacement representation needed to be approved by all parties.

(Doc. 40-36, at 2).[25]

Petitioner's Grievance Report set forth for the State Bar the abandonment at the heart of his pursuit of collateral review of his judgment:

> I feel it's Mr. Singleton's responsibility to find effective representation in which [sic] to replace himself with.  His contract states, "representation

---

[23] Kammer's absence would be short lived.  He returned months later and eventually resumed his role in petitioner's case in state habeas.  As this Court is aware, he represented petitioner with Ms. Salchow in the present proceedings before his office needed to withdraw.

[24] It should be noted that Chris Johnson had moved to New Hampshire in 2001 and has thus been an inactive member of the Georgia bar.

[25] Copy obtained from case files of prior counsel, the Resource Center.

through all levels of appeals process." Yet he failed to notify me in advance of the possible conflict issue, "ineffective assistance of counsel." I feel Mr. Singleton has abandoned me in the middle of my appeal process. And has pawned off ineffective counsel (Mr. Kinigstein) for his replacement. Thus creating two issues of ineffective assistance of counsel.

(*Id.* at 5).

Petitioner further stated:

The appeal process has time frames which must be met. (statute of limitations) If the time frame is not met, I lost [sic] my appeal and possibly my life. Doesn't the bar have a rule against attorney's [sic] leaving their clients in the middle of the case? (If the attorney leaving causes harm to their client.) If this doesn't qualify, what does?

(*Id.*).

On November 1, 2005, Ms. Carmen R. Rafter, Grievance Counsel for the State Bar, wrote Singleton about the Grievance Report. (Doc. 40-36). On November 18, 2005, Singleton wrote a one-page response to the State Bar. (*Id.*). Singleton did not respond at all to the terms of the Agreement on Legal Representation, which he had drafted. Singleton spent the bulk of his response speaking of his personal misgivings regarding Georgia law: "I also know that our state supreme court has seen fit to rule that our laws and constitution do not require that counsel be made available to people without resources in post-conviction proceedings even when they have been sentenced to death. *See Gibson v. Turpin*, 513 S.E.2d 186 (Ga. 1999)." (*Id.*). Singleton went on to cite 1985 Georgia authority for the point that his role as Petitioner's trial and appellate counsel precluded him from serving as habeas counsel. Of course, Singleton and his co-counsel were patently aware of that law when they conceived of their terms for the Agreement and, in bad faith, disloyalty and dishonesty pressured their client to sign it hours before jury selection in his capital murder retrial.

The State Bar of Georgia wrote Petitioner on December 15, 2005 to convey that his grievance against Singleton was closed. (*Id.*). Ms. Rafter wrote: "Though you are obviously dissatisfied with matters related to your case, I do not see any evidence in the file to suggest that Mr. Singleton has acted unethically." (*Id.*). Petitioner wrote the State Bar again to urge it not to ignore the Agreement on Legal Representation and not to close the process. The process remained closed.

In consultations with the Resource Center lawyers, petitioner repeatedly raised the Agreement and the surrounding Sixth Amendment issues. In keeping with his pursuit of accountability from Singleton, he persistently raised his desire for these issues to be aired on collateral review. Consistently, the IRCP attorneys merely humored his preoccupation with the document. The implicated legal questions were politely dismissed.

When he filed his October 26, 2005 Grievance Report, petitioner was still completely unaware that he had a grave federal statute of limitations problem due to the failure to have filed the state petition by October 7, 2004.

Not only had Kammer and the Resource Center mislead him at the time they hastily assembled his skeleton state petition (precipitated by the Federal Defender Program's prompt handling of Richard Sealey's baby warrant), rushed it to Petitioner for his signature (October 13, 2004) and filed it (October 14, 2004). The Resource Center continued to keep Petitioner in the dark on this point while his case moved through state habeas proceedings.

During 2006, Thomas H. Dunn, the Resource Center's Executive Director at the time, took the leading role in Petitioner's state habeas proceedings. On August 9, 2006, Dunn deposed Palmer Singleton in petitioner's state habeas case. The chief purpose of

such a deposition, given Singleton's role in petitioner's representation, was to adduce evidence relating to ineffective assistance of trial counsel and appellate counsel.

Dunn asked Singleton no questions about the Agreement on Legal Representation. Singleton testified in various ways about not recalling "ever meeting the guy" or having "no recollection" of petitioner. (Doc. 75-1, Resp't Ex. 85A at 73 (Tr. 19)). The testimony, of course, focused on the general time of trial preparation, the 2001 retrial, and the immediately following appellate process. However, the testimony is striking in light of the *sui generis* Agreement on Legal Representation. Undersigned counsel have seen no reported case reflecting a remotely similar arrangement between counsel and client. Singleton's portrayals of his recollection of petitioner would be dubious even if Sallie had not lodged a lengthy Grievance Report against him that required the attorney to respond to the Georgia State Bar at the end of 2005. That process presumably would have sharpened the attorney's recollection of the former client.

In any event, Dunn asked no question about the grievance process or its underlying basis, which was due to trial counsel's conduct at the critical point in petitioner's prosecution. Dunn also deposed Chris Johnson in the state habeas proceedings. Again, no question was asked nor was any testimony given concerning the Agreement on Legal Representation.

The state habeas corpus hearing itself was held on April 19-20, 2007. Dunn called ten witnesses in the hearing, including Singleton and Johnson. Extensive testimony was given of the third verdict form and the opt-in to the life without parole sentencing option. (*See,e.g.*, Singleton's testimony: Doc. 73-20, Resp't Ex. 76A at 41). Again, there was no testimony sought nor given concerning the Agreement on Legal

Representation and its consequences for petitioner at the critical point in his prosecution, for his attorney/client relationship with trial counsel, nor for his representation during his appellate and collateral reviews.

Singleton testified about the success in getting the third sentencing option of life without the possibility of parole. (Doc. 73-20, Resp't Ex. 76A, at 41 (Tr. 41)). Singleton further testified about co-counsel discussions well in advance of the retrial regarding "why there hadn't been serious plea negotiations." He explained that he "was always told that [settlement] wasn't feasible, it couldn't happen without irreparably damaging our relationship to the client." (*Id.*). Singleton said that he was "shocked"—at the time of the retrial in 2001 and at the habeas hearing in 2007—with respect to counsel's failure to pursue with his client the plea bargain opportunity. He testified that, in light of petitioner's rational sentencing option decision, "there would be no reason why he wouldn't also take seriously plea negotiations and that we should have put much more emphasis on that than we did. I know I never spoke to him directly about it, ever." (*Id.*).

The State and petitioner filed their respective Post-Hearing Briefs in May 2008. Judge Collier requested proposed orders from the two sides, which they filed with the habeas court on December 15, 2008. On June 22, 2009, Judge Collier signed the seventy-four page Proposed Order submitted by the Attorney General's office. (Doc. 84-6, Resp't Ex. 153). There is no indication that the state habeas court examined that document at all prior to signing it, given, for instance, that the court simply entered it as it was delivered, titled "<u>PROPOSED ORDER</u>" and with the Certificate of Service signed by Assistant Attorney General Emily R. Roselli still attached. (*Id.* at 74). The state habeas court made no revisions concerning errors, omission or alteration of any substance

in the State's Proposed Order.  Not a single comma was added or removed from the State's submission.

When Dunn resigned and retired from the practice of law in 2009, Kammer resumed the primary responsibility for Petitioner's case.

On August 26, 2009, Mr. Sallie filed an Application for Certificate of Probable Cause to appeal that denial.  Leeland Braley's Application for Certificate of Probable Cause was denied shortly after Sallie's was filed with the Supreme Court of Georgia. Braley's counsel—who, by then, were staff attorneys of the Federal Defender Program's Atlanta office—promptly filed a federal habeas petition in the Newnan Division of the Northern District of Georgia.[26]  Five days later, on October 6, 2009, the State filed its motion to dismiss the petition as untimely.  By December 2, 2009, Braley's counsel had moved to withdraw due to a conflict of interest.  Prior to a ruling on their motion to withdraw, Braley's counsel filed an amended petition on December 23, 2009.  On New Year's Day 2010, Leeland Braley was found dead in his cell in Jackson.[27]  He had hanged himself.

In the weeks that followed Braley's suicide, Kammer visited Jackson to reveal to petitioner—after more than five years since the hurried filings of Braley and Sallie's state petitions in 2004—that Mr. Sallie faced the identical statute of limitations problem that afflicted Braley's case and prompted the State's motion to dismiss Braley's petition as untimely.  (Doc. 42, at 13).  As petitioner has put it:  "In all the years of struggling to get a lawyer and to understand what was happening in my case, I never expected to hear this news."  (*Id.*).

---

[26] *Braley v. Upton*, Index No. 3:09-cv-00109-JTC (Doc. 1).

[27] *Braley v. Upton*, Index No. 3:09-cv-00109-JTC (Doc. 16)

### E.   FEDERAL HABEAS CORPUS APPLICATION, TIMELINESS AND EQUITABLE TOLLING LITIGATION

On January 14, 2011, the Supreme Court of Georgia issue its one sentence order denying Mr. Sallie's Application for Certificate of Probable Cause to appeal the denial of his state habeas petition by Judge Collier's signing of a completely unaltered "PROPOSED ORDER" filed by the State.  The related remittitur was issued to the trial court on February 7, 2011.

Petitioner's initial counsel in this Court were his lawyers from the Resource Center, Kammer and Salchow.  His initial federal habeas petition was filed on February 28, 2011.  The next day, the State filed its motion to dismiss for untimeliness.  On March 18, 2011, petitioner's prior counsel filed a response to that motion to dismiss and a corrected initial petition.  The State filed its reply on April 1, 2011 and the Court heard oral argument on the motion on May 4, 2011.  On June 9, 2011, the Court published its order ruling, *inter alia*, that petitioner (a) did not timely file his petition but (b) the petition was not subject to dismissal because further development of the record was necessary to resolve petitioner's claim that he is entitled to equitable tolling.  (Doc. 21).  On June 17, 2011, the Court granted prior counsel from the Resource Center's motion to withdraw due to their conflict preventing their litigation of petitioner's equitable tolling claims.  A month earlier, on May 18, 2011, replacement counsel had appeared in the case on behalf of petitioner following the Court's instruction to prior counsel at the May 4, 2011 hearing that new counsel for petitioner would be needed due to the foregoing determination of the limitations period issues.

**III.  PROCEDURAL DEFAULT & CAUSE AND PREJUDICE ANALYSIS
RELEVANT TO CLAIMS FOR RELIEF PURSUANT TO 28 U.S.C. § 2254**

The following section provides necessary background for the subsequent legal

analyses concerning (a) the initial-review collateral proceedings ("IRCP") showing of

cause and prejudice to excuse any procedural default in connection to his new Sixth

Amendment claims (*infra* at __-___), and (b) petitioner's request for an evidentiary

hearing in connection with those claims (*infra* at ___-___).

**A.  COMITY INFORMS EXHAUSTION DOCTRINE AND ITS
PROCEDURAL DEFAULT COROLLARY**

The comity doctrine has long been considered "a principle controlling all habeas

corpus petitions to the federal courts."  *Ex parte Hawk*, 321 U.S. 114, 117 (1944) (cited

by Congress in 1948 codification of the exhaustion doctrine via 28 U.S.C. § 2254).

Comity contemplates that federal courts should only rarely interfere with the

administration of justice in state courts in which the petitioner had not exhausted his state

remedies.  *Id.* at 117-118 (discussing *United States ex rel. Kennedy v. Tyler*, 269 U.S. 13,

17-19 (1925) ("In the regular and ordinary course of procedure, the power of the highest

state court in respect of [a petition for habeas writ] should first be exhausted.")).

However, relief from the federal courts is never barred where state remedies fail to

"afford a full and fair adjudication of the federal contentions raised."  *Id.* at 118.

"Because 'it would be unseemly in our dual system of government for a federal

district court to upset a state court conviction without an opportunity to the state courts to

correct a constitutional violation,' federal courts apply the doctrine of comity."  *Rose v.

Lundy*, 455 U.S. 509, 518-519 (1982) (quoting *Darr v. Burford*, 399 U.S. 200, 204

(1950)).  Except in unusual circumstances, state remedies must be exhausted prior to

seeking constitutional relief from a federal court.  *Id.* (citing *Ex rel. Kennedy*, at 17-19).

