IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

WILLIAM CARY SALLIE,           :
                               :
            Petitioner,        :
                               :
      vs.                      :
                               :          CIVIL ACTION NO.: 5:11-CV-75 (MTT)
CARL HUMPHREY, Warden,         :
                               :
            Respondent.        :
                               :
_____:

## ORDER

Petitioner William C. Sallie has moved the Court to stay this action so he can return to state court to exhaust claims of juror bias, claims he says are based on newly discovered evidence.   (Doc. 125).   Specifically, Sallie says his current counsel have learned that juror Gina D. Dawson falsely answered questions during voir dire.   For the reasons discussed below, the motion is **DENIED**.

## I.        FACTUAL AND PROCEDURAL BACKGROUND

Sallie was first convicted and sentenced to death in 1991.   The Georgia Supreme Court set aside that conviction in 1998.   After a change of venue to Houston County, Sallie was retried in 2001.   A jury again convicted him and sentenced him to death.

At the second trial, Dawson, in responding to a juror questionnaire, wrote that she was divorced and, in response to "For how many years?" wrote "2 yrs."   (Doc. 122 at 68). Dawson's completed questionnaire also indicated that neither she nor any member of her family had ever been accused of a crime, been the victim of a crime, or been a victim of spousal or family violence, and that she had never been a party to litigation.   (Doc. 122 at 70).

During voir dire examination, counsel briefly explored Dawson's marital history.

Q.      . . . We got a copy of your questionnaire.

A.      Uh-huh.

Q.      They sent those to us [sic] before to try to help speed things up.   It says here that you're divorced and you've been – was it you were divorced two years ago or you were married two years ago?

A.      My divorce has just finalized.

Q.      Okay.   So you just – you were married for two years?

A.      Uh-huh.

Q.      And would you consider that a nasty divorce, an amicable divorce, or how would you …

A.      Amicable.

Q.      Amicable?   Uh-huh.   All right.   Any big court battle?

A.      No.

Q.      Is that the only time you've been married?

A.      No.   I've been married before.

Q.      Okay.   And was that – were you divorced then?   I assume you were.

A.      Yeah.   Yes.

Q.      Got married again?

A.      Yes.

Q.      We meet a lot of people in court.   Was that divorce amicable or hostile?

A.      It was …

Q.      Amicable?

A.      It was amicable.

Q.     No big court fights?

A.     No.

Q.     Did you get custody of all the children?

A.     Yes.

Q.     Was there any big custody fight or issue?

A.     No.

Q.     Okay.

(Doc. 122 at 68-69) (examination by the prosecution).

. . .

Q.     Have you ever known anybody who has been through a very
       contentious divorce?   I gather yours were not so?

A.     No.   I can't say that I know of anyone who has.

(Doc. 122 at 69) (examination by the defense).

During voir dire, Dawson claimed strong religious convictions, and Sallie's counsel requested that she be excused for cause because of "her strong religious faith" and "the fact that she finds guidance for major life decisions from the Bible."   (Doc. 70-10 at 94). In response to further questioning by the trial court, Dawson said that her religious beliefs would not prevent her from considering all sentencing options, that she could follow the laws of the State of Georgia, and that she could carry out the instructions of the court. (Doc. 70-10 at 97-99).   The court denied Sallie's motion to remove Dawson for cause, and she ultimately served on the jury.

The trial court's and counsel's attention returned to Dawson immediately after the trial.   In a March 13, 2001, post-trial hearing, the trial judge reported that "one of our

jurors [Thomas Gootee] did not make it home" after Sallie's trial ended on March 5, 2001.
(Doc. 71-21 at 7).   The judge explained that a day or two after the end of the trial the
court received a call from Gootee's wife who complained that her husband had not
returned home, and the judge had to get "the sheriff's department … to go by [Dawson's
house] to see if they could rouse him out."   (Doc. 71-21 at 8).   The judge stated that
when deputies arrived at her residence, they learned that Gootee had just left.   (Doc.
71-21 at 8).   In other words, Dawson and Gootee were having an affair and rather than
return home, Gootee went home with Dawson.

    Shortly after the trial, Sallie's attorneys interviewed all twelve jurors.   They, or their
"staff," interviewed Dawson for over an hour on April 1, 2001.   (Doc. 122 at 8).   The
topics discussed during that interview are not in the record.