*Lundy* held, again based on interests of comity, "that federal courts may not adjudicate

mixed petitions for habeas corpus, that is, petitions containing both exhausted and

unexhausted claims."  *Rhines v. Weber*, 544 U.S. 269, 273 (2005).  However, when the

*Lundy* Court articulated the total exhaustion requirement, there was no statute of

limitations applicable to seeking the Great Writ in federal court, thus the dismissal

without prejudice of a mixed petition was, at that time, not likely to harm the petitioner

because he would be able to return unimpeded to federal court upon exhausting his

claims in the state proceedings.  *Id.* at 274.

In *Rhines*, the Court applied *Lundy* to the contemporary habeas landscape

changed by Congress's enactment of the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA").  544 U.S. at 272.  Given AEDPA's imposition of a one-year

limitations period pursuant to amended 28 U.S.C. § 2244(d)(1), the Court confronted the

problem of a mixed petition and the capacity of federal courts to stay and abey such

applications in order to allow a petitioner to return to state court—when such return is

permitted by the state procedural law—in order to present his unexhausted claims.  *Id.* at

271.  Where the petitioner has good cause for not previously exhausting such claims, the

federal procedure should accommodate the petitioner in returning to state court.  *Id.* at

277-278.

A vital "corollary" to the foregoing exhaustion requirement is "the general

principle that federal courts will not disturb state court judgments based on adequate and

independent state law procedural grounds."  *Dretke v. Haley*, 541 U.S. 386 (2004).  "The

procedural default doctrine . . . 'refers to a complex and evolving body of equitable

principles informed and controlled by historical usage, statutory developments, and judicial decisions.'" *Id.* (quoting *McCleskey v. Zant*, 499 U.S. 467, 489 (1991)). However, "the doctrine under which state procedural defaults are held to constitute an adequate and independent state law ground barring direct Supreme Court review is not to be extended to limit the power granted the federal courts under the federal habeas statute." *Fay v. Noia*, 372 U.S. 391, 399 (1963), *construed in Dretke*, 541 U.S. at 393.

## B.   CAUSE AND PREJUDICE PROVIDES EQUITABLE EXCEPTION TO PROCEDURAL DEFAULT

A longstanding "equitable exception" to this state law procedural bar to federal review exists for any petitioner who can demonstrate "cause and prejudice" for such a default. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977) (construing and overruling in part *Fay*, 372 U.S. 391 (explaining that cause and prejudice was narrower than the "knowing and deliberate waiver" rule in *Fay* ). When state law forecloses a return to state court for the purpose of exhausting a claim, merits review in federal court may still be obtained, despite a procedural default, upon the petitioner's demonstration of "cause and prejudice." *Id.* (construing *Francis v. Henderson*, 425 U.S. 536 (1976)). Under *Sykes*, the "cause and prejudice" showing is generally available to "petitioners seeking federal habeas relief on constitutional claims defaulted in state court." *Amadeo v. Zant*, 486 U.S. 214, 221 (1988). *Sykes* left "open for resolution in future decisions the precise definition of the 'cause'-and-'prejudice' standard." *Sykes*, 433 U.S. at 87.

The cause and prejudice standard gradually took on specific applications. For instance, counsel's "failure to raise a constitutional issue reasonably unknown to him is one situation in which the requirement is met." *Reed v. Ross*, 468 U.S. 1, 13-14 (1984). A showing "that some objective factor external to the defense impeded counsel's efforts

to comply" with state procedural strictures concerning pleading claims on direct appeal also falls within the standard. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).[28] Thus, ineffective assistance of counsel in failing to raise a claim is clearly "cause" under *Sykes*. *Id.*

The "prejudice" element of the *Sykes* standard has not received "precise content." *United States v. Farady*, 456 U.S. 152, 168 (1982). However, it is generally understood to mean that the given error worked to the petitioner's "actual and substantial disadvantage." *Carrier*, 477 U.S. at 488 (quoting *Farady* , 456 U.S. at 168.)

Pointing to the "external" aspect of the application of cause and prejudice in *Carrier*, *Coleman v. Thompson*, 501 U.S. 722 (1991), established that error that constitutes ineffective assistance of counsel because it violates the petitioner's right to counsel "must be seen as an external factor" because "the Sixth Amendment itself requires that responsibility for the default be imputed to the State." *Id.* at 753-754. *Coleman* contrasted this situation with "those circumstances where the State has no responsibility to ensure that the petitioner was represented by competent counsel." *Id.* at 754. Because an attorney is the agent of the client, *Coleman* provided that when the State is not constitutionally obligated to ensure that the petitioner has an attorney, "all attorney errors made in the course of the representation" inure to the petitioner rather than the State. *Id.*

---

[28] In connection to the failure to develop material facts in state court, *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), employed the cause and prejudice standard to entitle diligent prisoners to federal evidentiary hearings. It reasoned that imputing a diligence standard "will appropriately accommodate concerns of finality, comity, judicial economy, and channeling the resolution of claims into the most appropriate forum." *Id.* at 8. In *(Michael) Williams v. Taylor*, 529 U.S. 420 (2000), this diligence standard would be relied on heavily in the Court's construal of the availability of an evidentiary hearing pursuant to § 2254(e)(2), as amended by AEDPA. *Keeney* supplied the definition of "failed" in the opening clause of the amended § 2254(e)(2) as "requir[ing] lack of diligence or some other fault." *Id.* at 432-433 (recognizing codification of diligence standard from *Keeney* and also its general supersedence by AEDPA).

*Coleman* has been most widely relied on for its recognition of the absence of a right to counsel in state collateral proceedings. *Id.* (construing *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and *Murray v. Giarratano*, 492 U.S. 1 (1989)). However, *Coleman's* holding is more limited than the sweep of this postulate. The actual question in *Coleman* (answered in the negative), regarded "whether Coleman had a constitutional right to counsel *on appeal* from a state habeas trial court judgment." 501 U.S. at 755 (emphasis added).[29]

*Douglas v. California*, 372 U.S. 353 (1963), which established the right of any indigent criminal defendant to court-appointed counsel in his first appeal from a state court judgment, had been in tension with the reasoning in *Coleman*, which provided that the indigent criminal defendant lacks such a right to counsel in state post-conviction, even "where state collateral review is the first place a prisoner can present a challenge to his conviction." *Id.* For the past two decades, it had been difficult to reconcile *Coleman* and *Douglas* on this discrete point.

## C. INITIAL-REVIEW COLLATERAL PROCEEDINGS INEFFECTIVENESS MAY PROVIDE CAUSE FOR DEFAULTED TRIAL-COUNSEL-INEFFECTIVENESS CLAIMS

The March 20, 2012 opinion in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) (7-2 decision) (Kennedy, J.), speaks to the tension between *Coleman* and *Douglas*:

> *Coleman* had suggested, though without holding, that the Constitution may require States to provide counsel in initial-review collateral proceedings because 'in [these] cases . . . state collateral review is the first place a prisoner can present a challenge to his conviction.' *Id.* at 755. As *Coleman* noted, this makes the initial-review collateral proceeding a prisoner's 'one and only appeal' as to an ineffective-assistance claim, *id.*,

---

[29] In any case, *Coleman* was relied on recently for the point that state post-conviction counsel's negligence does not qualify as "cause" to excuse a procedural default during state collateral review. *Maples v. Thomas*, 132 S. Ct. 912, 914 (2012).

at 756 (emphasis deleted; internal quotation marks omitted), and this may justify an exception to the constitutional rule that there is no right to counsel in collateral proceedings.  *See id.*, at 755."

*Martinez*, 132 S. Ct. at 1315 (citing *Douglas*, 372 U.S. at 357).

However, the "equitable ruling" submitted in *Martinez* does expand the foregoing *Sykes* cause and prejudice doctrine significantly.  *Martinez* expressly modifies "the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default."  *Id.* at 1315.  *Martinez* then sets forth an exception to *Coleman*: "inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."  *Id.*

*Martinez* recognizes that there are "a variety of systems for appointing counsel in initial-review collateral proceedings.  And it permits a State to elect between appointing counsel in initial-review collateral proceedings or not asserting a procedural default and raising a defense on the merits in federal habeas proceedings."  *Id.* at 1319-1320.  By extending the cause and prejudice doctrine to the IRCP stage, *Martinez* thus "allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted."  *Id.* at 1320.

### i.    *Tandem Circumstances for IRCP Cause*

*Martinez* enunciates two circumstances in the IRCP context in which a petitioner may establish cause for a procedural default based on the absence of counsel or, where appointed, counsel's deficient performance (hereinafter, "IRCP Cause"):  "The first is where the state court did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial."  It should be noted that in the normal death

penalty context, such a scenario would only occur via an incomprehensible chain of errors and oversights, as virtually every death penalty state has some procedural framework for the provision of post-conviction counsel for inmates sentenced to death. *See, e.g.*, Ariz. Rule Crim. Proc. 32.4(c)(2) (2011) (collateral review appointment provided for substantial IAC claims, not limited to death penalty cases), *cited, among others, in Martinez*, 132 S. Ct. at 1319. Georgia, on the other hand, is singular in its insistence on denying any right to representation in the collateral review of a state judgment imposing a death sentence. *See e.g.*, Am. Bar Ass'n, *Evaluating Fairness and Accuracy in State Death Penalty Systems: The Georgia Death Penalty Assessment Report*, (Jan. 2005) 196-97.[30]

    *Martinez's* second circumstance in the IRCP context for establishing cause for a procedural default covers when the state had appointed counsel for the initial-review collateral proceeding and that attorney "was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984)." *Id.* at 1318.[31]

    Thus, under *Martinez*, the petitioner in federal court (whether under a death sentence or one less severe), must make the foregoing showing that either an attorney was simply not appointed or an appointed attorney performed deficiently in his IRCP in failing to raise a trial-ineffectiveness claim.

---

[30] http://www.americanbar.org/content/dam/aba/migrated/moratorium/assessmentproject/georgia/report.auth checkdam.pdf. It should be noted that Alabama's court's customarily do not employ statutory discretion to appoint counsel pursuant to Ala. R. Crim. P. Rule 32.7(c), which, in the text, provides for appointment of counsel if, *inter alia*, "it appears that counsel is necessary to assert or protect the rights of the petitioner."

[31] The Court uses the term "appointed counsel" and thus raises the question, in light of the first circumstance set forth above, of whether the first of Martinez's IRCP Cause circumstances applies to trial-ineffectiveness claims by a capital habeas petitioner who may have obtained volunteer legal representation at some point in his IRCP.

### ii. *Substantial Claim Test for Trial-Ineffectiveness Claims*

Once one of those predicates for IRCP Cause is established, then the underlying ineffective-assistance-of-trial-counsel claim must be assessed. *Martinez* provides that a petitioner must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that *the prisoner must demonstrate that the claim has some merit*. Cf. *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue)." *Id.* at 1318-1319 (emphasis added).

The issuance of a certificate of appealability from a district court's final order disposing of a habeas corpus proceeding is governed by 28 U.S.C. § 2253(c). In ruling on an application, the "court of appeal limits its examination to a threshold inquiry into the underlying merit of his claims." *Miller-El*, 537 U.S. at 327 (citing *Slack v. McDaniel*, 529 U.S. 473, 481 (2000)). As such, a prisoner need only demonstrate "a substantial showing of the denial of a constitutional right." § 2253(c)(2). This "substantial showing" standard, as explained in *Slack*, 529 U.S. 473, is met by establishing "that jurists of reason could disagree with the district court's resolution or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327 (citing *Slack*, 429 U.S. at 484); *see also Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack* , 429 U.S. at 484 ("petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong")).

## IV. INITIAL-REVIEW COLLATERAL PROCEEDINGS' CAUSE TO EXCUSE DEFAULT OF NEW SIXTH AMENDMENT CLAIMS

The briefing of petitioner's two new claims of violations of the Assistance of Counsel Clause of the Sixth Amendment are set forth after the following discussion of

petitioner's IRCP Cause[32] to excuse their related procedural default. This discussion builds on the prior analysis of the procedural default corollary to the exhaustion doctrine and, crucially, the cause and prejudice principles that have developed gradually within that larger doctrine chiefly through the *Wainwright v. Sykes* line of cases. The present section applies the manner of cause and prejudice established in *Martinez v. Ryan* to the specific violations of petitioner's rights by the conduct and performance of his court-appointed trial counsel.