    On direct appeal, Sallie contended that the trial court erred when it failed to remove
Dawson for cause because of her religious beliefs.   (Doc. 72-1 at 72).   The Georgia
Supreme Court disagreed:

> Prospective juror Dawson was qualified to serve as a juror.   She indicated
> no bias and she stated that she could consider and vote for all three
> sentencing options.   Although she has strong religious beliefs, she
> expressly stated that her religious beliefs would not prevent her from
> following Georgia law and the trial court's instructions.

*Sallie v. State,* 276 Ga. 506, 510, 578 S.E.2d 444, 450 (2003).

    Sallie filed his state habeas petition on October 14, 2004.   (Doc. 72-18).   In Claim
Three he alleged:

> Misconduct on the part of the jurors included, but was not limited to,
> improper consideration of matters extraneous to the trial, improper racial
> attitudes which infected the deliberations of the jury, **false or misleading
> responses of jurors on voir dire**, improper biases of jurors which infected
> their deliberations, improper exposure to the prejudicial opinions of third
> parties, improper communications with third parties, improper

communication with jury bailiffs, improper ex parte communications with the
trial judge, and improperly prejudging the guilt/innocence and penalty
phases of Petitioner's trial.

(Doc. 72-18 at 17) (emphasis added).

During the state habeas proceedings, Sallie's attorneys searched Houston County

court records for information about jurors.   While the record does not reveal all

documents reviewed during their record searches, habeas counsel marked as exhibits at

the state habeas evidentiary hearing various Houston Superior Court pleadings from the

Gootees' divorce proceedings.   (Doc. 73-25 at 32-53).

After a year long discovery period, Sallie filed, on June 30, 2006, the first

amendment to his state habeas petition.   (Doc. 73-11).   In Claim Five of the amended

petition Sallie alleged:

> Misconduct on the part of the jurors included, but was not limited to,
> improper consideration of matters extraneous to the trial, improper biases,
> **false or misleading answers in voir dire**, improper exposure to opinions
> of third parties, improper communications with third parties and bailiffs,
> improper relations between jurors, improper religious influences and
> premature deliberations.

(Doc. 73-11 at 25) (emphasis added).

State habeas counsel subpoenaed Dawson and Gootee to testify at the state

habeas evidentiary hearing.   (Doc. 75-15 at 6).   However, Respondent moved in limine

to exclude Dawson's and Gootee's testimony on the grounds that Sallie was attempting to

use juror testimony to impeach their verdict in violation of O.C.G.A. § 9-10-9 and O.C.G.A.

§ 17-9-41.   (Doc. 73-19 at 4-8).   At argument on the motion, state habeas counsel

asserted that Gootee and Dawson engaged in inappropriate conduct or were involved in

an inappropriate relationship.   (Doc. 73-20 at 23).   Counsel informed the court they had

interviewed bailiffs from Sallie's trial who confirmed the inappropriate relationship.   (Doc.

73-20 at 26).   They also told the court that Dawson had been a concern even prior to trial, explaining that trial counsel "was concerned about the partiality of Ms. Dawson before any of this information arose" because of her "strict fundamental religious beliefs."   (Doc. 73-20 at 26).

The state habeas court granted Respondent's motion, and Dawson and Gootee did not testify.   (Doc. 73-20 at 26-27).   However, the court allowed Sallie's counsel to call bailiffs from the trial to testify about Gootee and Dawson's relationship.   (Doc. 73-21 at 75-92).   Captain Allen Keith Everidge testified that Gootee and Dawson were "flirting" during the trial and Gootee's wife called the trial judge following the trial to question why her husband had not returned home.   (Doc. 73-21 at 77-79).   He also testified that Dawson contacted him when she received the March 8, 2007, subpoena requiring her to attend the state habeas evidentiary hearing.   (Doc. 73-21 at 81).   According to Everidge, she did not want to testify and was concerned that "they [were] going over [her] personal life."   (Doc. 73-21 at 81-82).   Everidge said that Dawson acknowledged that she and Gootee were involved in a post-trial relationship.   (Doc. 73-21 at 82).   Lieutenant Dorothy Harden testified that after the trial, the trial judge ordered her to go to Dawson's house to question Dawson about Gootee's whereabouts.   (Doc. 73-21 at 87).   Harden said she told Dawson that Gootee needed to go home.   (Doc. 73-21 at 88).   According to Harden, she never saw Gootee, but Dawson responded "'Okay.'"   (Doc. 73-21 at 88).