As set forth below, petitioner's IRCP Cause analysis emanates from (a) his lack of counsel at the commencement and for much of the first year of his state habeas corpus litigation, and (b) the implicated ineffective assistance of his volunteer counsel, lawyers for the Georgia Resource Center, throughout the balance of his state collateral review proceedings in which, of course, no attorney was ever appointed to represent him.

An important distinction between the two new Sixth Amendment claims must be noted at this point. Respondent has essentially addressed the first new claim, which is the denial of the assistance of counsel in connection with petitioner's court-appointed attorneys' conduct and performance concerning the execution of the Agreement on Legal Representation. Respondent addressed the gist of this claim in its Answer-Response, pleading that it was unexhausted and thus "should be treated as procedurally defaulted" because "such claim would be found to be 'successive' and thus procedurally defaulted pursuant to O.C.G.A. § 9-14-51." (Doc. 87, at 11). As set forth herein, petitioner's denial of the assistance of counsel claim relates to the execution of the Agreement *and* the immediately following conduct of court-appointed counsel in the critical stage of

---

[32] Defined, *supra* at 39, as the initial-review collateral proceedings context in which a petitioner may establish, based on the absence of counsel or, where appointed, counsel's deficient performance, cause for a procedural default of a trial-counsel-ineffectiveness claim.

petitioner's proceedings. The present briefing addresses the respondent's current procedural default pleading. Any further briefing concerning exhaustion, procedural default, cause and prejudice or other considerations emanating from the respondent's scheduled response shall be addressed in petitioner's reply.

The second new claim is due to trial-counsel-ineffectiveness in connection to the ill-fated plea negotiation. A basic statement of this claim was advanced in the state collateral review proceedings and reprised within the initial petition in this Court. Respondent has asserted in its Answer-Response that the claim that trial counsel "failed to adequately take steps to negotiate a plea agreement with the district attorney after the district attorney broached the subject and offered to negotiate," as it was phrased in the initial petition (Doc. 9, at 10), is exhausted and was adjudicated on the merits in state court. (Doc. 87, at 23). As such, respondent has found that exhausted claim "properly before this Court for review." (Doc. 87, at 20).

The new evidence which has been proffered to the Court in connection with the Supplemental Petition and the present submission, coupled with the evidence that is reasonably anticipated to result from a hearing pursuant to § 2254(e)(2), has transformed that exhausted claim. *See Pinholster*, 131 S. Ct. at 1401, n. 10.[33] This brief sets forth the evidentiary bases for the transformation of that trial-counsel-ineffectiveness claim from an exhausted one to a new claim. *See, e.g., Fairchild v. Workman*, 579 F.3d 1134, 1152 (10th Cir. 2009); *Demart v. Price*, 130 .3d 922, 938 (10th Cir. 1997). The State is on notice of the underlying facts, posited in the Supplemental Petition, that supply the core basis for the transformation. However, the nature of the pleading of the claims in the

---

[33] The footnote states: "Though we do not decide where to draw the line between new claims and claims adjudicated on the merits . . . Justice Sotomayor's hypothetical involving new evidence of withheld exculpatory witness statements, see *post*, at 1417-1418, may well present a new claim."

Initial Petition (Doc. 9) and the Amended Petition (Doc. 66) is such that petitioner

anticipates that the respondent may now choose to address the transformed claim as

exhausted and defaulted (pursuant to O.C.G.A. § 9-14-51), in keeping with respondent's

standard position in the Answer-Response. Any further briefing concerning exhaustion,

procedural default, cause and prejudice or other considerations emanating from the

respondent's scheduled response also shall be addressed in petitioner's reply.

Before turning to the factual background and application of the IRCP Cause

analysis concerning these new claims, it is necessary to discuss the transformation of the

claim concerning trial-counsel-ineffectiveness regarding plea bargain negotiation. The

discussion is best placed here, immediately prior to the application of the

*Martinez/Strickland/Miller-El* standard, so that that analysis of IRCP counsel's

performance can be connected to what trial counsel *actually* did to violate petitioner's

rights and the nature of the omission by IRCP counsel in failing to bring those violations

to light.

A.      TRANSFORMATION OF THE IAC PLEA BARGAINING CLAIM BASED
        ON FACTS NEVER AIRED IN STATE COURT

Petitioner was deprived of his Sixth Amendment right to the assistance of counsel

because of egregious attorney misconduct and his court-appointed counsel's breach of

their fiduciary duty to him. In addition to the pure *denial* of assistance of counsel, as

explained further below, the performance of counsel in connection with the district

attorney's effort to plea bargain provides a discrete claim for relief. The following

discussion shows that the exhausted claim is transformed by the new facts that had been

effectively suppressed by counsels during petitioner's direct and collateral review in the

state courts.

The basic facts of the claim, of course, have been litigated and, in their own right, show counsel's deficiency. Specifically, trial counsel failed to explore—even to *entertain* exploring—pleading to a sentence of life without parole when the prosecution tried to initiate that undertaking on the eve of jury selection. Further, Sallie's trial counsel failed simply to tell him that the district attorney wanted to work to resolve the case without putting him on trial. Instead, trial counsel unilaterally foreclosed any undertaking to achieve a plea bargain, Singleton chose to inform the district attorney that his client "would not plead to life without parole." (Doc. 75-1, Resp't Ex. 85A at 96-97 (Tr. 42-43)). These acts comprising counsel's deficient performance fell well below the *Strickland* standard. *Strickland v. Washington*, 466 U.S. 686 (1984). To petitioner's great detriment, the actual context in which this performance transpired was never presented in state court.

Sallie's court-appointed trial attorneys, especially the more senior lawyer, Singleton, had determined that their chance of success after having changed the venue of the case from the hamlet of Alma to the progressively minded Warner Robins, was high: "it was a very winnable case," "it was more than winnable." (Doc. 75-1, Resp't Ex. 85A at 118 (Tr. 64)). As such, a valuable hedge of their bet on winning a life sentence was to obtain a third sentencing option for life without the possibility of parole.

At that juncture, on the eve of jury selection, defense counsel had no reason to be confident that Currie would restore the option. From Singleton's perspective, it was apparently worth the trouble with his client. In any case, judging from the facts surrounding the Agreement on Legal Representation, there appears to have been a

perceived benefit to the defense team to be gotten from forcefully disabusing the client of his notions that he should have a say in the basic choices concerning his case.

During the years of preparation between the first judgment's reversal in May 1998 and the lead up to jury selection in February 2001, Singleton had been largely absent from the work in virtually all senses, and most certainly in the physical one. He joined Johnson for one of the last client contacts before pre-trial motions and the start of jury selection. Singleton forced the issue of the LWOP sentencing option. Sallie protested, given his deep concern about the lawyers' disregard of putting the State's case to proper testing, especially regarding its key witnesses. He felt cornered and stated he felt he had no option but to request the judge to order counsel to honor his basic choices. Singleton, in no uncertain terms, explained that Sallie would get in line because going to the judge would make failure a certainty. It was too late to permit the court-appointed attorneys to withdraw, it was explained, and they simply were not prepared to put on a defense like he wanted. Sallie's fears were thus confirmed, and he became convinced he was heading to defeat again. Singleton, with the complicity of Johnson (and perhaps even the executive director of their organization), framed a bad faith transaction to defraud their client of the little remaining autonomy he possessed.

On the heels of this paramount act of dishonesty and disloyalty to the client,[34] Singleton went to the prosecutor to try to restore the offer that was made years prior

---

[34] *Cf. Maples v. Thomas*, 132 S. Ct. 912 (2012), where the defense attorneys left their law firm and failed to arrange for replacement measures and failed to alert the client (and the court) to their inability to continue as counsel); *Holland v. Florida*, 130 S. Ct. 2549 (2010), where the deficient attorney had been derelict in his communications and incompetent in advice and other conduct (on remand petition granted on grounds of violation of right to self-representation at trial per *Faretta v. California*, 422 U.S. 806 (1975); ___ F.Supp.2d ___, No. 1:06-cv-20182, 2012 WL 1193294 (S.D.Fla., Apr. 3, 2012)). At work in Sallie's representation is a more disquieting misconduct, it is submitted, than the failings reflected in the respective cases of Messrs. Holland and Maples.

(when the case first returned to Bacon County for retrial upon reversal), to include a third verdict form.  Singleton, it should be assumed, did not take it as a given at that late stage, that Currie would be amenable to softening the prosecution's position, especially when it had been rebuked before.  For one thing, by then, the district attorney's office had done all of the preparation necessary for a complex capital murder case and would be less likely to step away from that than if a settlement were worked out before all of the cost and effort.  However, from Currie's perspective, the Houston County jury was unlikely to give a death sentence, especially given the intra-family nature of the case.  (Doc. 75-1, Resp't Ex. 46-47 (Tr. 45-46)).  Beyond agreeing to the third sentencing option, Currie was amenable to settling the case and avoiding trial. (*Id.*).  This appears to have caught Singleton unawares.  Singleton may have perceived it as a sign that the district attorney felt the State's prospects were weak.  The "very winnable" nature of this case may have dictated the choice to disregard Currie's offer.  Having achieved the crucial venue change and given the particulars of the case, including petitioner's army service and lack of a violent or criminal history, the case appeared, from Singleton's view (having tried roughly a dozen capital cases and been involved in scores of capital cases in post-conviction over his twenty years of experience at that point), to be a very strong one for a mere life sentence.

But, on the facts that have come to light for the first time in this Court, it is also apparent that Singleton's animus developed toward his own client in the hours immediately before his contact with Currie, may have caused the total breakdown in his

performance of the basic duties with respect to the critical stage of the case.[35]  As reflected in the Statement of the Case, *supra*, petitioner, after the humiliation of having Singleton enter the frame from nowhere within view during the entire three years of case preparation and simply force feed how the trial was going to go, crushed any optimism he had harbored about its outcome.  Petitioner simply would not have signed on to a document such as the Agreement on Legal Representation[36] in which the ostensible benefit—ostensible from the view of a prisoner with no legal training—was the guarantee of legal representation during collateral review in a future fight to overturn an adverse judgment.

Singleton's relationship with Sallie had transformed from negligible (since 1995, Johnson had always maintained the working relationship with the client) to adversarial, acrimonious, and hostile.  After the Agreement/third verdict form negotiations, Singleton did not speak to him.  Further, on the heels of these confrontations with Sallie, engaging him again in connection with plea bargaining would have made counsel susceptible to reigniting the crisis.  At that point, the client could have exposed counsel to damaging disclosures to the trial court and thereby the prosecutor.

This would have been harmful to counsel not only in petitioner's case, but also more generally.  Given these circumstances, and the fact that, from the perspective of his twenty years of defending capital cases, he felt he had a winner on his hands, he jettisoned his basic obligations to the accused.

---

[35] *See infra*, at 63, regarding the breach of professional norms with respect to communication concerning plea negotiations (manifested in ABA Standards for Criminal Justice, Pleas of Guilty 14—3.2(a) (3d ed. 1999))

[36] The resulting Agreement stated that Johnson and Singleton would not only represent petitioner in his direct appeals but also "through state and federal habeas," and even "for the rest of [petitioner's] life," "if he so desire[d]."  (Doc. 40-1).

A final factor weighs in this analysis of these violations. Singleton had known "Mr. Currie for a long time" prior to the retrial. Doc. 75-1, Resp't Ex. 85A at 69 (Tr. 25)). In Singleton's capital defense and capital habeas practice with the Southern Center (and, currently, in private practice), he has necessarily relied, in critical and varied ways, upon personal credibility with the prosecutors throughout the state. His efficacy (and his prestige) was necessarily a function, in significant part, of the perception of his command of his clients and their cases.

Given his professional circumstances, it was, important to Singleton to be seen as someone who is able to deliver an outcome when negotiating with the State. If he began to plea bargain in earnest, he would have exposed his political capital with Currie, and thereby also in that community statewide, to considerable risk. The distrust and rancor embodying Singleton's client relationship must have heavily affected his assessment of the situation at the precise moment when Currie presented the desire to negotiate. With the events of the Agreement on Legal Representation in view, the apparent conflict between Singleton's professional interests vis-à-vis the prosecutors' community and the plain interests of his client at that moment appears to have at least contributed to his breach of professional responsibility to Sallie in foreclosing any plea negotiation with a very willing D.A.