In their post-hearing brief, state habeas counsel argued that Sallie was erroneously precluded from developing his claim of juror misconduct, "a claim based upon an improper romantic relationship [that] developed between two jurors during the

course of … Sallie's second capital trial." (Doc. 83-23 at 7). Respondent argued that Sallie's entire juror misconduct claim (Claim Five in his amended state habeas petition) was procedurally defaulted because it was not raised during trial or on appeal. (Doc. 84-1 at 14, 17). The state habeas court, in an order drafted by Respondent's attorneys, found that Claim Five, in its entirety, was procedurally defaulted because it was not raised on direct appeal and Sallie had not established cause and prejudice or a fundamental miscarriage of justice to excuse the default. (Doc. 84-6 at 13, 17). However, the order, understandably, did not specifically address the claim that jurors answered improperly during voir dire.

In his initial and "corrected" habeas petitions filed in this Court, Sallie again alleged juror bias and claimed that unnamed jurors provided false or misleading responses during voir dire. (Docs. 1 at 16-17; 9 at 17-18). In his second amended petition, filed on May 9, 2013, Sallie added factual detail to these general allegations. He maintained that his current investigator interviewed Dawson on October 1, 2012, and Dawson's strong views and "bilious tone … betrayed a palpable bias that had not surfaced in the years since the 2001 trial." (Doc. 122 at 24-25). This conversation "precipitated an inquiry into Ms. Dawson's background." (Doc. 122 at 25). According to Sallie, this inquiry revealed "extensive court records and other public documents" showing that Dawson responded untruthfully to questions about "(i) spousal or family violence, (ii) criminal history of family members, (iii) victimhood of herself and family members, (iv) contentious divorces, (v) child custody, visitation and support matters, and (vi) being sued and seeking personal bankruptcy protection." (Doc. 125 at 3-4). Casting a very wide net, Sallie's second

amended petition discloses the following pretrial[1] facts about Dawson.

At the time of Sallie's 2001 trial, Dawson[2] had been married four times.   She married Glenn Terrell Holland on May 25, 1990, when she was seventeen years old. (Doc. 122 at 45).   Their son, Tyler, was born on February 14, 1991.   (Doc. 122 at 45). Holland filed for divorce on October 17, 1991 in Florida state court.[3]   (Doc. 122 at 45). In the divorce petition he acknowledged that Dawson, who resided in Houston County, had custody of Tyler but alleged that he was "the more fit and proper person to have custody."   (Doc. 122 at 45).   Dawson was served with a copy of the Florida divorce petition on October 22, 1991.   She then filed her own divorce petition in Houston County on October 25, 1991.   In her petition, Dawson alleged that she had not participated as a party "in any other capacity in any litigation concerning the custody" of Tyler and that she had "no information of any custody proceeding concerning [Tyler] pending in a court of this or any other state."   (Doc. 122 at 46).   On November 7, 1991, Dawson sought to have Holland's Florida divorce petition dismissed for lack of jurisdiction.   (Doc. 122 at 46).

The Florida court entered a temporary order on December 23, 1991, allowing Holland to have visitation rights with Tyler from December 26, 1991, to January 9, 1992. (Doc. 122 at 49).   On December 26, 1991, Dawson attended a custody hearing in

---

[1]  Sallie's attorneys have spent considerable time uncovering information about Dawson's life since the 2001 trial.   The Court sees no reason to recount that information.

[2]  Sallie's second amended petition contains a great deal of information about Dawson's mother's questionable parentage; her mother's numerous marriages; and the lives of Dawson's various stepfathers before, during, and after their marriages to Dawson's mother.   The Court sees no reason to recount that information.   (Doc. 122 at 29-44).

[3]  It is this divorce on which Sallie relies to support his assertion that Dawson misrepresented her divorce was amicable when she had actually been involved in "an acrimonious struggle over the course of the preceding decade in the courts of two states for the custody, and then support, of her son."   (Doc. 125 at 10).   However, the voir dire transcript suggests that Dawson was only questioned regarding her two most recent divorces, both of which could be characterized as amicable.   (Doc. 122 at 68-69).