In sum, this confluence of extraordinary and destructive circumstances violated petitioner's rights pursuant to the Assistance of Counsel Clause of the Sixth Amendment.

To recognize the transformation of the exhausted claim due to the new evidence, the foregoing must be contrasted with the prior theory of the plea bargaining claim, which unfolds as follows:

According to IRCP counsel's post-hearing briefing, Singleton, "who had less than direct interaction with Mr. Sallie, . . . assumed that the client/attorney relationship would have been negatively affected had counsel relayed the District Attorney's offer to negotiate." (Doc. 83-22, Ex. 146A at 47).

According to Singleton's state habeas hearing testimony:

> I had spoken with co-counsel [Johnson] before the sentencing form issue ever surfaced about why there hadn't been serious plea negotiations, that this case needed to be settled, and was always told that that wasn't feasible, it couldn't happen without irreparably damaging our relationship to the client. But what shocked me then and now is that when Mr. Sallie had to work through and make a decision about whether to opt in and permit the jury to consider all three sentencing options, he did the reasonable, rational thing and wanted all three verdict forms to go to the jury.

(Doc. 73-20, Resp't Ex. 76A at 41 (Tr. 41)).

In sum, the old theory amounts to a depiction of well-intentioned Southern Center attorneys who could not conceive of a way to address the decisive aspect of their client's fate. This was due to their inability to discuss sentencing in the context of his capital murder trial. As a result of this simple ineptitude (however implausible), no plea bargaining took place and no offer emerged from the district attorney's desire to settle the case.

After discovering these Agreement-related facts, what remains is the unshakable sense that the attorney/client relationship went very terribly wrong. And this catastrophic failure occurred at the worst time for the accused. With the benefit of the Agreement-related facts, there is no credible argument that Singleton was performing anywhere near the baseline for constitutionally adequate counsel. He defrauded his client of the last shred of control that Sallie had going into a trial where he faced a death sentence. Singleton had lied to his client to get his way with him, demoralizing him in the process.

This is a case that, in the prosecution's estimation certainly, should have settled. Trial counsel prevented petitioner from that outcome perhaps because they thought it was "winnable." Conduct of this variety is not contemplated by the Assistance of Counsel Clause.

Petitioner's case history in state habeas court documents the sort of unthinkable series of depredations that a makeshift death penalty system is prone to cause. This very kind of breakdown is an extreme instance of the concern over safeguarding prisoner's rights to counsel that appears to have animated the *Martinez* Court (in a non-capital case), in extending the equitable "cause and prejudice" doctrine of *Sykes* to circumstances where prisoners either do not obtain legal representation in their initial collateral review or, when an inmate obtains representation by court appointment (or, perhaps, from volunteer counsel), and that counsel does not provide effective assistance. *Martinez,* 132 S. Ct. 1309 (2012). The equitable ruling in *Martinez*, notwithstanding the exhaustion doctrine discussed *supra* (at 34-36), thus "allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Id.* at 1320.

**B.  FACTUAL BASES FOR IRCP CAUSE RELATING TO NEW SIXTH AMENDMENT CLAIMS OF (1) TRIAL-COUNSEL-INEFFECTIVENESS REGARDING PLEA NEGOTIATION AND (2) DENIAL OF THE ASSISTANCE OF COUNSEL**

As set forth below, petitioner has clear cause and prejudice because of the status and the quality of his representation during his initial-review collateral proceedings in state court. For years and at critical junctures upon conclusion of his direct review, he had no counsel; when he was represented by volunteer counsel during the latter part of his collateral review, counsel was grossly deficient on certain, vital elements of his case.

### i. Petitioner's IRCP Status

Petitioner's court-appointed trial counsel carried on as his appellate counsel through his direct appeal. Since the landmark decision in *Strickland v. Washington*, 466 U.S. 668 (1984), Georgia law has recognized that counsel cannot litigate on direct appeal any claim of ineffective assistance of trial counsel because such a claim emanates from the attorney's own performance. *Gibson v. Turpin*, 270 Ga. 855, 868, 513 S.E.2d 186, 196 (1999) (citing *Castell*, 254 Ga. at 558, 331 S.E.2d at 530). As a result, the prisoner with these circumstances may not first attack his state court judgment on ineffective assistance of counsel grounds until his state habeas corpus litigation. *White v. Kelso*, 261 Ga. 32, 401 S.E.2d 733 (1991) (citing *Johnson v. State*, 259 Ga. 428 (1989) ("In *Johnson* . . . we held that the [ineffective assistance] claim *may* be raised for the first time in the direct appeal if the direct appeal marks the first appearance of new counsel. The rule is consistent: New counsel must raise the ineffectiveness of previous counsel at the first possible stage of post-conviction review." (emphasis added)).

Thus, pursuant to Georgia law, petitioner's state habeas court provided the first forum where he was permitted to raise trial-counsel-ineffectiveness claims. O.C.G.A. § 9-14-41. *Martinez v. Ryan*, coins the term "initial-review collateral proceeding" to stand-in for "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *Martinez*, 132 S. Ct. 1309, 1313 (2012) (quoting *Coleman v. Thompson*, 501 U.S. 722, 755 (1991)).[37]

As set forth *supra*, at 39-40, the analysis of IRCP Cause starts from the identification of one of two basic circumstances. *Martinez*, 132 S. Ct. at 1318. These, as

---

[37] Arizona's procedural framework *precludes* any counsel raising trial-counsel-ineffectiveness claims on direct review. *See State v. Spreitz*, 202 Ariz. 1, 3, 39 P.3d 525, 527 (2002), *cited in Martinez*, 132 S. Ct. at 1314; *see also* Ariz. Rule Crim. Proc. 32.2(a)(3), *cited in Martinez*, 132 S. Ct. at 1314.

considered in *Martinez*, are the conditions under which a habeas petitioner, in connection

to a trial-counsel-ineffectiveness claim in federal habeas, may establish cause and

prejudice for a procedural default due to his IRCP counsel's ineffectiveness. "The first

[circumstance] is where the state courts did not appoint counsel in the initial-review

collateral proceeding for a claim of ineffective assistance at trial. The second is where

appointed counsel in the initial-review collateral proceeding, where the claim should have

been raised, was ineffective under the standards of *Strickland*. *Martinez* 132 S. Ct. at

1318-1319 (citation omitted).

> ii. ***Petitioner Commenced State Collateral Review Without Counsel:***
> ***Georgia Does Not Appoint Counsel for Indigent Prisoners—Even Those***
> ***Under a Death Sentence—to Pursue Constitutional Remedies in State***
> ***Habeas Corpus Proceedings***

The first circumstance, that no appointment of counsel was made for IRCP, is

plainly in the record. As chronicled in the Supplemental Petition (Doc. 66, at 11-50),

petitioner stumbled into state habeas court with a hastily and shoddily drafted *Pro Se*

Petition filed on October 14, 2004. (Doc. 72-18, Resp't Ex. 48). Petitioner flailed to

obtain counsel for approximately a year thereafter. (Doc. 66, at 61-70).

Instability defined the counsel relationship during 2005. After a false start by a

New York practitioner in April, the Resource Center ultimately agreed to represent him

when their caseload lessened unexpectedly. Shortly after Kammer appeared as his

counsel, he abruptly departed. (Kammer would later return to the Resource Center and,

in the end, take over Sallie's representation in the final stages of his state habeas

proceedings and in the commencement of the application before this Court.) With a

significant motion's deadline looming, Kammer informed petitioner that he was taking a

job in Pennsylvania. Petitioner received lukewarm assurances of continuity. But he

observed, even from his perspective confined to death row, the apparent disarray of the public interest law office representing him pursuant to a grossly underfunded and perhaps impossible mandate. (*See, e.g.,* Doc. 66, at 45-50). Desperate—again—petitioner sought to call the bar to account for the miserable handling of his representation, precipitated by Georgia's procedural framework, at trial and in collateral review. Petitioner filed a grievance against Singleton with the Georgia State Bar Association wherein he used the only avenue available to him to pressure Strickland into taking some meaningful step to mitigate the grave harm still flowing from his imposition of the fraudulent Agreement on Legal Representation and its aftermath. Petitioner's plea for help once again received short shrift from everyone who had to address it—including Singleton.

By 2006, petitioner's representation by the Resource Center stabilized in the sense that Tom Dunn, the organization's executive director, took primary responsibility for petitioner's case. Dunn was assisted by Kirsten Salchow and, over the course of that year and into the next, the two prepared for and carried out a hearing in petitioner's collateral review proceedings on April 19-20, 2007. Petitioner consistently raised his desire to litigate about the Agreement in relation to the violation of his rights under the Assistance of Counsel Clause. As the state record makes plain, any suggestion of the Agreement's very existence had been assiduously suppressed.

This is placed in stark relief in the context of the deposition and hearing examinations of his trial attorneys. Singleton and Johnson were both deposed, on August 9, 2006 and September 19, 2006 respectively,[38] and also testified in the state habeas corpus hearing (both on April 19, 2007 (Doc. 73-20, Resp't Ex. 76A; Doc. 73-21, Resp't

---

[38] References *supra* at n. 12 and n. 13.

Ex. 76B). As explained above in the Statement of the Case, Tom Dunn's examinations

extensively explored the circumstances surrounding the decision to present a third verdict

form to the jury and, thus, Singleton's effort to resuscitate the prosecutor's offer made

circa 1998 or 1999, to opt-in to the life without the possibility of parole sentencing option

(which had emerged from the 1993 legislative amendments to the O.C.G.A effective after

Sallie's first trial in 1991). Examiner and witness, in each of the four discrete encounters

in connection with state habeas, studiously avoided any suggestion of the existence of an

Agreement or any other scent of impropriety concerning petitioner's purported election,

ultimately, to proceed in the manner espoused by his trial counsel.

During the 2004-2005 timeframe when petitioner was without counsel and, later,

when the several Resource Center attorneys handled his case, no filing nor any oral

representation was made to the state court to raise any form of this claim concerning

Sixth Amendment violations due to attorney misconduct surrounding the Agreement on

Legal Representation. It is acknowledged that in the IRCP, there was never any

indication of the existence of the Agreement. *See* Respondent's Answer-Response (Doc.

87, at 11) (trial counsel claim in reference to Agreement (made in the Amended Petition

(Doc. 67, at 5-6)) is asserted to be unexhausted and, simultaneously, procedurally

defaulted pursuant to O.C.G.A. § 9-14-51).

Petitioner's counsel filed his Post-Hearing Brief with Superior Court Judge

Collier in May 2008 and the State and his counsel later submitted proposed orders in

mid-December of that year. Neither the Resource Center's brief nor its proposed order

contained any reference or allusion to the facts surrounding the Agreement and the

impact of that scenario upon Singleton's gross attorney misconduct in the face of a

prosecutor seeking to bring the capital case to a close without a trial. Judge Collier signed the State's completely unaltered, and, conceivably, unread Proposed Order on June 22, 2009. (Doc. 84-6, Resp't Ex. 153). By around that time, Dunn had left the practice of law and, of course, also the Resource Center. Kammer then returned to the leading role in Sallie's representation and the office prepared and filed its Application for Certificate of Probable Cause to Appeal in the Supreme Court of Georgia. (Doc. 84-8, Resp't Ex. 155A). This, his attorney's last representation to the state courts, of course, contained no reference to any of the facts that have transformed the trial-counsel-ineffectiveness in plea bargaining claims into new ones before this Court.

### iii. Petitioner's Pro Bono, IRCP Counsel Were Deficient in Failing to Present Any Evidence Relating to the Agreement on Legal Representation, Including Its Devastating Consequences for District Attorney Currie's Attempt to Reach a Plea

*Martinez* (as explained *supra* at 38-41), has established a new line of analysis applicable to post-conviction counsel in the general context described in that opinion concerning ineffectiveness in initial-review collateral proceedings. The review requires the adaptation of the basic *Strickland* standard for trial or appellate counsel ineffectiveness.

The deficient performance inquiry begins *Strickland's* standard two-part test and simply requires a showing "that counsel's representation fell below an objective standard of reasonableness." *Ferrell v. Hall*, 640 F.3d 1199, 1223 (11th Cir. 2011), (quoting *Strickland*, 466 U.S. at 688 (citing in accord *Wiggins v. Smith*, 539 U.S. 510, 521-522 (2003); *Darden v. Wainwright*, 477 U.S. 168, 184 (1986)). A little more specifically, "[t]he proper measure of attorney performance remains simply reasonableness under

prevailing professional norms." *Strickland*, 466 U.S. at 688, *quoted in Padilla*, 130 S. Ct. at 1482.