Houston County, and she was granted temporary custody of Tyler.   Holland did not

attend the hearing because he had not been served with the October 25, 1991, petition

for divorce and had no notice of the hearing.   (Doc. 122 at 47).

On January 7, 1992, Holland moved for contempt in the Florida action complaining

that he was not allowed visitation with Tyler and that Dawson obtained the Houston

County custody order without advising the court that the Florida divorce action was

pending.   (Doc. 122 at 49).   In response, Holland amended her Houston County divorce

petition to show that "unbeknown to her," Holland filed a divorce petition in Florida one

day before she filed her divorce petition in Houston County and that Houston County was

the more appropriate forum.   (Doc. 122 at 50).   However, as stated above, Dawson had

actually been served with a copy of the divorce petition filed in the Florida action three

days before she filed her divorce petition.   (Doc. 122 at 46).

In a January 16, 1992, conference in Florida, attorneys for both Holland and

Dawson entered into an agreement resolving all issues of the marriage.   (Doc. 122 at

50-51).   However, on March 3, 1992, Dawson, again in Houston County Superior Court,

petitioned under the Uniform Reciprocal Enforcement of Support Act seeking child

support payments for Tyler.   (Doc. 122 at 51).   On March 26, 1992, Dawson's attorney

complained that Holland had been uncooperative and refused to sign the January 16,

1992, settlement agreement.   (Doc. 122 at 51).   On May 14, 1992, a Final Judgment

Dissolving the Marriage was entered in the Florida action.   (Doc. 122 at 51).   Tyler's

physical residence was to remain with Dawson and Holland was given "secondary

physical residence (visitation) rights."   (Doc. 131-3 at 4).

On April 21, 1993, Holland filed, in Florida, a motion to hold Dawson in contempt

because she "frustrated [his] attempt to obtain … visitation" with Tyler.   (Doc. 122 at 52).

On June 30, 1993, the Florida court ruled in Holland's favor, and on July 13, 1993,

Dawson filed a supplemental complaint for modification in which she sought to change

Holland's visitation rights and to receive an increase in child support payments.   (Doc.

122 at 52-53).

On December 2, 1993, Dawson moved to hold Holland in contempt, alleging that

Holland failed to make child support payments from August to December 1993.   (Doc.

122 at 53).   On January 11, 1994, the court found Holland in contempt and sentenced

him to be jailed for 180 days.   (Doc. 122 at 53).   While it does not appear that he was

ever actually incarcerated, Holland was continuously delinquent in his child support

obligations up to the time of Sallie's trial.   (Doc. 122 at 54-56).

Dawson married her second husband, Grant Weller,[4]  in Houston County on April

10, 1993, and on that same day, he was arrested by the Houston County Sheriff's

Department for the offenses of Terroristic Threats or Acts, Obstruction of an Officer, and

Pedestrian Under the Influence of Alcohol.[5]   (Doc. 122 at 58).   Dawson and Weller

separated three months later on July 9, 1993, and she filed a settlement agreement on

October 1, 1993.   (Doc. 122 at 57).   Their son, Kyle, was born on October 16, 1993, and

their divorce was finalized on December 22, 1993.   (Doc. 122 at 57).   Dawson was

given "permanent custody" of Kyle, and Weller was given visitation.   (Doc. 134-1 at 4).

Also on December 22, 1993, Dawson obtained a child support order against Weller for

---

[4]  Sallie's attorneys provide details regarding Weller's first marriage that ended on April 5, 1993.   (Doc. 122 at 57).   They also have spent time uncovering details about his life post-divorce from Dawson.   Again, the Court sees no reason to recount that information.

[5]  In September 1996, three years after divorcing Dawson, Weller negotiated a guilty plea and received probation.   (Doc. 134-6 at 1).

support of Kyle, but Weller was $12,900.00 in arrears at the time of Sallie's trial.   (Doc. 122 at 58).