The foregoing IRCP record is devoid of anything to suggest that IRCP counsel had a defensible motivation for studiously avoiding the mere suggestion, let alone evidence, of the Agreement on Legal Representation and the associated misconduct of the attorneys who propagated it. The resulting direct harm to petitioner was obscured by IRCP counsel and the state habeas court never received any of this exceptionally compelling evidence concerning the conduct and performance of trial counsel.

The circumstances set forth above point only to IRCP counsel's interest in suppressing the misconduct of the trial attorneys and shielding them from negative consequences that may have resulted from an airing of the unseemly details surrounding their pretrial crisis with the client. As advanced below in the discussion of the underlying new claims, the prejudice to petitioner by not putting forth this information concerning trial counsel and the district attorney's ill-fated plea negotiations could not have been greater. Trial counsel's betrayal of their client by coercing his ascent to the Agreement almost immediately cascaded into a more grievous one: the effective denial of counsel at *the* critical stage in the prosecution—the juncture when a settlement with a sentence less severe than death could have been reached.

The *Martinez* inquiry's chief alteration to the *Strickland* standard is the incorporation of a prejudice determination dedicated to answering whether the underlying claim of trial-counsel-ineffectiveness, as Justice Kennedy put it, "has some merit" or, as reflected in the certificate of appealability jurisprudence to which Justice Kennedy cited (*Miller-El*, 537 U.S. 322), "deserves encouragement to proceed further." *Id.* at 327. For

the reasons demonstrated in the discussion of the underlying claims (*infra* at 61-70), this "substantial showing" standard is plainly exceeded here. 28 U.S.C. § 2253(c)(2); *see Slack v. McDaniel*, 529 U.S. 473, 481 (2000).

## V. PETITIONER'S NEW SIXTH AMENDMENT CLAIMS FOR RELIEF

## A. "INDEPENDENT JUDGMENT" ANALYSIS OF NEW CLAIMS

Having established the petitioner's IRCP Cause for the procedural default of his new claims regarding the denial of his right to the assistance of counsel and, relatedly, his transformed claim of trial-counsel-ineffectiveness in his plea negotiation, the analysis must next turn to the Court's "independent judgment" upon the new claims in this § 2254 proceeding. *See (Terry) Williams v. Taylor*, 529 U.S. 362, 400 (2000) (O'Connor, J., concurring and delivering the opinion of the Court in part II). These new Sixth Amendment claims have not been "adjudicated on the merits" by the state court, as contemplated under § 2254(d).[39]

Generally, the strictures of § 2254 apply to all federal habeas corpus applications, such as the present one, filed after the effective date of AEDPA, which was signed into law on April 24, 1996. *Lindh v. Murphy*, 521 U.S 320, 326-327 (1997). Under this framework, every claim adjudicated on the merits in the state court is reviewed pursuant to the unique frame of analysis established by the AEDPA amendments to § 2254(d).[40]

---

[39] Adjudication of these claims requires the introduction in this Court of evidence that is not on the state court record. The new evidence that transforms the previously exhausted IAC in plea bargaining claim to the present claim set forth herein is addressed below in the discussion dedicated to the inapplicability of § 2254(e)(2) limitations on the Court's discretion to conduct a hearing.

[40] Under § 2254(d), "a court may grant habeas relief only if a state court decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or," § 2254(d)(1), "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). Thus, the given "state court decision is 'contrary to' clearly established law if the court arrived at a conclusion opposite to the one reached by the Supreme

The "highly deferential,"[41] standard required by (d), *Pinholster*, 131 S. Ct. at 1391, does not apply to claims that were not adjudicated in state proceedings but are nonetheless properly before the district court given the exhaustion doctrine and its corollary, procedural default, as those architectural principles are codified in § 2254 and animated by federal jurisprudence. *Id.* at 1400. *Martinez's* extension of the equitable principles of "cause and prejudice" from the *Sykes* line of cases, for the reasons examined above, clearly place these new claims before the Court *without any limitation* on its power to grant relief from the connected violations of petitioner's constitutional rights.

"Where the state court did not reach the merits of the claim," *Ferrell v. Hall*, 640 F.3d 1199, 1224 (11th Cir. 2011), pointed out, "federal habeas review is not subject to the deferential standard that applies under AEDPA to 'any claim that was adjudicated on the merits in State court proceedings,'" and instead, "the claim is reviewed *de novo*." *Id.* (quoting *Cone v. Bell*, 566 U.S. 449, 472 (2009) (citing *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (*de novo* review where state courts did not reach prejudice prong under *Strickland*); *Wiggins v. Smith*, 539 U.S. 510, 534, (2003) (same)); *see Ferrell*, 640 F.3d at 1224 (identifying the *de novo* review standard when the state court did not reach the merits of a given claim).[42] "Before 1996 [enactment of AEDPA], this Court held that a

---

Court on a question of law or the state court confronted facts that are 'materially indistinguishable' from Supreme Court precedent but arrived at a different result." *Ferrell*, 640 F.3d at 1223 (quoting (*Terry*) *Williams*, 529 U.S. at 405). Further, the "state court decision is an 'unreasonable application' of clearly established law if the state court identifies the correct governing legal rule from the Supreme Court's holdings but unreasonably applies it to the facts of the particular defendant's case." *Id.* (citing (*Terry*) *Williams*, 529 U.S. at 407).

[41] *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (referring to the "doubly" deferential nature of review of *Strickland* claims pursuant to § 2254(d) (quoting *Lindh v. Murphy*, 521 U.S 320, 333 (1997); *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009)).

[42] Stated more precisely, the new claims before this Court, as such, require its independent judgment, as that manner of analysis had prevailed in the adjudication of habeas corpus petitions in the federal courts prior to AEDPA's enactment. In this context, the federal court is not *reviewing* any

*federal court entertaining a state prisoner's application for habeas relief must exercise its independent judgment* when deciding both questions of constitutional law and mixed constitutional questions ( i.e., application of constitutional law to fact)." *(Terry) Williams*, 529 U.S. at 399-400 (2000) (O'Connor, J., II) (citation omitted ) (emphasis added). Justice O'Connor's concurrence in *(Terry) Williams* further provided that "a federal habeas court owed no deference to a state court's resolution of such questions of law or mixed questions." *Id.* at 400 (part I of the opinion). The exercise of the district court's "independent judgment" starkly contrasts the nature of federal court review when—as is not the case here—§ 2254(d) dictates the analysis.

## B. GROUNDS FOR RELIEF DUE TO NEW SIXTH AMENDMENT CLAIMS

GROUND ONE: PETITIONER'S RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL, AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, WAS VIOLATED WHEN COUNSEL FORECLOSED THE PROSECUTION'S EFFORT TO SETTLE HIS CASE WITHOUT A TRIAL, FAILED TO COMMUNICATE THE PROSECUTOR'S OBJECTIVE TO HIM, AND MISREPRESENTED HIM TO THE PROSECUTOR

### i. *Applicable principles*

The Sixth Amendment right to counsel extends to all critical stages of the criminal process. *Maine v. Moulton*, 474 U.S. 159, 170 (1985); *United States v. Wade*, 388 U.S. 218, 224 (1967), *construed in Iowa v. Tovar*, 541 U.S. 77, 80 (2004)). In explaining the imperative for the Sixth Amendment's reach to certain pre-trial contexts, the *Moulton* Court distilled the line of authorities from *Powell v. Alabama*, 287 U.S. 45 (1932); *Johnson v. Zerbst*, 304 U.S. 458 (1938); and *Gideon v. Wainwright*, 372 U.S. 335 (1963),:

---

adjudication; it is directly ruling on the claim presented to it anew and not after having been adjudicated by the state court.

> The assistance of counsel cannot be limited to participation in a trial; to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself. Recognizing that the right to the assistance of counsel is shaped by the need for the assistance of counsel, we have found that the right attaches at earlier, 'critical' stages in the criminal justice process "where the results might well settle the accused's fate …"

*Moulton*, 474 U.S. at 170 (citations omitted).

Prior to *Moulton's* foregoing explication, *McMann v. Richardson*, 397 U.S. 759 (1970), established that an indigent criminal defendant is "entitled to the effective assistance of competent counsel" during plea negotiations. *Id.* at 771, *quoted in Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012). Shortly after the 1984 landmark opinion on ineffective-assistance of counsel, *Hill v. Lockhart*, 474 U.S. 52, 57 (1985), "established that claims of ineffective assistance of counsel in the plea bargain context are governed by the two-part test set forth in *Strickland*." *Missouri v. Frye*, 132 S. Ct. 1399, 1405 (citing *Hill,* at 57*; Padilla v. Kentucky*, 130 S. Ct. 1473, 1486 (2010) ("the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel"); *see also Burger v. Kemp*, 483 U.S. 776, 803-804 (1987) ("pretrial plea negotiations" among the "two critical stages" in conflict of interest case)).[43]

---

[43] As Scott & Stuntz put it in 1992, plea bargaining "is not some adjunct to the criminal justice system; it *is* the criminal justice system." *Plea Bargaining as Contract*, 101 Yale L. J. 1909, 1912 (1992) (emphasis in the original) (quoted in *Missouri v. Frye*, 132 S. Ct. 1399, 1407 (2012)). *Frye* concluded that "[t]he reality is that plea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages." 132 S. Ct. at 1407; *quoted, in part, in Lafler*, 132 S. Ct. at 1397.

Prejudice is demonstrated under *Strickland* and *Hill* if there is a "reasonable probability that" "counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill*, 474 U.S. at 59.

The Court in *Frye* applied *Strickland*, concluding that the accused's counsel was ineffective by failing to communicate a plea offer before it had expired. 132 S. Ct. at 1408. In addressing the discrete question on certiorari review of the Missouri Court of Appeals' reversal of the Circuit Court, Boone County's denial of defendant-Frye's motion for post-conviction relief, *Frye* explained that 'the constitutional right to counsel extends to the negotiation and consideration of plea offers that lapse or are rejected." 132 S. Ct. at 1404.

ABA Standards guided the *Frye* analysis, pointing out that "numerous state and federal courts over the last 30 years" have adopted these blackletter standards, and their underlying rationale, concerning the obligation of counsel to communicate plea offers. *Frye*, 132 S. Ct. at 1408, (citing, *inter alia, Diaz v. United States*, 930 F2d 832, 834 (11th Cir. 1991)[44] ("Counsel has an obligation to consult with his client on important decisions and to keep him informed of important developments in the course of the prosecution."). The specific standard states, in full:

> ***Defense counsel should keep the defendant advised of developments arising out of plea discussions conducted with the prosecuting attorney***, and should promptly communicate and explain to the defendant all plea offers made by the prosecuting attorney.

ABA Standards for Criminal Justice, Pleas of Guilty 14—3.2(a) (3d ed. 1999) (quoted in *United States v. Allen*, 53 F. App'x. 367, 375 (6th Cir. 2002); *see also Calvert v.*

---

[44] *Diaz* decided a § 2255 motion to vacate a sentence in a RICO prosecution where counsel informed client of a plea offer and advised that he reject it, client's "after the fact testimony concerning his desire to plead, *without more*, is insufficient to establish that but for counsel's alleged advise or inaction, he would have accepted the plea offer." 930 F.2d at 835 (emphasis added).

*Dinwiddie*, No. 07-CV-714-TCK-FHM, 2011 WL 1060308, at \*6 (N.D. Okla., Mar. 18, 2011). This standard places a premium on communication, which can be seen to emanate from *Strickland's* rationale:

> From counsel's function as assistant to the defendant derives the overarching duty to advocate the defendant's cause and ***the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments*** in the course of the prosecution.