Dawson married James E. Buckbee in Aiken, South Carolina on May 7, 1994, and separated from him in May 1995.   (Doc. 122 at 60).   They were divorced in Houston County on September 1, 1995.   (Doc. 122 at 60).   They had no children, and the divorce appears to be without incident.[6]

Dawson married Donald Eugene Payne, Jr. on October 19, 1998, and gave birth to their son, Donald, on July 30, 1999.   (Doc. 122 at 61).   Payne and Dawson separated in April 2000, and Dawson filed a divorce petition in Houston County Superior Court on August 22, 2000.   (Doc. 122 at 61).   Dawson and Payne entered in a settlement agreement in which they agreed to share legal custody of Donald, but Dawson was named the primary custodial parent.   (Doc. 135-8 at 1).   The final decree dissolving their marriage was entered on February 13, 2001.[7]   (Doc. 122 at 61).

Dawson was also a party in three court proceedings prior to 2001.   She was named as a defendant in a debt collection action filed in Laurens County, Georgia in June 1997.   Venue in that action was transferred to the State Court of Houston County and the creditor voluntarily dismissed the action in February 2000.   (Docs. 122 at 66; 137-3 at 1).   Dawson filed a Chapter 13 bankruptcy petition in the Middle District of Georgia in September 1997 and converted the case from a Chapter 13 to a Chapter 7 in October 1998.   (Doc. 122 at 67).   Dawson was named as a defendant in a June 1998 personal injury action concerning an automobile collision that occurred in June 1996.   The action

---

[6] As with Dawson's other former husbands, Sallie's attorneys provide details regarding Buckbee's life after he divorced Dawson.   The Court sees no need to recount this information.

[7] The Court does not include information regarding Payne's life after his 2001 divorce from Dawson because it is absolutely irrelevant to Dawson's 2001 voir dire responses.

settled and was dismissed with prejudice in September 1999.   (Doc. 122 at 67).

## II.    DISCUSSION

Sallie maintains that his potentially meritorious claims of juror misconduct and bias based on Dawson's false and misleading responses have not been exhausted and he has good cause for failing to exhaust.   *Rhines v. Weber*, 544 U.S. 269, 278 (2005).   He also claims that "[t]he newly discovered information concerning Ms. Dawson, upon full investigation, is expected to overcome the procedural bar precluding successive state habeas petitions because the emerging new grounds 'could not reasonably have been raised in the original or amended petition.'"   (Doc. 125 at 14) (quoting O.C.G.A. § 9-14-51).

The Respondent claims that "the legal theory and substance of [Sallie's] juror misconduct claims, which include juror bias and false or misleading answers in voir dire, are the same claims that were presented in the state habeas court[,]" and therefore, these claims are exhausted.   (Doc. 143 at 2).   Even if not exhausted, the Respondent continues, the claims would be barred as successive under Georgia law.   O.C.G.A. § 9-14-51.

### A. Did Sallie Exhaust His Claim that Dawson Responded Untruthfully During Voir Dire?

In his state habeas petitions, Sallie alleged that unidentified jurors were biased and provided false or misleading responses in voir dire.   (Docs. 72-18 at 17; 73-11 at 25). But the only evidence of or argument about juror misconduct during the state habeas proceedings concerned the relationship between Dawson and Gootee.

In *Vasquez v. Hillery*, 474 U.S. 254 (1986), the Court noted that "[w]e have never held that presentation of additional facts to the district court … evades the exhaustion

requirement when the prisoner has presented the substance of his claim to the state courts." *Id.* at 257-58.   It is only when the supplemental evidence presented by the habeas petitioner "fundamentally alter[s] the legal claim already considered by the state courts," that the claim is not exhausted.   *Id.* at 260; *see also Picard v. Connor*, 404 U.S. 270, 275 (1971) (explaining that the federal claim must have been "fairly presented to the state courts" and the state courts must have had an opportunity to apply legal principles to the facts bearing upon the claim).   However, "the prohibition against raising nonexhausted claims in federal court extends not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief."   *Kelley v. Sec'y for the Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004).