466 U.S. at 688.

As a general matter, our federal and state courts have long recognized that "[p]revailing norms of practice as reflected in American Bar Association standards and the like … are guides to determining what is reasonable … ." *Strickland*, 466 U.S at 688, *quoted in Padilla*, 130 S. Ct. at 1482. *See also Bobby v. Van Hook*, 130 S. Ct 14, 16-18 (2009) (*per curiam*); *but cf. Bobby*, 130 S. Ct. at 20 (Alito, J., concurring); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003), *quoted in Rompilla v. Beard*, 545 U.S. 374, 387 (2005). The weight that these standards may warrant in determining whether defense counsel performed reasonably, within the range of professional norms, is evinced in analysis *parsing different editions* of ABA publications and scrutinizing the implications of different Standards and Guidelines. *Rompilla*, 545 U.S. at 387 (finding, at 391, in light of various ABA standards and guidelines, that counsel's specific failures to investigate "fell below the line of reasonable practice").[45]

---

[45] The Court in *Rompilla* devoted an entire page of text and two footnotes to the following elements of ABA publications relating to defense counsel's performance in connection with mitigation investigations: ABA Standards for Criminal Justice 4—4.1 (2d ed. 1982 Supp.); ABA Standards for Criminal Justice, Prosecution Function and Defense Function 4—4.1 (3d ed. 1993); 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989), §§ 11.4.1.C, 11.4.1.D.2, 11.4.1.D.4,; and ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, § 10.7, comment. (rev. ed. 2003)

With respect to the jurisprudential standards, *Frye* expressly did "nothing to alter the standard laid out in *Hill."*  *Frye*, 132 S. Ct. at 1409 (explaining holding of *Hill* that IAC claims concerning an accepted plea offer need to satisfy "reasonable probability" standard that defendant would have insisted on going to trial but for counsel's errors). Further, *Frye* explained that "*Hill* was correctly decided and applies in the context in which it arose.  *Hill* does not, however, provide the sole means for demonstrating prejudice arising from the deficient performance of counsel during plea negotiations."  *Id.* at 1409 (emphasis added).

Similarly, the Court in *Lafler* applied *Hill* and *Strickland* to conclude that when an accused went to trial instead of resolving his prosecution with a plea as a "result of ineffective assistance during the plea negotiation process," the trial itself "caused the injury from error."  *Lafler*, 132 S. Ct. at 1386.  *Lafler* expressly derived its outcome from *Strickland*:  "*Strickland* recognized "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Id.* at 1388 (quoting *Strickland*, 466 U.S. at 686).

### ii.    *Application of Strickland to Trial Counsel Conduct in Plea Negotiation*

#### a.  *Deficiency*

Singleton's performance in relation to Currie's desire to explore a plea bargain was, as established above, unconscionable.  He did not merely fail to take any step to advance the district attorney's good faith (and self-interested) effort to pursue a deal. Singleton foreclosed any progress toward such a resolution.  Trial counsel failed to even inform his client, petitioner, that the prosecutor wanted to pursue resolution of the case.

Petitioner's case, in his own eyes, was in free fall at that juncture and avoiding a death sentence would have seemed out of the question until learning such news. But Singleton never delivered the news of the D.A.'s desire to settle. Singleton closed this grim chapter by himself. He responded to Currie's desire to negotiate by, according to Currie, simply stating that his client "will not plead to life without parole." (Doc. 75-1, Resp't Ex. 85A at 97-98 (Tr. 42-43)).

As set forth above in relation to the *Martinez/Strickland/Miller-El* analysis, the standard for constitutional deficiency posited more than a quarter-century ago remains the benchmark: "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688, *quoted in Padilla*, 130 S. Ct. at 1482. Facially, the foregoing rehearsal of Singleton's conduct in connection to Currie's desire to pursue a plea deal cannot strike any member of the bar as reasonable. In any event, applying the "prevailing professional norms" first requires *identifying the norms*. The superior source for an articulation of professional norms for prosecutors and defense attorneys alike would appear to be the ABA Standards.

Looking again to the standards applicable at the time of petitioner's trial in 2001 (and applied, in part, in *Frye*, discussed *supra*), it is clear that Singleton's conduct plainly violated the relevant tenant: "Defense counsel should keep the defendant advised of developments arising out of plea discussions conducted with the prosecuting attorney, and should promptly communicate and explain to the defendant all plea offers made by the prosecuting attorney." ABA Standards for Criminal Justice, Pleas of Guilty 14—3.2(a) (3d ed. 1999). On the plain face of this standard (which remains in place today,

unrevised), Singleton's failure to keep Sallie "advised of developments arising out of plea discussions" contravenes a basic expectation of counsel by the profession.

Finally, trial "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, *quoted in Lafler*, 132 S. Ct. at 1386. In petitioner's case, the trial itself was the unjust result. His prosecutor recognized that it was a case that was appropriate to settle and deemed it desirable to do so from his office's standpoint. The one liaison between the prosecutor and the accused, however, derailed any communication to the defendant and voided the clear opportunity to work to resolve the case. "The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." *Strickland*, 466 U.S. at 685. Petitioner's counsel played no role in relation to this critical stage, gave no information concerning the *existence of this critical stage*, and, of course gave no advice concerning the opportunity presented by the district attorney. *Cf. Bauder v. Dept. of Corrections State of Florida*, 619 F.3d 1272, 1275 (11th Cir. 2010) ("affirmative misadvice" may constitute constitutionally deficient performance).

Beyond failing simply to advise Sallie about the major plea negotiation development, trial counsel also failed to perform within the range of professional norms by foreclosing the clear possibility of a plea deal. Singleton did nothing when he should have zealously pursued the opportunity created by District Attorney Currie, who felt that a plea bargain "was something we should explore," especially "given the facts of the case." (Doc. 75-1, Resp't Ex. 85A at 99-100 (Tr. 45-46)), and who had reached the

conclusion before trial that he would be unlikely to obtain a death sentence given the circumstances of the case and the changed venue to Houston County. (*Id.* at 34-35). The above-discussed standards also expresses the applicable professional norm in this context: "At the outset of a case, and whenever the law, nature and circumstances of the case permit, *defense counsel should explore the possibility of a diversion of the case from the criminal process*." ABA Standards for Criminal Justice, Pleas of Guilty 14—3.2(e) (3d ed. 1999) (emphasis added). Although Currie's second attempt to pursue a plea occurred on the eve of trial rather than at the case's outset, the principle expressed in this guideline applies *a fortiori*.

### b. Prejudice

Having established trial counsel's deficiency, *Strickland* then requires a second test to be satisfied: "that the deficient performance prejudiced the defense." *Id.* at 687.

This contemplates a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.[46] Further, *Strickland* explained that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Sears v. Upton*, 130 S. Ct. 3259, 3264, n. 8 (2010) (*per curiam*) (finding Supreme Court of Georgia failed to correctly apply *Strickland* prejudice standard to penalty phase investigation adjudged deficient by

---

[46] The *Strickland* Court reasoned that for IAC claims it would be inappropriate to use the higher standard which applied to newly discovered evidence claims, *viz.*, "that counsel's deficient conduct more likely than not altered the outcome in the case," *id.* at 693, because a proceeding's result "can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* at 694 (emphasis added). The Court thus derived its prejudice standard from the respective materiality tests regarding (i) "exculpatory information not disclosed to the defense by the prosecution" (citing *United States v. Agurs*, 427 U.S. 97, 104 (1976)), and (ii) "testimony made unavailable to the defense by Government deportation of a witness," (citing *United States v. Valenzuela-Bernal*, 458 US 858, 872-874 (1982)).

that court; reversed and remanded), *quoted in Wiggins*, 539 U.S. at 534 (quoting *Strickland*, 466 U.S. at 694).

The reasonable probability analysis in *Frye* reflecting the prejudice to that defendant due to his counsel's failure to communicate a formal plea offer is instructive in the present circumstances, notwithstanding that Singleton's unilateral conduct actually terminated Currie's overture—unbeknownst to the prosecutor, Sallie or Singleton's co-counsel—from developing into a formal offer. In the context *sub judice*, it is appropriate to show each of the following: (i) a reasonable probability that petitioner would have accepted a life without the possibility of parole plea deal; (ii) a reasonable probability that the prosecutor would have carried through with his effort to arrange a plea; and (iii) the trial court would have implemented the resulting plea agreement. *See Frye*, 132 S. Ct. at 1410.

### (i) Petitioner Would Have Seized a Plea Deal

In the wake of the confrontation and humiliating outcome surrounding trial counsel's imposition of the Agreement on Legal Representation, Sallie considered his chances at trial to be quite bad. He had just capitulated to Singleton and Johnson instead of requesting the trial court to intervene and instruct the court-appointed attorneys to adhere to his fundamental decisions regarding his case. (Doc. 42, at 3). He did so because the lawyers convinced him that going to the judge would guarantee that his trial would be disastrous because it was too late to permit the lawyers to withdraw. (*Id*., at 3). He perceived the fundamental benefit to him from the fraudulent Agreement on Legal Representation was that he would be able to have legal representation during the

collateral review of his death sentence. (*Id.*). This scenario portrays a capital murder defendant desperate for a plea deal.

### (ii) Prosecutor Sought a Plea Deal for Multiple, Compelling Reasons

Currie had sought to negotiate when the case returned to his judicial district upon reversal by the Supreme Court of Georgia. (Doc. 75-1, Resp't Ex. 85A, at 87-88 (Tr. 33-35)). Currie testified that, as a rule, he will not plea bargain regarding "certain death penalty case." (Doc. 75-1, Resp't Ex. 85A, at 89 (Tr. 45)). But he repeated his effort to settle Sallie's case because he had determined that due to "the facts of the case," given that it was "not a stranger-on-stranger killing," "we should at least explore" a plea deal. (*Id.*, at 90 (Tr. 46)). It is not implausible that something would have gotten in the way of Currie moving his side of the process forward to a formal deal offer. But the present record shows that he almost certainly would have made such an offer, especially given his view of his chances in getting a death sentence from the Houston County jury. (*Id.* at 88-89 (Tr. 34-35)).

### (iii) Trial Record and Death Penalty Precedents Reflect Likelihood of Trial Court Approving a Deal

The trial record lacks any reason to think that the court would *not* have accepted a plea deal of life without the possibility of parole. While a trial court, under Georgia's rules,[47] is generally not bound by a plea agreement reached between a defendant and the

---

[47] *See generally,* Uniform Superior Court Rule 33.10

State,[48] rejection of an agreement is an apparently uncommon occurrence in the criminal courts and, in any case, would be very unusual in a death-eligible prosecution.

**GROUND TWO:  PETITIONER'S RIGHTS PURSUANT TO THE ASSISTANCE OF COUNSEL CLAUSE OF THE SIXTH AMENDMENT AND GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED SATES CONSTITUTION WERE VIOLATED WHEN COURT-APPOINTED COUNSEL BREACHED THEIR FIDUCIARY DUTIES, FAILED TO PERFORM AS COUNSEL DURING THE CRITICAL STAGE OF HIS CASE, AND MANUFACTURED A CONFLICT OF INTEREST DUE TO COUNSEL'S PROFESSIONAL AND PERSONAL INTERESTS**

As set forth above, petitioner's counsel's conduct was constitutionally deficient and prejudicial in relation to the plea negotiations stage before his trial.  Beyond this claim, the misconduct of petitioner's attorney, Singleton, and the resulting breakdown in his representation, and thereby the adversarial process, at the critical juncture of petitioner's case denied his right to the assistance of counsel.  This claim is distinct from the foregoing ineffective assistance of counsel claim although it, of course, originates from the same facet of the Sixth Amendment, *viz.* the Assistance of Counsel Clause. Singleton's conduct in connection with the Agreement on Legal Representation caused the breakdown in the court-appointed attorney's representation and, immediately thereafter, that breakdown foreclosed the prosecutor's effort to negotiate a settlement of the case.  These events violated the Assistance of Counsel Clause in two cognizable ways:  the breakdown in the representation "denied [petitioner] counsel at a critical stage of his trial," *United States v. Cronic*, 466 U.S. 648, 659 (1984), and it precipitated a conflict of interest that "affected the adequacy of [petitioner's] representation," *Cuyler v. Sullivan*, 446 U.S. 435, 349-350 (1980), and "significantly affected counsel's

---

[48]*See generally Fuller v. State*, 284 S.E.2d 29, 159 Ga. App. 512 (1981) (burglary case where Court of Appeals of Georgia held that, upon proper notice, a trial court may reject a plea agreement between the accused and the State).

performance—thereby rendering the verdict unreliable." *Mickens v. Taylor*, 535 U.S. 162, 173 (2002) (citing *Sullivan*, 446 U.S. at 348-349) (finding that such a violation of the Sixth Amendment applies *even when Strickland* prejudice cannot be found).