The question is whether Sallie exhausted his claims that Dawson was biased and provided dishonest responses on voir dire when he did nothing more than generally allege in his state habeas petitions that unidentified jurors were biased and provided false or misleading responses in voir dire.   Neither party cites authority addressing this specific question in a factually similar case.[8]   Some guidance is perhaps provided by the Eleventh Circuit's treatment of general allegations of ineffective assistance of counsel. The Eleventh Circuit has held that "habeas petitioners cannot preserve otherwise unexhausted, specific claims of ineffective assistance merely by arguing that their lawyers were ineffective in a general and unspecified way."   *Id.*   "'[A] general allegation of ineffective assistance ... [made in state court] *wholly unrelated* to the ground on which the claim ultimately depends [in federal court] will [not] immunize a petitioner from a

---

[8]  Perhaps this is in part because the Parties find themselves on unfamiliar terrain.   Typically, the petitioner argues that he has exhausted his claims and, thus, can pursue those claims in his federal habeas action. The respondent, on the other hand, argues that the claims were not exhausted in state court and, thus, the federal court cannot address them.

finding of procedural default.'" *Pope v. Sec'y for the Dep't of Corr.,* 680 F.3d 1271,

1286-87 (11th Cir. 2012) (alteration in original) (quoting *Ogle v. Johnson*, 488 F.3d 1364,

1369 (11th Cir. 2007)).   In other words, raising a general claim of ineffective assistance

of counsel does not necessarily exhaust every factually specific claim of ineffective

assistance of counsel that a petitioner could allege.   Rather, to exhaust a particular

claim, the petitioner must, to some degree, present that factually specific allegation to a

state court.   But state remedies are not considered exhausted "where entirely new

factual claims are made in support of the writ before the federal court."   *Hart v. Estelle*,

634 F.2d 987, 989 (5th Cir. Unit A. 1981) (citing *Knoxson v. Estelle*, 574 F.2d 1339, 1340

(5th Cir. 1978)).[9]

Sallie's general assertion of juror bias and untruthful responses, for which he

presented no evidence and made no argument, was not such that the "reasonable reader

would understand [the] claim's particular legal basis and specific factual foundation" to be

the same that he now presents to this Court.   *Kelley*, 377 F.3d at 1344-45.   The Court

recognizes that comparing ineffective assistance of counsel claims and false responses

to voir dire questioning claims may not be particularly apt.   The ways in which counsel

can be ineffective are often limited only by the creativeness of subsequent counsel.   On

the other hand, a claim that one or more jurors provided false information during voir dire

is necessarily limited to specific responses given by twelve jurors.   Still, in the Court's

judgment, Sallie did not present to the state habeas court the substance of his claim that

Dawson answered voir dire questions falsely in a manner that would allow the state court

to apply legal principles to the facts he now raises in support of that claim.   Thus, Sallie's

---

[9] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

claims regarding Dawson's juror bias and untruthfulness during jury selection are not exhausted.

### B.  Are Sallie's Unexhausted Claims Procedurally Defaulted?

"[I]f the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred … there is a procedural default for purposes of federal habeas…."  *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).   Under Georgia law, Sallie's current claims regarding Dawson would be barred as successive if they could "reasonably have been raised in the original or amended [state habeas] petition."   O.C.G.A. § 9-14-51.

Sallie, citing *(Michael) Williams v. Taylor*, 529 U.S. 420 (2000), maintains the factual bases for his unexhausted claims were not reasonably available to previous counsel because there was nothing to put them on notice of Dawson's dishonest responses, and to perform diligently, counsel was not required to "check public records containing personal information pertaining to each and every juror."  *Id.* at 443.   In *(Michael) Williams,* a juror failed to disclose, in response to direct questioning during voir dire, that she had been married to the sheriff and that one of the prosecutors handled her divorce from the sheriff.   After the resolution of Williams's state habeas proceedings, an investigator stumbled upon the connections among the juror, the sheriff, and the prosecutor.   The Fourth Circuit held that state habeas counsel had not been diligent because they, like federal habeas counsel, could have discovered the juror's misconduct. The Supreme Court disagreed.   The Court held that diligence "depends upon whether the prisoner made a reasonable attempt, **in light of the information available at the**

**time**, to investigate and pursue claims in state court." *Id.* at 435 (emphasis added). Based on the information available to Williams's counsel, there was no reason to question the veracity of the juror, and thus, "there was no basis for an investigation into [the juror's] marriage history." *Id.* at 443. *Williams* stands for the proposition that there is not a general duty to investigate the background of every juror. However, when a reasonable attorney would be placed on notice regarding the veracity of a particular juror, there is a duty to develop the matter in state court.