### i. *Attorney's Misconduct Deprived Petitioner of Counsel at Critical Plea Negotiation Stage*

"The Sixth Amendment . . . guarantees more than the appointment of competent counsel. By its terms, one has a right to 'Assistance of Counsel [for] his defence.' Assistance begins with the appointment of counsel, it does not end there." *Cronic*, 466 U.S. at 654, n. 11 (citations omitted); *see also Avery v. Alabama*, 308 U.S. 444, 446 (1940) ("The Constitution's guarantee of assistance of counsel cannot be satisfied by mere formal appointment."). At no point in petitioner's trial proceedings did his appointed counsel formally cease to represent him. As jury selection approached, however, the crisis between petitioner and his attorneys, as reflected above, went to that brink. In the event, petitioner suffered greater harm than the departure of one or more attorney from his defense on the eve of trial likely would have caused. Instead, counsel caused the "actual breakdown of the adversarial process" when he and co-counsel irrefutably breached their fiduciary duty with their disloyal and fraudulent Agreement. In the immediate wake of the imposition of that bad faith Agreement, Singleton ceased to perform as petitioner's agent in relation to the critical stage of his litigation that emerged during discussions with Curie about sentencing. Petitioner had no idea of this turn of events until long afterward, but the evidence that can be adduced in this Court demonstrates the effective *denial* of counsel in connection to this pivotal moment in Sallie's prosecution. *See McMann*, 397 U.S. at 771.

In *Cronic*, the Court pointed to the "most obvious" form of denial of counsel, *viz.* "when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." 46 U.S. at 659, n. 25 (citations omitted). But beyond this most obvious manner of denial, *Cronic* recognized that when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.* The Court explained that "[n]o specific showing of prejudice was required . . . because the petitioner had been 'denied the right of effective cross-examination' which would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.'" *Id.*, *quoting Davis v. Alaska*, 415 U.S. 308, 318 (1974).

Counsel's total breakdown in relation to Currie's desire to work to settle the case was, beyond simply deficient performance, an utter denial of any sense of the right to counsel at that juncture. While prejudice in that circumstance was manifest, *it is not appropriate to even consider it. Cf. Powell v. Alabama*, 287 U.S. 45 (1932). Under "circumstances [where] the likelihood that counsel could have performed as an effective adversary was so remote as to have made the trial inherently unfair," the *Powell* Court did not require scrutiny of "the actual performance of counsel at trial." *Cronic*, 446 U.S. at 661. While Sallie's trial surely did not involve the grossly unjust circumstances surrounding the courtroom and trial in *Powell*, the principles apply here in relation to the breakdown in petitioner's representation following the egregious attorney misconduct concerning the Agreement. *See Mickens v. Taylor*, 535 U.S. 162, 166 (2001) ("where assistance to counsel has been denied entirely or during a critical stage of the

proceeding," examination of counsel's performance is bypassed and the violation is simply recognized); *see also Geders v. United States*, 425 U.S. 80, 91 (1976).

### ii. Counsel's Conflict of Interest Deprived Right to Counsel Irrespective of Stickland Showing

"Circumstances of that magnitude" have arisen in cases where, as here, the criminal defendant's attorney possessed "conflicting interests." *Mickens*, 535 U.S. at 166. The *Mickens* Court expressly recognized that, *inter alia*, the conflict of interest analysis encompasses the attorney's professional interests (citing *Garcia v. Bunnell*, 33 F.3d 1193 (9th Cir. 1994)), or personal interests (citing *United States v. Hearst*, 638 F.2d 1190, 1193 (9th Cir. 1980)). 535 U.S. at 174. "Conflict of interest" has been used "to mean a division of loyalties *that affected counsel's performance*." *Id.* at 172, n. 5 (emphasis in original). The Court re-emphasized that terminology, after further discussing *Holloway v. Arkansas*, 435 U.S. 475 (1978), and *Sullivan*, 446 U.S. 335, cases concerning conflicts due to the attorney's trial representation of multiple defendants. *Id.*

As noted in *Holloway*, "[t]he mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations have effectively sealed his lips on crucial matters." 435 U.S. at 490. In petitioner's case, counsel's "conflicting obligations" resulted in conduct that "effectively sealed" *the accused's lips* on the most crucial matter in his case, the death sentence.

Attorney Singleton's conflicts were twofold. First, he and Johnson became adverse to petitioner when they breached the major ethics canons and principles in the law of lawyers and of agency by force-feeding the terms of petitioner's defense via their bad faith Agreement. *See, e.g.*, 1 Restatement (Second) of Agency § 112 (1957), Comment *a* ("the agent commits a breach of duty [of loyalty] to his principal by acting

for another [including himself] in an undertaking which has a substantial tendency to cause him to disregard his duty to serve his principal with only his principal's purposes in mind."), *quoted in Maples v. Thomas*, 132 S. Ct. 912, 924. Following from this gross breach, any conduct that could lead to that Agreement seeing the light of day was adverse to counsel's professional and personal interests due to the grievous ethical implications of the actions.[49]

Second, petitioner's broken relationship with Sallie became a liability in dealing with Currie, one of the many prosecutors with whom he had handled capital cases in the past and was likely to need to deal with again in the future. In the aftermath of his negotiation with his client regarding the Agreement, Singleton could not consider raising the prospect of settlement with Sallie because their communication was broken and, as a result of the contentious nature of their discussions concerning strategy, feared that the client could take the entire scenario to the trial court, as just days earlier he had expressed he felt he should do. Thus, from Singleton's vantage, the episode surrounding the Agreement disabled him from advancing Currie's overture in any way given the possibility that it could lead to Currie learning of the attorney's misconduct and, perhaps more important to Singleton, observing the defense attorney's loss of control of his client and the situation. Such an outcome would likely carry long-term affects for Singleton's practice. He would thus have every reason to avoid risking such a problematic exposure.

---

[49] The "necessity of full disclosure to the preservation of the lawyer-client relationship" underlies the unseemliness in this episode for Sallie's attorneys. *Mickens*, 535 U.S. at 181 (Stevens, J., dissenting) (quoting Justice Story in *Williams v. Reed*, 29 F. Cas. 1386, 1390 (No. 17,733) (C.C.D.Me. 1824): "I agree to the doctrine urged at the bar, as to the delicacy of the relation of client and attorney, and the duty of a full, frank, and free disclosure by the latter of every circumstance, which may be presumed to be material, not merely to the interests, but to the fair exercise of the judgment, of the client.").

## C.    EVIDENTIARY HEARING PURSUANT TO § 2254(E)(2)

### i.    *Evidentiary Hearing Availability for Faultless Petitioner*

Petitioner seeks an evidentiary hearing for the foregoing new claims.  These new claims were not adjudicated on the merits in state court and thereby do not fall within the scope of § 2254(d).  *Pinholster v. Cullen*, 131 S. Ct. 1388, 1401 (2011).  The question before this Court is whether Sallie met the cause and prejudice requirements, pursuant to *(Michael) Williams v. Taylor*, 529 U.S. 420, 444 (2000) (unanimous) (Kennedy, J.), for a § 2254(e)(2) hearing of the new evidence supporting his new claims.  *See Brumfield v. Cain*, No. 04-787-JJB-CN, ___ F. Supp.2d ___, 2012 WL 602163, at *3 (M.D. La., Feb. 23, 2012) (recognizing the "cause and prejudice" inquiry of § 2254(e)(2) applies only to procedurally defaulted claims and not to claims adjudicated on the merits).

As reflected in Justice Alito's concurring opinion and in Justice Thomas's opinion for the Court, *Pinholster* addressed a different question from the one contemplated in petitioner's present request for a hearing under § 2254(e)(2).  Specifically, *Pinholster* addressed "whether review under § 2254(d)(1) permits consideration of evidence introduced in an evidentiary hearing before the federal habeas court."  *Id.* at 1398.  Scott Pinholster, in the estimation of the Supreme Court, was not diligent with respect to presenting his evidence in his state proceedings:  "Federal courts sitting in habeas are not an alternative forum for trying facts and issues which *a prisoner made insufficient effort to pursue in state proceedings*."  *(Michael) Williams*, 529 U.S. at 437 (emphasis added), *quoted in Pinholster*, 131 S. Ct. at 1401.  Further to this point, Justice Alito (concurring) opined that he "would hold that the federal-court hearing should not have been held because respondent did not diligently present his new evidence to the California courts."

*Id.* at 1417.  Furthermore, Pinholster sought to introduce evidence in the federal district court that supported an *old claim*.  *Id.* at 1396-1397.

The *Pinholster* Court thus held "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Id.*  The "backward-looking language [of (d)(1)] requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at that same time, *i.e.*, the record before the state court."  *Id.*

*Pinholster* does not disrupt or alter the analysis set forth in *(Michael) Williams v. Taylor*, 529 U.S. 420 (2000), insofar as it concerns circumstances such as those in the present request by Sallie.  In criticizing the Ninth Circuit Court of Appeals' misunderstanding of *(Michael) Williams*, the *Pinholster* Court articulated that

> *(Michael) Williams* did not concern whether evidence introduced in such a hearing [pursuant to (e)(2)] could be considered under § 2254 (d)(1).  In fact, only one clam at issue in that case was even subject to § 2254(d); the rest had *not been adjudicated on the merits* in state-court proceedings.

*Id.* at 1400 (emphasis added).

In reference to Justice Sotomayor's dissent, the Court "explain[ed] that § 2254(e)(2) should be interpreted in a way that does not preclude a state prisoner, who was diligent in state habeas court and who can satisfy § 2254(d), from receiving an evidentiary hearing."  *Id.* at 1400, n. 5.  The Court affirmed the view embodied in *(Michael) Williams* that (e)(2) governs the federal habeas court's discretion regarding evidence concerning "claims that were not adjudicated on the merits in state court."  *Id.* at 1401.

In contrast, *(Michael) Williams* addressed the scope of, and, to a lesser extent, the operation of § 2254(e)(2).  The essential question presented by the prisoner in that case

concerned the meaning of "failed to develop," the opening clause in that statutory framework.[50]  That is also the operative clause concerning Sallie's request *sub judice*.

Justice Kennedy, writing for the Court, determined that the use of "failed" in that clause denoted a fault-based approach rather than the "no-fault reading" espoused by the respondent in that case, the Commonwealth of Virginia.  *Id.* at 431.[51]  Pointing to the "similarity between the Court's phrasing in [*Keeney v. Tamayo-Reyes*, 504 U.S. 2, (1992)] and the opening clause of § 2254(e)(2)," *(Michael) Williams* concluded that "Congress intended to preserve at least one aspect of *Keeney's* holding:  prisoners who are at fault for the deficiency in the state-court record must satisfy a heightened standard to obtain an evidentiary hearing."[52] 529 U.S at 433.  Thus, the Court determined that the opening clause "codifie[d] *Keeney's* threshold standard of diligence."  *Id.* at 434.

In *Keeney*, the petitioner, a Cuban immigrant who spoke almost no English, had failed to develop in his state collateral proceedings the facts of his claim attacking his plea of *nolo contendere* to first-degree manslaughter because it was not knowing and intelligent due to translator error.  *Keeney*, 504 U.S. at 3.  This failure to develop the claim on state collateral review was attributed to the negligence of petitioner's post-conviction attorney.  *Id.* at 4.  After "characterize[ing] this as the prisoner's failure to

---

[50] § 2254(e)(2) states:  "If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—."  Sub-paragraphs (A) and (B) provide exceptions that are not applicable here.

[51] The *(Michael) Williams* Court explained its conclusion as to how Congress had used "failed" in the statute: "To say a person has failed in a duty implies he did not take the necessary steps to fulfill it. He is, as a consequence, at fault and bears responsibility for the failure.  In this sense, a person is not at fault when his diligent efforts to perform an act are thwarted, for example, by the conduct of another or by happenstance.  *Fault lies, in those circumstances, either with the person who interfered with the accomplishment of the act or with no one at all.*"  *Id.* at 432 (emphasis added).

[52] *See* discussion of *Keeney* and its incorporation via *(Michael) Williams* into the meaning of "failed," *supra*, at fn. 28 (p. 37).

develop material facts in state court [the Court] required the prisoner to demonstrate cause and prejudice excusing the default before he could receive a hearing on his claim." *(Michael) Williams*, 529 U.S. at 433 (internal citations and quotations to *Keeney* omitted). The opinion further explained that *Keeney* "borrowed the cause and prejudice standard applied to procedurally defaulted claims." *Id.* (citing *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977)); *see also Brumfield*, ___ F. Supp.2d at ___, 2012 WL 602163, at *3.