Unlike the situation in *(Michael) Williams*, Sallie's attorneys had reason to focus, and did focus, on Dawson. (Doc. 73-20 at 26). During voir dire, at least twice-divorced[10] Dawson maintained she lived by Biblical principles when making all important life decisions. (Doc. 70-10 at 90). A little over two weeks later, counsel learned that the supposedly deeply-religious Dawson took a married juror home with her following Sallie's trial. (Doc. 71-21 at 7-8). Counsel knew that the trial judge had to dispatch a deputy to Dawson's house to tell Gootee to go home. (Doc. 71-21 at 7-8). Two weeks later, counsel's staff interviewed Dawson for more than an hour. In the direct appeal, counsel continued to focus on Dawson, although that focus was on Dawson's professed strong religious beliefs. (Doc. 72-1 at 72).

State habeas counsel also focused intently on Dawson. (Doc. 73-20 at 26). Sallie's state habeas petition was pending for almost five years, and state habeas counsel was allowed to conduct formal discovery for more than a year. (Docs. 72-26 at 3; 73-13). They searched records in Houston Superior Court and gathered records of Gootee's divorce. (Doc. 73-25 at 32-53). Records of Dawson's divorces, and other

---

[10] Dawson did not disclose that she had been married four times, only that she had been married at least twice. But Sallie does not contend, and could not contend, that Dawson misrepresented the number of times she was married. She was never asked. (Doc. 125 at 5).

litigation, were filed in that court.   (Docs. 130-5 to 130-7; 131-2; 134-1; 135-8 to 135-9; 137-4; 137-6 to 137-7; 137-9 to 137-13).   When counsel subpoenaed Dawson, she resisted, expressing concern about "the possibility of having her personal life examined." (Doc. 83-23 at 8).   State habeas counsel admitted that they had been "concerned about the partiality of Ms. Dawson" since trial.   (Doc. 73-20 at 26).   Given these facts, diligent state habeas counsel would have investigated Dawson and easily discovered the information current counsel have found.[11]   *Id.* at 435.

   *(Michael) Williams* lays down a reasonable principle.   That principle is not applicable here.   Because the current juror bias claims could "reasonably have been raised in the original or amended" state habeas petitions, they are barred as successive under Georgia law.   O.C.G.A. § 9-14-51.   Accordingly, this Court applies "'the familiar principle that federal courts may treat unexhausted claims as procedurally defaulted, even absent a state court determination to that effect, if it is clear from state law that any future attempts at exhaustion would be futile.'"   *Turner v. Crosby*, 339 F.3d 1247, 1281 (11th Cir. 2003) (quoting *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999)).[12]

## III.   CONCLUSION

   *Rhines* authorizes a stay only when three factors are established:   (1) there was good cause for the petitioner's failure to exhaust his claims first in state court; (2) the

---

[11] While the facts known and available to trial and appellate counsel are relevant to a determination of whether state habeas counsel was diligent, the Court expresses no opinion on the performance of trial or appellate counsel.

[12] Procedural default can be excused upon a showing of cause for the default and prejudice or by establishing a fundamental miscarriage of justice.   *Turner,* 339 F.3d at 1281.   "Cause [for a procedural default] exists if there was 'some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule.'"   *Mize v. Hall*, 532 F.3d 1184, 1190 (11th Cir. 2008) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).   The Court's conclusion that reasonably diligent state habeas counsel would have discovered Dawson's conduct precludes a finding of cause.   Because cause does not exist, the Court need not address prejudice.   Also, Sallie has not shown that failure to consider the claim would result in a fundamental miscarriage of justice.

claims are potentially meritorious; and (3) there is no indication of intentionally dilatory litigation tactics.   *Rhines,* 544 U.S. at 277-78.   For the reasons discussed above, Sallie has not shown good cause for his failure to exhaust the current claims regarding Dawson's alleged bias and alleged dishonest responses during voir dire.   Having found that good cause does not exist, the Court does not address the remaining factors.   A stay is not warranted in this case.[13]

Accordingly, the Petitioner's Motion to Stay and Abey Proceedings in Order to Exhaust Claims in State Court is **DENIED.**

**SO ORDERED**, this 26th day of July 2013.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

---

[13] Notwithstanding this conclusion, Sallie, of course, may raise any claims he wants in the appropriate state court.   But this Court will not stay this action if he does.   If Sallie files a state action, the parties are to keep the Court informed of any developments in the state court proceedings.