After explaining the manner by which Congress "raised the bar *Keeney* imposed on prisoners who were not diligent in state-court proceedings," *id*. at 433, Justice Kennedy, writing for a unanimous Court, explained that

> there is no basis in the text of § 2254(e)(2) to believe Congress used "fail" in a diferent sense than the Court did in *Keeney* or otherwise intended the statute's further, more stringent requirements to control the availability of an evidentiary hearing in a broader class of cases than were covered by *Keeney's* cause and prejudice standard.

*Id*. at 433-434.

The Court then applied the statutory test to the three claims for which he had sought an evidentiary hearing in the Eastern District of Virginia. *Id*. at 437-445. The Court concluded that, in the sense expressed in *Keene*, he had been diligent in efforts to develop the facts supporting his juror bias and prosecutorial misconduct claims in collateral proceedings in the Commonwealth's courts. *Id*. at 439-444. It was thus held that that new claim did not fall within § 2254(e)(2) and, as such, it was not limited by its exceptions: "Our analysis should suffice to establish cause for any procedural default petitioner may have committed in not presenting these claims to the Virginia courts in the

first instance."[53] *Id.* at 444.  The Court concluded that Michael Williams was not at fault in the sense expressed in *Keeney*.

### ii. *Sallie's Frustrated Efforts to Introduce Trial Counsel Evidence in State Collateral Proceedings*

Sallie had struggled for years during state proceedings to bring to light the disastrous sequence of events surrounding the Agreement on Legal Representation.  He did so while he was languishing in post-conviction without counsel and doing everything within his power, and the power of virtually everyone he knew outside of prison, to find an attorney.  Sallie was neglected by the "monitor" of Georgia's death-sentenced inmates as his federal limitations period ran down.  *All* of the many lawyers with whom he made contact (including, but not limited to lawyers from the Southern Center and the Resource Center), either failed even to address the issue despite Sallie's direct requests for information about it, or, even worse, gave recklessly misleading responses that betray a total absence of calculation. [54] Kammer from the Resource Center, awoke to the crisis in Sallie's case (and the identical one in Leeland Braley's) apparently only after receiving a call from counsel with the Federal Defender Program that resulted from a baby warrant's issuance for a third man.  After being alerted to the facts that he had two inmates with blown statute of limitations periods, Kammer, as monitor, hastily threw together

---

[53] Justice Kennedy continued:  "Questions regarding the standard for determining the prejudice that petitioner must establish to obtain relief on these claims can be addressed by the Court of Appeals or the District Court in the course of further proceedings."  *Id.* at 444.

[54] *See, e.g.*, Doc. 40-19 (July 19, 2004 letter from Singleton to Sallie, copying Kammer, wherein Singleton states:  "I received your July 13 letter.  Yesterday, I emailed Brian Kammer, an attorney at the Resource Center, and he assured me that they are well aware of the relevant time deadlines."  *See also* Doc. 45 and Doc. 40-23 reflecting contemporaneous notes of petitioner's mother, written on a letter from petitioner instructing her to contact the Resource Center (dated Aug. 26, 2004) and reflecting that the Resource Center told petitioner's mother upon her phone call to the office that Sallie would not need to file anything until January 2005.  This calculation could not be supported by any conceivable reading of the statute and petitioner's procedural posture.

boilerplate *pro se* petitions to file in state court on October 14, 2004 in order to put a cap on the damages to the two men due to the lapsing of their limitations period (which had expired on October 7, 2004).

By the time that Sallie had commenced his *pro se* initial-review collateral proceedings, his most viable chance of obtaining a lawyer rested with the Resource Center. Before Sallie's first state habeas court conference in the small courtroom in Jackson at the Diagnostic & Classification Prison, Kammer contacted him to indicate he would attend and advise. Litigating state habeas proceedings *pro se* was plainly daunting to Sallie, as it would be to anyone. In his conversation with Kammer prior to the first conference, Sallie explained that he wanted to show his judge the Agreement on Legal Representation and try to get the judge to bring Singleton and Johnson into court to explain why they were not honoring the pact. Kammer, after speaking with Singleton, steered Sallie from handling the issue as he had envisioned. Desperate to have the assistance of a lawyer, Sallie deferred to Kammer's judgment. At the first conference on February 1, 2005, Kammer, on behalf of the Resource Center, interposed his organization—and the interests of his peers in the capital habeas bar—in petitioner's case *before it was even representing Sallie*.

Ultimately, the Resource Center became willing to take on Sallie's case. Sallie had no other options and he accepted the representation. Not long after the Resource Center had finally appeared as Sallie's counsel in his state collateral proceedings, their engagement faltered due to Kammer's departure from the organization. Very desperate again, Sallie filed his Grievance Report against Singleton in the Georgia State Bar in

October 2005 in order to try to get his former attorney to address his obligations to find him stable representation.

Throughout the years that lawyers from that organization represented him in his initial-review collateral proceedings, Sallie regularly raised the matter of the Agreement and the dishonesty, disloyalty, and denial of assistance surrounding his capitulation to the lawyers who coerced him to enter into it. Sallie returned recurringly to Singleton's contacts with the district attorney on the eve of trial and the court-appointed attorney's failure to perform in any way resembling Sallie's counsel in that critical juncture of the prosecution. His state collateral review lawyers perennially refused even to mention the Agreement in any court filing. His state collateral review lawyers perennially refused to inquire in any way about the Agreement, even when deposing both attorneys in 2006 and, later, examining them in Sallie's habeas hearing in 2007. These examinations focused in large measure on the preparation of the third verdict form (for an LWOP sentence) and Singleton's resuscitation of Currie's offer, made years prior, to opt-in to the third sentencing option. Questioner, Dunn, and the witnesses, Singleton and Johnson, studiously avoided even an allusion to the Agreement, the very undertaking that figured decisively in the verdict form events. When he inquired or protested in conference with his counsel, petitioner was advised that the Agreement did not raise any issues and it was best left ignored. Sallie's individual efforts to bring to light through his counsel evidence concerning the attorney misconduct embodied in the Agreement, and the resulting attorney performance due to its formation, never ceased during his IRCP.[55]

---

[55] The Agreement was among the first things presented to undersigned counsel after appearing in the present proceedings in May 2011.

### iii. *"Independent Judgment" to be Exercised in Hearing*

For the reasons examined *supra* at 75-79, § 2254(d) would impose no limitation on the Court's power to grant relief based on evidence adduced in a hearing pursuant to § 2254(e)(2). That is the case because the claims related to the evidence to be introduce in such a hearing would be before the Court without having been "adjudicated on the merits by a state court," as is required to engage (d). *See Pinholster*, 131 S. Ct. at 1401 n 10 ("Though we do not decide where to draw the line between new claims and claims adjudicated on the merits . . . Justice Sotomayor's hypothetical involving new evidence of withheld exculpatory witness statements, see *post*, at 1417-1418, may well present a new claim."). This procedural posture places the Court on pre-AEDPA footing, which would require the exercise of "independent judgment when deciding both questions of constitutional law and mixed constitutional questions ( i.e., application of constitutional law to fact)." *(Terry) Williams v. Taylor*, 529 U.S. 362.

## D. PROSPECTIVE WITNESSES IN EVIDENTIARY HEARING

Palmer Singleton

The examination of Mr. Singleton would concern the following subjects: his actions, understanding and intentions concerning his meeting with petitioner and co-counsel prior to the execution of the Agreement on Legal Representation; drafting of the Agreement; discussion of the Agreement with others at the Southern Center, including the executive director's office; execution of the Agreement with petitioner; discussions with D.A. Richard E. Currie concerning, *inter alia*, submission of a third verdict form providing for a sentencing option of life without the possibility of parole and Currie's discussions relating to plea bargaining; actions surrounding Currie's effort to pursue a

plea deal; discussions with Kammer concerning the Agreement and the raising of it during collateral review.

Christopher Johnson

The examination of Mr. Johnson would concern the following subjects: his actions, understanding and intentions concerning his meeting with petitioner and co-counsel prior to the execution of the Agreement on Legal Representation; drafting of the Agreement by Singleton; discussion of the Agreement with others at the Southern Center, including the executive director's office; execution of the Agreement with petitioner; any discussions with Singleton concerning his discussions with D.A. Richard E. Currie concerning, *inter alia*, submission of a third verdict form and plea bargaining; awareness of Singleton's actions surrounding Currie's effort to pursue a plea deal.

Stephen Bright

The examination of Mr. Bright would concern the following subjects: discussions with Singleton and/or Johnson about the preparation, execution or effect of the Agreement on Legal Representation; efforts by Singleton or Johnson concerning plea negotiations.

Brian Kammer

The examination of Mr. Kammer would concern the following subjects: discussions with Singleton in or around January 2005 regarding introduction of the Agreement on Legal Representation to the state habeas court in petitioner's collateral

review; discussions with Singleton concerning identifying volunteer counsel for petitioner during collateral review; investigation of the Agreement and the events concerning its execution by trial counsel and petitioner; understanding of the legal significance of the Agreement and its bearing on petitioner's right to trial counsel; decisions within the Resource Center not to raise the Agreement during collateral review; discussions with petitioner about the Agreement; discussions with co-counsel at the Resource Center about the Agreement and right to counsel issues.

Thomas Dunn

The examination of Mr. Dunn would concern the following subjects: investigation of the Agreement and the events concerning its execution by trial counsel and petitioner; understanding of the legal significance of the Agreement and its bearing on petitioner's right to trial counsel; decisions within the Resource Center not to raise the Agreement during collateral review; discussions with petitioner about the Agreement; discussions with co-counsel at the Resource Center about the Agreement and right to counsel issues.

Kirsten Salchow

The examination of Ms. Salchow would concern the following subjects: investigation of the Agreement and the events concerning its execution by trial counsel and petitioner; understanding of the legal significance of the Agreement and its bearing on petitioner's right to trial counsel; decisions within the Resource Center not to raise the Agreement during collateral review; discussions with petitioner about the Agreement;

discussions with co-counsel at the Resource Center about the Agreement and right to counsel issues.

William Sallie

The examination of Mr. Sallie would concern the following subjects:  his actions, understanding and intentions concerning his meeting with trial counsel prior to the execution of the Agreement on Legal Representation; execution of the Agreement; Singleton's discussions with D.A. Richard E. Currie concerning, *inter alia*, submission of a third verdict form providing for a sentencing option of life without the possibility of parole and plea negotiations; discussions and advice from lawyers at the Resource Center concerning the legal significance of the Agreement in relation to collateral review.

Richard E. Currie

The examination of Mr. Currie would concern the following subjects:  his discussions and negotiations with Singleton and/or Johnson concerning sentencing options and plea bargaining; his perceptions of the case against petitioner prior to trial; his views on the likelihood of reaching a plea agreement if petitioner's counsel had indicated a willingness to do so.

# CONCLUSION

WHEREFORE, for these reasons, petitioner prays that the court:

a) issue an order to have him brought before it, to the end that he may be discharged from the unconstitutional confinement and restraint;

b) conduct a hearing at an appropriately scheduled time where proof may be offered and argument advanced concerning the allegations set forth in this brief; and

c) grant such other relief as may be necessary and appropriate.

Respectfully submitted,

Joseph J. Perkovich
White and Williams LLP
One Penn Plaza
250 W. 34th St., Ste 4110
New York, NY 10119-4115
(212) 400-1660 (Tel.)
jjp@jos.perkovich.name

John R. Martin
Martin Brothers, P.C.
500 Grant Building
44 Broad Street, N.W.
Atlanta, GA 30303
(404) 522-0400 (Tel.)
Jack@Martinbroslaw.com

Counsel for William C. Sallie

May 21, 2012

**CERTIFICATE OF SERVICE**

I hereby certify that a correct copy of the foregoing document was filed electronically.  Notice of this filing will be provided by cooperation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF system.

Dated: May 21, 2012
New York, New York

<div style="margin-left: 50%;">

s/Joseph J. Perkovich
Joseph J. Perkovich
White and Williams LLP
One Penn Plaza
250 W. 34th St., Ste 4110
New York, NY 10119-4115
(212) 400-1660 (Tel.)
jjp@jos.perkovich.name

</div>