**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **WILLIAM CARY SALLIE,** | : | |
| | : | |
| **Petitioner,** | : | |
| | : | |
| **vs.** | : | |
| | : | **CIVIL ACTION NO. 5:11-CV-75 (MTT)** |
| **BRUCE CHATMAN, Warden,** | : | |
| | : | |
| **Respondent.** | : | |
| | : | |

_____

**ORDER**

Petitioner **WILLIAM CARY SALLIE** petitions the Court for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254.   For the reasons discussed below, Sallie's original habeas

petition (Docs. 1, 9), as supplemented (Docs. 39, 66), and his amended habeas petition

(Doc. 67) are dismissed as untimely.[1]

---

[1] In addition to his February 28, 2011 initial habeas petition, which he corrected on March 18, 2011, Sallie filed a supplemental petition on September 28, 2011, which he corrected on January 13, 2012, and filed an amended habeas petition on January 13, 2012.   (Docs. 1, 9, 39, 66-67). Sallie's supplemental petition contains no constitutional claims but provides the facts upon which Sallie bases his claim of equitable tolling.   (Docs. 39, 66).   Sallie has briefed the constitutional claims from his original and amended habeas petitions that he wishes to pursue.   (Docs. 99, 102).   This Order dismisses as untimely Sallie's original habeas petition, as corrected and supplemented, and his amended habeas petition.   Sallie also filed a second amended habeas petition and a motion to amend his second amended habeas petition with a proposed third amended habeas petition.   (Docs. 122, 151-52).   In an Order dated March 11, 2014, the Court denied Sallie's motion to amend his second amended habeas petition, finding the claim he wished to assert in his proposed third amended habeas petition was not timely filed.   (Doc. 158).   The Court denied Sallie's motion to reconsider its March 11, 2014 Order but vacated the Order and entered a new Order denying Sallie's motion to amend dated July 15, 2014.   (Doc. 169).   In an Order dated July 15, 2014, the Court denied the claims in Sallie's second amended habeas petition as both untimely and procedurally defaulted.   (Doc. 170).

## I.   INTRODUCTION

Sallie's initial habeas petition was not timely filed.   (Doc. 21).   Raising issues of deceit, disloyalty, breach of professional responsibility, abandonment, and a breakdown of Georgia's death penalty scheme, Sallie argues AEDPA's[2] one-year statute of limitations should be equitably tolled.[3]   (Docs. 52-1, 159).

Sallie is pursuing only unexhausted, procedurally defaulted claims from his original and amended habeas petitions.   (Docs. 99, 102).   Initially, Sallie relied on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), to provide cause to excuse the defaults.   (Docs. 99, 102). It seemed clear to the Court that *Martinez* did not apply in Georgia.   *See Hittson v. Humphrey*, 5:01-CV-384 (MTT), Doc. No. 102, (M.D. Ga. Sept. 25, 2012).   Because of this, the Court thought it would be judicially efficient to deny Sallie's claims as procedurally defaulted, rather than tackle the factually-sensitive issue of equitable tolling. Therefore, the Court entered its September 6, 2012 Order (Doc. 103) denying without prejudice Respondent's motion to dismiss (Doc. 4) and Sallie's motion for an order ruling his initial habeas petition timely filed or, alternatively, granting an evidentiary hearing (Doc. 52).

Sallie's renewed motion for an order ruling his initial petition timely filed or, alternatively, granting an evidentiary hearing (Doc. 159), coupled with developments in the law, namely *Trevino v. Thaler*, 133 S. Ct. 1911 (2013) and *Cadet v. Fla. Dep't of Corr.*,

---

[2]  The Antiterrorism and Effective Death Penalty Act 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996).

[3]  Sallie also claims the breakdown in Georgia's death penalty scheme in 2003 through 2004 created an impediment to filing within the purview of 28 U.S.C. § 2244(d)(1)(B), and AEDPA's statute of limitations did not commence until this impediment was removed.   (Docs. 52-1 at 8, 23-25; 159 at 2-3, 19-22).

742 F.3d 473 (11th Cir. 2014), have caused the Court to reconsider this approach.   For

the reasons discussed below, the Court **DENIES** Sallies initial and renewed motions

(Docs. 52, 159) for an order ruling his initial petition timely filed or, alternatively, granting

an evidentiary hearing and **GRANTS** Respondent's motion to dismiss (Doc. 4).

## II. BACKGROUND AND PROCEDURAL HISTORY

### A.   Facts

The Georgia Supreme Court summarized the facts in Sallie's direct appeal:

William Sallie and his wife, Robin, separated in December 1989 and Robin
sought a divorce.   Sallie had been physically abusive to Robin during their
marriage and his striking her with a belt had precipitated the separation.
They had a two-year-old baby named Ryan.   Robin and Ryan went to live
with her parents, John and Linda Moore, in their rural house in Bacon
County.   Robin's seventeen–year–old sister, April, and her nine-year-old
brother, Justin, also lived there.   Shortly thereafter, under the pretense of
seeing Ryan at the Moores' house, Sallie abducted Ryan and went to
Illinois, where he lived.   However, an Illinois court awarded temporary
custody of Ryan to Robin, and she returned with him to the Moores' house
in February 1990.

In March 1990, Sallie returned to Georgia and rented a mobile home in
Liberty County using the name Bill Simons.   Also in March, he had a friend
purchase a nine millimeter pistol for him in Illinois.   On March 28, 1990,
Sallie dressed in green camouflage and went to the Moores' house at night;
he carried the pistol, a roll of duct tape, and four sets of handcuffs.   At
approximately 10:00 p.m., April was talking to her boyfriend when the
phone line went dead.   She did not think this was unusual and went to bed.
It was later discovered that Sallie had ripped the wires from the phone box
on the outside wall.   At 12:45 a.m., after everyone inside was asleep, Sallie
pried open the back door and entered the house.   He went immediately to
the master bedroom, flicked on the lights, and shot John and Linda Moore
as they lay in bed.   John was struck by six bullets, including two that
damaged his heart.   He tried to get out of bed, but he collapsed, fell on the
floor, and died.   Linda was shot in the thumb, the shoulder, and both thighs.
Sallie then fled outside and reloaded.   When Robin and April were in the
master bedroom trying to help their parents, Sallie fired two more shots
through the bedroom window, hitting no one.   They doused the light and
pleaded with Sallie to let them get help for their parents.   April tried to leave
the house to get help (the nearest neighbor was 1/4 of a mile away), but
Sallie confronted her on the porch and told her to stay in the house or he
would blow her head off.   Sallie eventually re-entered the house and

handcuffed Justin and Linda, who was still bleeding from her wounds, to each other and to a bed rail.   He bound Robin and April to each other with handcuffs and duct tape, and he abducted them to his Liberty County mobile home where he raped them both.   He left his two-year-old son in the master bedroom.   After a few hours, Linda and Justin managed to extricate themselves from the bed rail and reach a neighbor, who summoned the police.   Sallie released Robin and April in Bacon County the night of March 29 after asking them not to press charges.   He was arrested shortly thereafter.   The police found the murder weapon in his mobile home.

*Sallie v. State*, 276 Ga. 506, 506-07, 578 S.E.2d 444, 448-49 (2003).

### B.   Procedural History

On March 30, 1991, a jury convicted Sallie of malice murder, burglary, aggravated assault, two counts of kidnaping with bodily injury, and possession of a firearm during the commission of a felony.   *Sallie v. State*, 269 Ga. 446, 446 n.1, 499 S.E.2d 897, 898 n.1 (1998).   The jury recommended death for the murder conviction.   *Id.*   At trial, Sallie was represented by Earl McRae and Wendell Boyd English.   *Id.* at 447, 499 S.E.2d at 898. On direct appeal, Sallie was represented by Palmer Singleton and Christopher Johnson, both with the Southern Center for Human Rights ("Southern Center").   *Id.* at 446, 499 S.E.2d at 898.   The Georgia Supreme Court reversed Sallie's convictions "[b]ecause one of [his] trial lawyers was laboring under a conflict of interest" and remanded the case for a new trial.   *Id.*

On June 26, 2000, a grand jury again indicted Sallie, this time for malice murder, felony murder, burglary, aggravated assault, two counts of kidnaping with bodily injury, and possession of a firearm during the commission of a felony.   *Sallie*, 276 Ga. at 506 n.2, 578 S.E.2d at 448 n.2.   Johnson and Singleton continued to represent Sallie.   (Doc. 42 at 2).

On February 10, 2001, six days before the start of voir dire, Johnson, Singleton, and Sallie entered into an Agreement on Legal Representation ("Agreement"), which

provided:

> Because William Sallie has agreed to allow the use of the life without parole third sentencing option at his retrial, Christopher Johnson and Palmer Singleton agree to continue to represent William Sallie, even if he receives a sentence other than death, through direct appeals, through state and federal habeas, and at any subsequent re-trial, even if the charges at subsequent re-trials do not carry a possible death sentence. *We also agree that Christopher Johnson and Palmer Singleton will continue to represent William Sallie, if he so desires, for the rest of his life.*

(Doc. 40-1) (emphasis added).

On March 5, 2001, a jury found Sallie guilty and recommended a sentence of death for the malice murder charge. *Sallie*, 276 Ga. at 506 n.2, 578 S.E.2d at 448 n.2. On April 3, 2001, Sallie filed a motion for new trial, which was denied on June 17, 2002. (Docs. 68-8 at 109; 68-9 at 62).

Johnson and Singleton continued to represent Sallie in his direct appeal. The Georgia Supreme Court affirmed Sallie's conviction and sentence on March 24, 2003. *Sallie*, 276 Ga. at 506, 578 S.E.2d at 448. The United States Supreme Court denied Sallie's petition for certiorari on October 6, 2003. *Sallie v. Georgia*, 540 U.S. 902 (2003). Sallie petitioned for rehearing and that petition was denied on December 8, 2003. *Sallie v. Georgia*, 540 U.S. 1086 (2003). On December 10, 2003, the Georgia Supreme Court transmitted the remittitur to the trial court. (Doc. 8 at 12).

After December 10, 2003, but before January 2004, Johnson notified Sallie that he and Singleton could no longer represent him. (Docs. 42 at 5; 45 at 2; 99 at 16). According to Sallie, they informed him he would need to raise ineffective assistance of counsel claims during his state and federal habeas proceedings, and they could not raise these claims against themselves. (Doc. 42 at 5).

Sallie, proceeding *pro se* but with substantial assistance from the Georgia Resource Center, filed his state habeas corpus petition in the Superior Court of Butts County on October 14, 2004.   (Doc. 72-18 at 6).   According to a footnote in the petition

> Mr. Sallie files his state petition for writ of habeas corpus at this time so as to comply with the privisions [sic] of ___ Because the Georgia Resource Center cannot competently and thus, ethically, undertake the representation of more capital habeas petitioners at this time, Mr. Sallie files this petition *pro se*….   However, Mr. Sallie requests that copies of any pleadings and orders in his case be served on the Georgia Resource Center … so that it can effectively carry out its duty of monitoring the case.

(Doc. 72-18 at 6) (The blank represents a gap in the original).

After first granting the Georgia Resource Center's motion to be served with all pleadings and orders, the state habeas court reconsidered and denied the request finding the Georgia Resource Center was neither a party to the case, nor counsel to Sallie. (Doc. 72-24).   The Georgia Resource Center is first shown as counsel of record in an order dated April 25, 2005.   (Doc. 72-26).   Following an evidentiary hearing on April 19 and 20, 2007, the state habeas court denied Sallie's petition in an order dated June 22, 2009.   (Docs. 73-20 to 83-8, 84-6).   On January 14, 2011, the Georgia Supreme Court denied Sallie's application for certificate of probable cause to appeal.   (Doc. 84-12). The Georgia Supreme Court issued its remittitur of the judgment to the trial court on February 7, 2011.[4]   (Doc. 160 at 7).

Still represented by the Georgia Resource Center, Sallie filed his federal habeas corpus petition on February 28, 2011.[5]   (Doc. 1).   On March 1, 2011, Respondent

---

[4]  The Court cannot locate verification of this date in the record submitted by Respondent or the exhibits submitted by Sallie.   Sallie provided this date in his corrected supplemental petition and one of his briefs, and Respondent has not disputed the date.   (Docs. 66 at 71; 160 at 7, 17).

[5]  Sallied filed a corrected petition on March 18, 2011, which corrected a factual error in one paragraph of the original petition.   (Doc. 9).

moved to dismiss the petition as untimely.   (Doc. 4).   The Court agreed that Sallie did not timely file his federal habeas petition but did not dismiss the petition because further development of the record was needed to determine whether Sallie was entitled to equitable tolling of the statute of limitations.   (Doc. 21).

Due to a conflict of interest,[6] the Court allowed the Georgia Resource Center to withdraw from the case on June 17, 2011.   (Docs. 24, 25).   Sallie's current counsel, Joseph J. Perkovich, who filed a notice of appearance on May 18, 2011, and John R. Martin, were appointed as counsel under 18 U.S.C. § 3599 on April 4, 2012.   (Docs. 18, 94).

On July 26, 2011, Sallie was ordered to supplement his petition to state with particularity the facts upon which he based his claim of equitable tolling.   (Doc. 28).   He filed a supplemental petition[7] and moved for an order ruling his habeas petition timely filed or, alternatively, granting an evidentiary hearing.   (Docs. 39-53).   Respondent filed an answer to the supplemental petition.   (Doc. 55).   On November 1, 2011, the Court entered an Order withholding ruling on both Respondent's motion to dismiss the petition and Sallie's motion for an order ruling his initial habeas petition timely filed or, alternatively, granting an evidentiary hearing.   (Docs. 4, 52, 58).   The Court ordered Sallie to file an amended petition alleging every previously unalleged constitutional error and ordered Respondent to file an answer in accordance with Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts.   (Doc. 57).   Sallie

---

[6]  The conduct of Georgia Resource Center attorneys would be at issue in determining whether equitable tolling applied.

[7]  Sallie filed a corrected supplemental petition on January 13, 2012, which corrected citations to the record and typographical errors.   (Doc. 66).

filed his amended petition, and Respondent filed an answer and an addendum to his
answer.   (Docs. 67-87).

In a February 14, 2012 scheduling order, which was amended on April 16, 2012,
the Court ordered Sallie to brief all of the claims from his original and amended habeas
petitions that he wished to pursue.   (Docs. 92, 98).   The Court informed Sallie that any
issue or argument not raised in the briefs would be considered abandoned.   (Doc. 92).
Respondent was ordered to respond to all issues raised by Sallie in his brief, including
any discovery requests, requests for evidentiary hearings, and issues related to
exhaustion and procedural default.   (Doc. 92).   Both parties complied.   (Docs. 99,
101-02).

At that point, the Court determined, based on the law at the time, that Sallie raised
"significant issues regarding whether the one year limitations period should be equitably
tolled, issues that almost certainly require an evidentiary hearing to resolve."   (Doc. 103
at 2).   The Court concluded "that it would be judicially efficient to review the merits of
Sallie's claims, including exhaustion or procedural default issues, before attempting to
determine the timeliness issue."[8]   (Doc. 103 at 2).   Therefore, in an Order dated
September 6, 2012, the Court denied without prejudice both Respondent's motion to
dismiss Sallie's petition as untimely and Sallie's motion for an order ruling his initial
habeas petition timely filed or, alternatively, granting an evidentiary hearing.   (Doc. 103

---

[8] This over Respondent's objection that the Court could not reach the merits until it had resolved
the statute of limitations issue.   The Court disagreed.   Clearly, there is no jurisdictional bar to the
Court resolving a case on the merits rather than ruling on a statute of limitations defense.   *Day v.
McDonough*, 547 U.S. 198, 205 (2006); *Lambrix v. Singletary*, 520 U.S. 518, 523-24 (1997)
(explaining that procedural bars should normally be resolved first, but judicial economy may
dictate ruling on the merits first if the procedural bar involves complicated issues).   But, as
discussed below, subsequent legal developments have led the Court to return to the statute of
limitations.

at 3).

Before the Court entered an order addressing the claims raised in Sallie's briefs, he raised additional issues.   On February 13, 2013, Sallie requested $10,000.00 to obtain investigative services to explore allegedly newly-discovered claims of juror bias and misconduct.[9]   (Doc. 116).   The Court allowed $7,500.00.   (Doc. 121).   Following investigation, Sallie filed a second amended habeas petition raising claims of juror bias and misconduct, and he moved to stay federal proceedings while he exhausted those claims in state court.   (Docs. 122-37).   This Court ruled that Sallie's new claims were procedurally defaulted and denied his motion to stay on August 6, 2013.   (Docs. 146, 148-50).

On August 7, 2013, Sallie moved for leave to amend his second amended petition to add a new claim of ineffective assistance of his motion for new trial counsel based on their failure to investigate and discover the juror bias claims.[10]   (Docs. 151-52).   Sallie claimed his third amended petition was timely filed pursuant to 28 U.S.C. § 2244(d)(1)(D), which provides that AEDPA's one-year statute of limitations begins to run from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."   28 U.S.C. § 2244(d)(1)(D); (Doc. 152 at 1).   Respondent opposed Sallie's motion not on the grounds that his newly asserted ineffective assistance claim was untimely but, rather, because it was procedurally defaulted.   (Doc. 153).

---

[9] This was after Sallie filed a January 7, 2013 motion for leave to proceed *ex parte* and under seal regarding his application for funds for investigative services, which the Court denied on February 7, 2013.   (Docs. 106, 114)

[10] In other words, Sallie converted his juror bias claim into an ineffective assistance of counsel claim.

On March 11, 2014, the Court denied Sallie's motion for leave to amend his second amended petition on the grounds of futility; the claim he wished to assert in his third amended petition was time-barred.   (Doc. 158).   On March 25, 2014, Sallie asked the Court to reconsider, contending, inter alia, that the Court should not have found his claim untimely when the Respondent had not opposed his claim on that ground.   (Doc. 160).   Respondent opposed the motion.   (Doc. 162).   This Court's local rules ordinarily do not allow a party moving for reconsideration to file a reply brief, but to give Sallie the opportunity to adequately address the timeliness issue, the Court allowed him to reply and granted his request for oral argument.   (Doc. 164).   On July 15, 2014, the Court denied Sallie's motion for reconsideration, but vacated its initial Order denying leave to amend and entered a new Order addressing all of Sallie's contentions.   (Doc. 169). Also on July 15, 2014, the Court dismissed Sallie's second amended habeas petition because the claims raised were both untimely and procedurally defaulted.   (Doc. 170).

On March 25, 2014, Sallie renewed his motion for an order ruling initial habeas petition timely filed or, alternatively, granting an evidentiary hearing.   (Doc. 159).

## II.  DISCUSSION

### A.  Sallie's underlying constitutional claims

In response to the Court's scheduling orders, (Docs. 92, 98), which ordered Sallie to brief all claims from his original and amended habeas petitions that he wished to pursue, Sallie raised only two claims, both of which he said were new and unexhausted. (Docs. 99 at 44-47; 102 at 4-6).

The first claim involves trial counsel's failure to negotiate a plea agreement.   Sallie acknowledges that the state habeas court ruled on the merits of his claim that "[c]ounsel failed to adequately take steps to negotiate a plea agreement with the district attorney

after the district attorney broached the subject and offered to negotiate."[11]   (Docs. 9 at
10; 99 at 46-48).   However, Sallie claims his Agreement with trial counsel and the facts
surrounding its creation, which he says were suppressed during direct and collateral
review in the state courts, transformed this claim from exhausted to unexhausted.
(Docs. 40-1; 99 at 46-54, 63-73).   His second unexhausted claim is that trial counsel's
misconduct and breach of their fiduciary duties in connection with the Agreement caused
him to be denied counsel at a critical stage in his case and manufactured a conflict of
interest due to counsel's professional and personal interests.   (Doc. 99 at 73-77).

        Sallie acknowledges these claims are unexhausted and procedurally defaulted but
argues that ineffective assistance of state habeas counsel provides the cause necessary
to excuse the default.   (Docs. 99 at 41-47; 102 at 6-7).   At the time the parties briefed
these issues and at the time of the Court's September 6, 2012 Order, *Coleman v.
Thompson,* 501 U.S. 722 (1991) and *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) provided
the applicable law regarding whether ineffective assistance of post-conviction counsel
could provide cause to overcome a procedurally defaulted ineffective assistance of trial
counsel claim.   In *Coleman,* the Supreme Court held that counsel's errors in
post-conviction proceedings do not qualify as cause for a default.   501 U.S. at 754-55.
But in *Martinez*, the Court recognized a "narrow exception" and held that inadequate
assistance of post-conviction counsel may establish cause for a procedurally defaulted
"substantial" ineffective assistance of trial counsel claim if state law barred the prisoner

---

[11]  Sallie advances no arguments regarding "the *exhausted*, old version of his ineffective
assistance of counsel claim in connection to District Attorney Currie's failed attempt to negotiate a
plea with trial counsel on the eve of trial."   (Doc. 102 at 4) (emphasis in original).   Instead, his
briefs address only the "transformed and new claims."   (Doc. 102 at 4).   Respondent addresses
Sallie's exhausted ineffective assistance claim at length in his brief and argues any new claims
are procedurally defaulted.   (Doc. 101)

from raising the claim on direct appeal.   132 S. Ct. at 1315, 1318-20.

Georgia law has never barred a defendant from raising a claim of ineffective assistance of trial counsel on direct appeal.   Thus, it appeared *Martinez* would not save Sallie's petition, and the Court could simply deny his two unexhausted ineffective assistance of trial counsel claims as procedurally defaulted.[12]   Therefore, the Court entered its September 6, 2012 Order finding it judicially efficient to review the merits of Sallie's claims, including procedural default, instead of determining whether he was entitled to equitable tolling for his untimely federal habeas petition.   (Doc. 103).

However, following entry of the September 6, 2012 Order, but before any order dismissing Sallie's claims as procedurally defaulted, the Supreme Court decided *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).   The Court extended *Martinez* to situations in which state law does not expressly require a prisoner to raise his claim of ineffective assistance of trial counsel in post-conviction proceedings, but the "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal."   *Id.* at 1921.   While it seemed clear the narrow exception to *Coleman* announced in *Martinez* would not apply to Georgia's criminal law procedures, *Trevino's* application is less clear and the Eleventh Circuit has not yet addressed the issue.

---

[12] Although he requested one, it did not appear that Sallie would be entitled to an evidentiary hearing.   (Doc. 99 at 78).   He would have to show cause and prejudice to overcome procedural default before the Court could allow a hearing for him to develop the factual basis of the claims. *See Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1342 (11th Cir. 2004) (explaining that a habeas petitioner who raises an unexhausted claim must establish cause and prejudice to overcome procedural default *before* the court can grant an evidentiary hearing).   Without *Martinez*, Sallie could not show cause, his claims would barred, and "the issue of factual development [would be] moot."   *Id.*

In short, the approach that seemed "judicially efficient" prior to *Trevino*, no longer seems so.   *Trevino*, along with developments in the law regarding equitable tolling and Sallie's renewed motion to declare his petition timely, has led the Court to return to the question of whether equitable tolling saves Sallie's petition.

## B.  Equitable tolling

The Court previously ruled that Sallie had one year from the conclusion of direct review—October 6, 2003—to either file his federal habeas petition properly file a state habeas petition to toll the running of AEDPA's statute of limitations.   (Doc. 21 at 11).   He did neither; he filed his state habeas petition on October 14, 2004.   (Doc. 21 at 2, 11).   Thus, absent equitable tolling, Sallie's petition is time-barred.

Sallie claims that, despite his diligence, extraordinary circumstances beyond his control prevented him from filing his state habeas petition prior to October 14, 2004. (Doc. 52-1 at 7).   He requests that the Court toll the period from the conclusion of direct review, October 6, 2003, until October 12, 2004, "the date when the Georgia Resource Center resumed its function within Georgia's death penalty scheme."   (Doc. 159 at 5-6).

### 1.  Equitable tolling standard

In *Holland v. Florida,* the Supreme Court held that "§ 2244(d) is subject to equitable tolling."   560 U.S. 631, 649 (2010).   "Equitable tolling is an extraordinary remedy which is typically applied sparingly."   *Steed v. Head*, 219 F.3d 1298, 1300 (11th Cir. 2000) (citing *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990)).   Decisions regarding equitable tolling "must be made 'on a case by case basis' in light of 'specific circumstances.'"   *Hutchinson v. Florida*, 677 F.3d 1097, 1098 (11th Cir. 2012) (quoting *Holland,* 560 U.S. at 649-50).   It is well settled that "[t]he burden of proving circumstances that justify the application of the equitable tolling doctrine rests squarely on

the petitioner." *San Martin v. McNeil,* 633 F.3d 1257, 1268 (11th Cir. 2011) (citations omitted). A petitioner "must plead or proffer enough facts that, if true, would justify an evidentiary hearing on the issue."[13] *Hutchinson,* 677 F.3d at 1099 (11th Cir. 2012) (citing *Chavez v. Sec'y. Fla. Dep't of Corr.*, 647 F.3d 1057, 1060 (11th Cir. 2011)). [T]he allegations supporting equitable tolling must be specific and not conclusory." *Id.* While equitable relief is flexible and the Court must consider all of the facts and circumstances, it must "draw upon decisions made in other similar cases for guidance." *Holland*, 560 U.S. at 650.

A habeas petitioner "is 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland*, 560 U.S. at 649 (quoting *Pace v.*

---

[13] In his original and renewed motions for an order finding his habeas petition timely filed, Sallie alternatively requested an evidentiary hearing. (Docs. 52; 159). If material facts are in dispute, a habeas petitioner may be entitled to an evidentiary hearing. *San Martin*, 633 F.3d at 1271. The Court "'must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.'" *Chavez,* 647 F.3d at 1060 (quoting *Schriro v. Landrigan,* 550 U.S. 465, 474 (2007)). It is the petitioner's responsibility to plead or proffer enough facts that, taken as true, would justify a hearing. *Id.* Furthermore, "[t]he allegations must be factual and specific, not conclusory." *Id.* at 1061. Sallie's allegations regarding Singleton, Johnson, and the Georgia Resource Center are specific. However, there is no need for an evidentiary hearing to allow Sallie to prove the allegations because, even if true, they do not warrant equitable tolling. *Id.* at 1060. Sallie's allegations regarding the lack of access to legal assistants and the inadequate law library at GDCP are more conclusory and, in many instances, directly contradicted by the record. However, even if an evidentiary hearing allowed Sallie to prove the truth of these allegations, he would not be entitled to equitable tolling because he has alleged no facts to show any nexus between the inadequacies at the prison and his late filing. As the Eleventh Circuit recently explained, "vague allegations about the existence of impediments, without more, or an argument that fails to explain how such impediments prevented the timely filing of the petition, does not establish extraordinary circumstances. Nor are they sufficient to warrant an evidentiary hearing." *Lugo v. Sec'y, Fla. Dep't of Corr.*, 750 F.3d 1198, 1209 (11th Cir. 2014) (citing *Chavez,* 647 F.3d at 1060). For these reasons, the Court **DENIES** Sallie's requests for an evidentiary hearing.

*DiGuglielmo*, 544 U.S. 408, 418 (2005)).   "[A]n inmate bears a strong burden to show specific facts to support his claim of extraordinary circumstances and due diligence." *Brown v. Barrow*, 512 F.3d 1304, 1307 (11th Cir. 2008).

"The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence."   *Holland*, 560 U.S. at 653 (quotation marks and citations omitted).   The presence of extraordinary circumstances must be determined on a case by case basis.   *Id.* at 650.   It is not enough for a habeas petitioner to show the existence of an extraordinary circumstance, he must "show a causal connection between the alleged extraordinary circumstance and the late filing of the petition."   *San Martin*, 633 F.3d at 1267 (citations omitted).

Lacking counsel in state collateral proceedings and being ignorant of the law are not extraordinary circumstances.   *Coleman*, 501 U.S. at 756-57 (no right to counsel in state collateral proceedings); *Rivers v. United States*, 416 F.3d 1319, 1323 (11th Cir. 2005) (lack of education or "procedural ignorance" are not excuses for failing to file a timely petition); *Perez v. Florida*, 519 F. App'x 995, 997 (11th Cir. 2013) (a *pro se* litigant is deemed to know the one year statute of limitations).   However, courts have recognized that various conditions or actions, including attorney misconduct, may amount to extraordinary circumstances.   *See Spottsville v. Terry*, 476 F.3d 1241, 1245-46 (11th Cir. 2007) (court's misleading instructions are extraordinary circumstances); *Knight v. Schofield*, 292 F.3d 709, 710-11 (11th Cir. 2002) (extraordinary circumstances found when Clerk of the Georgia Supreme Court sent notice of the court's denial of certiorari to the wrong inmate); *Holland*, 560 U.S. at 652-53 (attorney's gross or egregious negligence may amount to an extraordinary circumstance).

Determining when attorney misconduct qualifies as an extraordinary circumstance "is a work in progress." *Cadet v Fla. Dep't of Corr.*, 742 F.3d 473, 475 (11th Cir. 2014) In *Holland*, the Supreme Court held that "a garden variety claim of excusable neglect, such as a simple miscalculation that leads a lawyer to miss a filing deadline, does not warrant equitable tolling," but "far more serious instances of attorney misconduct" might. *Holland*, 560 U.S. 651-52 (quotation marks and citations omitted).

Almost two years after *Holland*, the Court revisited the issue of when attorney misconduct rises to the level of extraordinary circumstances beyond a petitioner's control, albeit in the context of establishing cause to excuse a procedural bar to federal habeas relief. *Maples v. Thomas*, 132 S. Ct. 912 (2012). The Court reaffirmed the longstanding rule that "'under well-settled principles of agency law,'" a habeas petitioner "bears the risk of negligent conduct on the part of his [attorney]" and is, therefore, bound by the attorney's failure to meet a deadline. *Id*. at 922 (quoting *Coleman*, 501 U.S. at 753-54). "A markedly different situation is presented, however, when an attorney abandons his client without notice, and thereby occasions the default." *Id*. Because the principal-agent relationship is severed, the attorney's acts or omissions cannot be attributed to the client. *Id*. at 923.

Then, in *Cadet*, the Eleventh Circuit "determine[d] the current test for equitable tolling of the § 2244(d) statute of limitations period." *Cadet*, 742 F.3d at 475. The Court agreed the petitioner had acted diligently and assumed his post-conviction counsel was grossly negligent.[14] Interpreting *Holland*, "[i]n light of the Supreme Court's *Maples*

---

[14] Cadet had only five days after the state appellate court issued its mandate to file his federal habeas petition. *Cadet*, 742 F.3d at 475. Cadet repeatedly told his post-conviction attorney, Michael Goodman, that he did not think he had much time to file his federal habeas petition and insisted that Goodman file the petition immediately after the state court denied relief. *Id*. at

decision," the Court held "attorney negligence, however gross or egregious, does not qualify as an 'extraordinary circumstance' for purposes of equitable tolling; abandonment of the attorney-client relationship … is required."   *Id.* at 481.   For attorney misconduct to amount to an extraordinary circumstance, there must be an "absolute renunciation or withdrawal, or a complete rejection or desertion of one's responsibilities, a walking away from a relationship."   *Id.* at 484 (citing <u>Black's Law Dictionary</u> 2 (6th ed. 1990)).

### 2.   Sallie has failed to show extraordinary circumstances prevented him from timely filing.

Sallie claims that

his extraordinary circumstances concern essentially two overlapping calamitous sequences.   The first sequence concerns his justifiable reliance upon his attorneys' bad faith Agreement on Legal Representation, dated February 10, 2001… and, well after the conclusion of direct review of his judgment, the attorneys' commission of additional severe violations of basic professional standards of care by their (a) renunciation of the Agreement, (b) abandonment of their representation and (c) failure to mitigate the resulting harm to Mr. Sallie.   The second sequence concerns the breakdown, at the critical juncture in Mr. Sallie's pursuit of collateral review in state and federal courts, of Georgia's death penalty scheme to ensure that death sentenced inmates have meaningful access to the courts.

(Docs. 52-1 at 11-12; 159 at 6).

In short, Sallie's first "calamitous sequence[]" involves Singleton and Johnson's alleged misconduct.   The second involves failures on the part of the Georgia Resource Center in 2003 and 2004, coupled with the alleged lack of legal resources available to

---

475-76.   Goodman, who conducted no research beyond misreading § 2244(d)(1), mistakenly and repeatedly assured Cadet that he had one year from the resolution of his post-conviction motion to file his federal habeas petition.   *Id.* at 476.   Goodman filed Cadet's federal habeas petition almost one year after the statute of limitations expired.   *Id.*   After the State responded that the petition was untimely and explained why, Goodman finally "conduct[ed] some research, realize[d] his mistake, and [felt] 'horrendous.'"   *Id.*

death-row inmates at the Georgia Diagnostic and Classification Prison ("GDCP").[15]

Taking Sallie's factual allegations as true, the Court finds he has failed to show any of

these actions, failures, or conditions, independently or in the aggregate, amounted to

extraordinary circumstances that prevented him from timely filing his petition.

### a. Singleton and Johnson's misconduct does not constitute an extraordinary circumstance that prevented Sallie from timely filing.

On February 10, 2001, six days before the start of voir dire in his retrial, Sallie,

Singleton, and Johnson entered into the Agreement in which Sallie agreed to the life

without parole sentencing option in exchange for his lawyers' promise to represent him

during appeal, state and federal habeas, any re-trials, and "for the rest of his life."   (Doc.

40-1).

After signing the Agreement, Singleton and Johnson diligently represented Sallie

at trial, during his motion for new trial, and on direct appeal.   Singleton then filed a

petition for writ of certiorari with the Supreme Court that was denied on October 6, 2003,

thereby rendering final the judgment against Sallie and starting AEDPA's one year statute

of limitations.   (Docs. 72-13, 72-15).   Johnson informed Sallie of the Supreme Court's

denial of certiorari shortly after October 6, 2003.   (Docs. 42 at 4-5; 66 at 22).   Although

Sallie cannot recall exactly when he was told, he does not dispute that he was in regular

contact with Johnson and Singleton throughout all stages of appellate review and he

knew the Supreme Court had denied his petition for certiorari.   (Docs. 42 at 4-5; 99 at

15).   Singleton's petition for rehearing was denied on December 8, 2003.   (Docs. 72-16,

72-17).   Sallie acknowledges receiving notice of this "[a]t some point shortly thereafter."

---

[15] Various exhibits and briefs refer to death-row inmates as "G-House inmates" because all inmates sentenced to death are housed in "G-House" at GDCP.   (Doc. 55-2 at 3).

(Doc. 99 at 15).   On December 10, 2003, the Georgia Supreme Court transmitted the remittitur to the trial court.   (Doc. 8 at 12).

Sometime after December 10, 2003 but prior to January 1, 2004, long before the AEDPA statute of limitations had run, Singleton and Johnson told Sallie they could not honor the Agreement and continue representing him.   (Docs. 42 at 5; 45 at 2; 99 at 16). According to Sallie, Johnson told him he and Singleton could not represent him in state or federal habeas proceedings because Sallie would need to raise ineffective assistance of counsel claims and "the law had been clear for a long time that a lawyer cannot litigate an [ineffective assistance of counsel claim] against himself."   (Doc. 42 at 5).

After learning of Singleton and Johnson's withdrawal, Sallie unsuccessfully sought representation from numerous individuals and agencies.   (Docs. 40-7 to 40-21, 40-23; 40-25, 42 at 5-9).   Letters he wrote in this effort confirm that Sallie was well aware of his *pro se* status long before the statute of limitations had run and that he was aware the statute of limitations was "running."   (Docs. 40-7 to 40-21, 40-23, 40-25).

Sallie first argues that simply entering into the Agreement constitutes an extraordinary circumstance for the purposes of equitable tolling, but he never explains how or why.   While the Court accepts that Singleton and Johnson must have known that they could not represent Sallie in habeas proceedings, entry into the Agreement, by itself, has no impact on the statute of limitations.   Moreover, even if entry into the Agreement could be considered an extraordinary circumstance, Sallie has not shown, or even argued, how that prevented him from timely filing a habeas petition years later.[16]

---

[16] Sallie also states he justifiably relied on Singleton and Johnson's "express commitment in the Agreement … to act as his post-conviction counsel, which preempted [him] from pursuing alternative post-conviction representation."   (Doc. 52-1 at 13).   Before December 2003, it may have been reasonable for Sallie to believe Singleton and Johnson would honor the Agreement.

Sallie next argues that Singleton and Johnson abandoned him when they renounced the Agreement.   Of course, a lawyer's abandonment of his client can constitute an extraordinary circumstance.   *Cadet*, 742 F.3d at 481.   But Singleton and Johnson did not "abandon" Sallie as that term is used in the context of equitable tolling. The cases addressing attorney abandonment have all involved situations where the attorney cut off communication with his client, failed to keep the client updated on the status of his case, and "abandon[ed] his client without notice."   *Maples* 132 S. Ct. at 922 (counsel left their law firm and took jobs that rendered them ineligible to represent their client, but they never informed the client or the court of their departure); *Holland*, 560 U.S. at 652 (despite repeated pleas from client, counsel failed to communicate with client for years while his state action was pending and failed to inform client that his state post-conviction appeal had been denied); *Cadet*, 742 F.3d at 484 (explaining attorney did not abandon client because he maintained regular contact through state conviction process and responded to his concerns about federal statute of limitations).

In contrast, Singleton and Johnson diligently represented Sallie throughout his trial and direct appeal and kept him informed of the status of his appeal.   They then gave him timely notice they could not represent him during his state or federal habeas actions. (Docs. 42 at 5; 45 at 2; 99 at 16).   In short, like any attorney with a conflict, Singleton and Johnson notified Sallie of their conflict and then withdrew, some ten months before the

─────────────────────────────────────────

But, after learning of their withdrawal, there was no justifiable reason for Sallie to refrain, and, in fact, he did not refrain, "from pursuing alternative post-conviction representation."   (Doc. 52-1 at 13).   The fact that Sallie was unable to find replacement counsel is not an extraordinary circumstance because there is no federal or state constitutional right to appointed counsel in Georgia habeas corpus proceedings.   *Coleman*, 501 U.S. at 756-57 (defendant not entitled to counsel in state collateral proceedings following completion of his direct appeal); *Murray v. Giarratano*, 492 U.S. 1, 10 (1989) (applying the same rule in capital cases); *Gibson v. Turpin*, 270 Ga. 855, 857, 513 S.E.2d 186, 188 (1999) (no state constitutional right to counsel).

AEDPA statute of limitations would expire.   This is not abandonment.   Even if it were, Sallie fails to establish a nexus between the "abandonment" and the late filing of his federal habeas petition.   *San Martin*, 633 F.3d at 1267.   He cannot show the "abandonment," which he knew about months before AEDPA's statute of limitations ran, "'stood in his way' and prevented timely filing."   *Holland*, 560 U.S. at 649 (quoting *Pace*, 544 U.S. at 418).   "[C]ausation is more difficult for a petitioner to prove if an extraordinary circumstance occurs early in the statute of limitations period."   *Bell v. Florida Att'y Gen.*, 461 F. App'x 843, 849 (11th Cir. 2012) (citing *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011)).   Given their early notice, Singleton and Johnson's withdrawal from his case was not an extraordinary circumstance that prevented Sallie from timely filing a federal habeas petition or properly filing a state habeas petition to toll AEDPA's statute of limitations.

Finally, Sallie argues that Singleton and Johnson's failure to mitigate the harm flowing from the execution and renunciation of the Agreement is an extraordinary circumstance.   (Doc. 52-1 at 13).   Sallie says that Singleton and Johnson could have taken any number of reasonable mitigating steps, such as:   Telling him, before conclusion of direct review, that he would need to find replacement counsel; locating volunteer replacement counsel; retaining replacement counsel using the Southern Center's funds; allowing other Southern Center attorneys to temporarily represent Sallie; filing a timely state habeas petition that informed the state court of their predicament and Sallie's need for replacement counsel; preparing a timely skeleton *pro se* petition for Sallie; or advising Sallie "extensively as to his filing deadline and basic elements for him to proceed *pro se* effectively."   (Doc. 52-1 at 13).

Again, the Court accepts that Singleton and Johnson knew when they signed the Agreement they could not represent Sallie during his post-conviction proceedings. The Court also accepts that they must have realized it would be difficult for Sallie to find replacement counsel because "Georgia has never funded appointments of legal representation to indigent death sentenced inmates in state habeas corpus litigation." (Doc. 49 at 1).[17] Although well aware of the challenges Sallie faced, it appears Singleton and Johnson did little to find suitable replacement counsel,[18] and even less to help Sallie determine the federal habeas filing deadline.[19] But even if they should have done more to assist him, they did nothing to prevent Sallie from timely filing. They never misled him to believe they would change their minds or that they would file his petition. Under these circumstances, the Court cannot say that Singleton and Johnson's failure to do more for Sallie after December 2003 actually prevented him from timely filing.

---

[17] Singleton was well aware of the dilemma facing death-row inmates. In October 2005, Sallie filed a grievance against Singleton with the State Bar of Georgia complaining that Singleton breached the Agreement by abandoning him and failing to find acceptable replacement counsel. (Docs. 40-36; 42 at 11-12). In his response, Singleton explained that several death-row inmates were without counsel in their habeas proceedings because the State legislature had not adequately funded post-conviction representation and the Georgia Supreme Court had "seen fit to rule" that the Georgia constitution and laws do not require post-conviction counsel for death-sentenced inmates. (Doc. 40-36 at 7). Ultimately, the State Bar of Georgia notified Sallie it was closing the disciplinary file because there was no "evidence in the file to suggest that Mr. Singleton acted unethically." (Doc. 40-36 at 8). The Court gives no weight to that determination.

[18] Singleton and Johnson spoke with the Georgia Resource Center and apparently made some unsuccessful attempts to locate volunteer counsel to represent Sallie in conjunction with the Georgia Resource Center. (Docs. 40-12; 40-19 to 40-20).

[19] It is unclear if Sallie ever asked Singleton or Johnson to help him determine his filing deadline. The record shows that Sallie mentioned the statute of limitations to Singleton once. On July 13, 2004, Sallie wrote Singleton to ask what they should do next and "reminded him the statute of limitations is running." (Doc. 40-18). In response, Singleton told Sallie to contact the Georgia Resource Center, which was "well aware of the relevant time deadlines." (Doc. 40-19).

In conclusion, Sallie has not shown that any misconduct on the part of Singleton and Johnson prevented him from timely filing his federal habeas petition, or properly filing a state habeas petition to toll the running of AEDPA's statute of limitations.

> **b. The alleged breakdown in Georgia's death penalty scheme does not constitute an extraordinary circumstance that prevented Sallie from timely filing.**

Sallie's second "calamitous sequence[]" is the alleged breakdown in Georgia's death penalty scheme in 2003 and 2004. (Docs. 52-1 at 12; 159 at 6). Sallie alleges this breakdown has two components: The Georgia Resource Center's failure to monitor post-conviction death penalty cases and the Georgia Department of Corrections' ("GDOC") failure to provide death-row inmates with access to legal assistants and adequate legal resources. (Docs. 52-1 at 14-15; 66 at 36-69, 74). According to Sallie, Georgia's scheme for the imposition of the death penalty has, since the late 1980s, depended upon the Georgia Resource Center to ensure that death-row inmates have meaningful access to collateral review of state court judgments. (Doc. 66 at 45, 47). But beginning in late 2003 and until October 12, 2004,[20] Sallie says the Georgia

---

[20] Sallie's claims that tolling should not end "until October 12, 2004, the moment of the [Georgia] Resource Center's institutional resuscitation due to the swift action of a Federal Defender Program [("FDP")] lawyer." (Doc. 159 at 2). Sallie arrives at this date by engaging in quite a bit of speculation. His argument is this: (1) On October 4, 2004, an execution warrant was signed for Richard Sealey, an unrepresented Georgia death-row inmate, who had not filed a state habeas petition (Doc. 66 at 36); (2) this caused FDP to "give a rudimentary assessment of the dockets of other death row inmates who had concluded their direct review yet had not commenced state habeas" (Doc. 66 at 40-41); (3) FDP realized that Sallie and Leeland Braley, another death-row inmate whose direct review concluded on October 6, 2003, "should have filed state habeas petitions well before October 7, 2004" (Doc. 66 at 41); (4) FDP obtained a state habeas petition from the Georgia Resource Center, which it had Sealy sign on October 12, 2004 (Doc. 66 at 37-38); (4) when contacted by FDP regarding Sealy, the Georgia Resource Center "recognized—either by having the fact pointed out to them by a peer or surmising it upon their own look at their files—that they had failed to monitor the Braley and Sallie cases" (Doc. 66 at 42); and (5) the Georgia Resource Center met with Braley and Sallie on October 13, 2004 and had them

Resource Center failed to perform its most basic function—to act as monitor of Georgia's post-conviction death penalty cases.   (Doc. 66 at 46).   According to Sallie, this "procedural failure," coupled with the lack of legal assistants and resources available to death-row inmates, meant he faced a denial of access to courts under *Bounds v. Smith*, 430 U.S. 817 (1977).[21]   (Doc. 66 at 47-48).

> According to the Georgia Supreme Court, the Georgia Resource Center
>
> was created in 1988 through the joint efforts of this Court, the State Bar of Georgia, the Georgia Attorney General, and the federal judiciary to provide expert assistance to attorneys who volunteer to represent indigent, death-row inmates in post-conviction proceedings.   The Resource Center obtains volunteer counsel for the death-sentenced inmates, and sometimes directly represents prisoners through its staff attorneys.

---

sign "skeleton" *pro se* state habeas petitions that were filed on October 14, 2004.   (Doc. 66 at 38-39).

[21] In a related argument, Sallie claims these allegations also require the Court to rule his federal habeas petition timely under 28 U.S.C. § 2244(d)(1)(B).   28 U.S.C. § 2244(d)(1)(B) provides that a habeas petitioner's limitation period runs from "the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action."   His claim is this: Georgia's death penalty scheme denied him access to the courts in violation of the Constitution and this impediment prevented him from timely filing until it was removed when the Georgia "Resource Center, essentially by happenstance, came to prepare and file his state habeas petition."   (Doc. 66 at 75).   Sallie argues Georgia is in a "unique position among death penalty states" because it does not appoint counsel for state post-conviction proceedings.   (Doc. 159 at 16).   However, access to the courts under *Bounds* does not require the appointment of post-conviction counsel.   *Murray*, 492 U.S. at 12.   Thus, Georgia's failure to appoint counsel is not a "violation of the Constitution or laws of the United States," as required by § 2244(d)(1)(B).   *See Johnson v. Fla. Dep't of Corr.*, 513 F.3d 1328, 1331 (11th Cir. 2008) (holding delay in appointment of post-conviction counsel is not an impediment to filing within purview of § 2244(d)(1)(B) because prisoners in capital cases have no constitutional right to post-conviction counsel).   Also, as discussed in detail below, Sallie has not shown how any alleged "impediment" prevented him from timely filing.   Therefore, § 2244(d)(1)(B) is inapplicable.   The Court also notes that state appointment of post-conviction counsel does not necessarily result in fewer death-sentenced inmates being time-barred by AEDPA's statute of limitations.   *See Lugo,* 750 F.3d at 1212-13 (explaining that, as of April 24, 2014, 34 Florida death-row inmates have missed AEDPA's filing deadline despite the provision of post-conviction counsel in every case while only 1 Georgia death-row inmate has missed the deadline).

*Gibson*, 270 Ga. at 856 n.1, 513 S.E.2d at 188 n.1

In Sallie's case, the Georgia Resource Center was unable to recruit volunteer counsel or directly represent him at any time before AEDPA's statute of limitations expired.[22]   (Doc. 55-1 at 5-6).   Although not his counsel of record, the Georgia Resource Center still claimed to have "the responsibility of monitoring [his] case and keeping its habeas files up to date."   (Doc. 72-19 at 3).

Sallie's relationship with the Georgia Resource Center started before direct review of his case was concluded.   Records from GDOC show that in July 2003, Sallie asked prison officials to add Georgia Resource Center attorney Thomas Dunn to his list of attorneys.   (Doc. 55-3 at 3).   In a September 2, 2003 letter to his mother, Sallie wrote that he "[h]ad a paralegal visit with [Georgia Resource Center paralegal] Ed Weir last Tuesday," August 26, 2003.   (Docs. 40-4 at 3; 55-3 at 4).   The Georgia Resource Center also had contact with Sallie between October 6, 2003 and October 6, 2004, the year AEDPA's statute of limitations was running.   Thomas Dunn requested, in writing, that Weir be allowed to visit Sallie on eight separate occasions:   November 13, 2003, December 4, 2003, January 22, 2004, February 26, 2004, May 3, 2004, July 14, 2004, August 19, 2004, and October 5, 2004.   (Doc. 55-3 at 4-11).   GDOC records confirm that Weir met with Sallie on each of these dates except two, November 13, 2003 and

---

[22] This was not unique to Sallie.   The Georgia Resource Center also assisted Exzavious Gibson with filing his state habeas petition and various motions, but was unable to represent him because it lacked the staff and was unable to find volunteer counsel.   *Gibson*, 270 Ga. at 856, 523 S.E.2d at 188.   Gibson claimed that his constitutional rights were violated because Georgia did not provide him with a state-funded attorney for his habeas proceedings.   *Id.* at 856-57, 523 S.E.2d at 188.   The Georgia Supreme Court disagreed, holding "there is no federal or state constitutional right to appointed counsel in Georgia habeas corpus proceedings."   *Id.* at 857, 523 S.E.2d at 188.   Moreover, the lack of appointed counsel does not deny an indigent death-row inmate meaningful access to the courts under *Bounds*.   *Id.* at 858, 523 S.E.2d at 189.

January 22, 2004.   (Doc. 55-3 at 12-17).   On March 19, 2004, Brian Kammer, who was

then a staff attorney with the Georgia Resource Center, met with Sallie.   (Doc. 42 at 7).

Kammer met with Sallie again on October 13, 2004 to have him sign the *pro se* state

habeas petition that was filed on October 14, 2004.   (Docs. 42 at 8; 72-18)

Sallie acknowledges the Georgia Resource Center did not represent him, but

claims that Singleton expressly directed him to rely on the Georgia Resource Center for

guidance through the post-conviction process.   (Doc. 159 at 8-9).   In a July 13, 2004

letter to his mother, Sallie told her:   "Just finished writing a letter to Palmer Singleton.

Told him the ball is in his court.   He needs to call me and advise me of what we should do

next.   *I reminded him the statute of limitations is running.*"   (Doc. 40-18 at 1) (emphasis

added).   In a July 19, 2004 letter to Sallie, copied to Kammer, Singleton responded:

> I received your July 13 letter.   Yesterday, I emailed Brian Kammer, an
> attorney at the Resource Center, and he assured me that they are well
> aware of the relevant time deadlines.   They did get all of the materials that
> we have concerning your case several weeks ago.
>
> …
>
> Please contact the Resource Center and keep me posted.[23]

(Doc. 40-19).

On August 26, 2004, Sallie wrote his mother and instructed her to "Call the

Resource Center and ask for Tom Dunn.   He's the director.   Tell him who you are and

ask about my case and his office, in searching for a lawyer, outside his office.   And

what's up, in picking up my case files?"   (Doc. 40-23 at 1).   She made the call but was

unable to speak with Dunn.   (Doc. 45 at 3).   Sallie alleges the unnamed representative

---

[23] This is unsigned.   Respondent argues that this raises doubts about the veracity of the letter or
whether it was mailed.   (Doc. 55 at 10 n.13).   For purposes of determining if equitable tolling
applies, the Court assumes Singleton authored the letter and mailed it to Sallie.

with whom she spoke told her:   The Georgia Resource Center had contacted the American Bar Association to find a lawyer to represent Sallie; the Georgia Resource Center picked up Sallie's files so the Attorney General would not pick them up; and Sallie had until January 2005 to file his state habeas petition.   (Doc. 45 at 3-4).

Sallie argues that the Georgia Resource Center was "completely derelict" in fulfilling their responsibility and "effectively abandoned its fundamental role" as monitor of Georgia's post-conviction death penalty cases.   (Doc. 66 at 42).   He maintains that its failure went beyond a simple "matter of miscalculating [his] deadline."   (Doc. 66 at 42). Instead, the Georgia Resource Center did not even look at his procedural history to make a "conceivable calculation of the limitations period."   (Doc. 159 at 9).   Sallie states this was evidenced by the "inexplicable advice" to his mother that he had until January 2005 to file.   (Docs. 159 at 9).

But the Georgia Resource Center was not Sallie's counsel of record at the time and Sallie does not allege the Georgia Resource Center gave him any reason to believe they would represent him before the AEDPA statute of limitations ran.   Under these circumstances, the Court fails to see how the Georgia Resource Center's actions, or inactions, could be considered an extraordinary circumstance that prevented Sallie from timely filing a habeas petition.

Sallie's argument seems to be that because the State created the Georgia Resource Center to monitor Georgia's post-conviction death penalty cases, the Georgia Resource Center's incompetence amounts to an extraordinary circumstance.   A similar situation arises when an incompetent state-appointed lawyer fails to timely file a death-row prisoner's federal habeas petition.   This, the Eleventh Circuit has held, "is not an extraordinary circumstance that warrants the application of equitable tolling."

-27-

*Lawrence v. Florida*, 421 F.3d 1221, 1226 (11th Cir. 2005), *aff'd,* 549 U.S. 327 (2007).   In

upholding that ruling, the Supreme Court explained

> Lawrence argues that his case presents special circumstances because the
> state courts appointed and supervised his counsel.   But a State's effort to
> assist prisoners in postconviction proceedings does not make the State
> accountable for a prisoner's delay.   Lawrence has not alleged that the
> State prevented him from hiring his own attorney or from representing
> himself.   It would be perverse indeed if providing prisoners with
> postconviction counsel deprived States of the benefit of the AEDPA statute
> of limitations.

*Lawrence v. Florida*, 549 U.S. 327, 337 (2007) (citing *Duncan v. Walker*, 533 U.S.

167, 179 (2001)).

Like Lawrence, nothing (or at least nothing of AEDPA significance) prevented

Sallie from hiring his own attorney or filing his own federal habeas petition.   "It would be

perverse indeed" if Georgia's creation of the Georgia Resource Center deprived it of the

benefit of AEDPA's statute of limitations.   *Id.*

Moreover, even if the Georgia Resource Center had been Sallie's counsel of

record, this type of "attorney negligence is not the basis for equitable tolling."   *Howell v.*

*Crosby*, 415 F.3d 1250, 1252 (11th Cir. 2005).   The Georgia Resource Center's

miscalculation of Sallie's filing date may have been the result of simple negligence.   Its

lawyers may have thought, as one argued to this Court, that Sallie had until December 10,

2004 to file because his conviction was not final until the Georgia Supreme Court

transmitted the remittitur to the trial court on December 10, 2003.   (Doc. 8); *Horton v.*

*Wilkes*, 250 Ga. 902, 302 S.E.2d 94 (1983).   Or, as Sallie argues, the Georgia Resource

Center may have had no idea when Sallie's statute of limitations expired and made no

effort to find out.   Whatever, it simply does not matter.   "[A]ttorney negligence, however

gross or egregious, does not qualify as an 'extraordinary circumstance' for purposes of

equitable tolling."   *Cadet*, 742 F.3d at 481.

The second component of Sallie's alleged 2003 to 2004 breakdown in Georgia's death penalty scheme is GDOC's failure to assist death-row "inmates in the preparation and filing of meaningful legal papers by providing [them] with adequate law libraries or adequate assistance from persons trained in the law."   *Bounds,* 430 U.S. at 828.   Sallie claims that GDOC's "systemic failure" to provide death-sentenced inmates with access to legal assistants or an adequate law library is normally "masked" by the Georgia Resource Center.   (Doc. 159 at 9).   However, without help from the Georgia Resource Center in 2003 and 2004, Sallie states he was confronted with a complete lack of access to the courts.

With regard to the alleged lack of "adequate assistance from persons trained in the law," Sallie says that GDOC contracted in the spring of 1996 with the Center for Prison Legal Assistance ("CPLA"), a privately owned for-profit law firm, to provide legal assistance to "the entire Georgia prison system population of unrepresented inmates." *Bounds*, 540 U.S. at 828; (Docs. 46 at 1; 66 at 55-56).   According to the "access to courts" Standard Operating Procedure ("SOP") in effect from July 15, 2003 until April 14, 2004,[24] an inmate needing legal assistance could either write CPLA directly or complete request forms that were available at the prison.   (Doc. 55-2 at 41-46).   The inmate could mail his request for assistance directly to CPLA or leave the form in a drop-box for prison officials to mail to CPLA.   (Doc. 55-2 at 42).   CPLA conducted monthly on-site interviews in addition to telephone interviews with inmates who requested assistance.

---

[24] There were three SOPs in effect between October 6, 2003 and October 6, 2004.   The first was in effect from July 15, 2003 until April 14, 2004.   (Doc. 55-2 at 38-67).   The second was in effect from April 15, 2004 until August 31, 2004.   (Doc. 55-2 at 68-93).   The third was in effect from September 1, 2004 until March 31, 2011.   (Doc. 55-2 at 94-120).

(Doc. 55-2 at 43-44).   While Sallie does not claim death-row inmates were denied access to CPLA,[25] he alleges that the assistance provided by CPLA was "negligible, at best" and that CPLA failed to dedicate "specific resources to assist the unique access needs of the G-House population."   (Doc. 66 at 56-57).

"[A]t some point during 2003," GDOC notified CPLA that it would not renew its contract for 2004.   (Doc. 46 at 2).   Sallie contends CPLA's contract concluded in December 2003, but the SOP in effect from July 15, 2003 until April 15, 2004 states that CPLA provided legal assistance to inmates until April 15, 2004.   (Docs. 66 at 57; 46 at 2; 55-2 at 38, 40).   Whenever the contract ended, Sallie and Respondent agree that thereafter GDOC employed its own legal assistants to help inmates conduct research and file habeas petitions.   (Doc. 55-2 at 4; 66 at 59).   With scant, if any, factual basis, Sallie argues that only the "general prison population," not inmates on death-row, could request help from these legal assistants.[26]   (Doc. 66 at 58-61).   Death-row inmates, according to

---

[25]   In April 2001, part of Sallie's formal orientation upon re-entry to GDCP following his re-trial was to watch a "CPLA Video on Legal Assistance."   (Doc. 55-2 at 123).

[26]   Sallie cites two sources to support this statement.   First, he cites an affidavit from Marcus C. Chamblee, a former CPLA staff attorney, who states he "understood" that GDOC "planned to rely on computer-stored files of legal opinions to perform the role that the CPLA had carried out." (Doc. 46 at 2).   Chamblee left the CPLA in November 2003.   (Doc. 46 at 2).   Nothing in Chamblee's affidavit reveals how he would know what GDOC did after he left.   Next, Sallie cites a December 13, 2006 affidavit from GDOC counselor Wesley Baker, which was filed in this Court in *Mize v. Zant*, 5:00-CV-80 (WDO).   (Doc. 66 at 58).   Sallie quotes three paragraphs from Baker's affidavit that address death-row inmates' access to (1) trained law librarians, (2) the electronic law library, and (3) legal books from GDCP's main reference library.   (Docs. 44-15 at 7-8; 66 at 58).   From this, Sallie leaps to the unsupported conclusion that these were the only resources available to "Georgia's condemned" and all other resources shown in the SOP in effect at the time, including access to legal assistants, were solely for the "general prison population." (Doc. 66 at 59).   However, a review of the record in *Mize* shows Baker likely did not address the availability of legal assistants in his affidavit because the plaintiffs in that case were complaining about the lack of persons trained to use the law library computer and lack of access to legal books.   (Doc. 25 at 9-10 in *Mize v. Zant*, 5:00-CV-80 (WDO)).   Sallie's argument also ignores

Sallie, had no access to legal assistants following CPLA's departure.   Instead, they had

to rely solely on "computer-stored files of legal opinions to perform the role that the CPLA

had carried out."   (Doc. 66 at 57).

　　　The SOPs in effect from April 15, 2004 until August 31, 2004 and from September

1, 2004 until March 31, 2011 provided that an inmate in need of legal assistance could

sign up for an interview with a legal assistant.   (Doc. 55-2 at 75-76, 101-02).   Nothing in

either SOP excluded death-row inmates from access to legal assistants.   Counselor

Wesley Baker, in an October 28, 2011 affidavit, confirms death-row inmates could access

a legal assistant simply by submitting a written request to the media resource specialist.

(Doc. 55-2 at 4).   Indeed, it appears Sallie made such a request and was allowed to meet

with a legal assistant for three hours on September 2, 2008.   (Doc. 55-2 at 6, 136).   The

SOP in effect on September 2, 2008 had been in effect since September 1, 2004.   (Doc.

55-2 at 94).   Moreover, the earlier SOP, which was in effect from April 15, 2004 until

August 31, 2004, contained the same language regarding access to legal assistants

employed by GDOC.   (Doc. 55-2 at 75-76, 101-02).   Therefore, if Sallie had access to a

legal assistant on September 2, 2008, it is logical to conclude that he had the same

access between April 15, 2004 and October 2004.

　　　In any event, there is no evidence, or even an allegation, that Sallie requested to

meet with a legal assistant between October 6, 2003 and October 6, 2004.   (Doc. 66 at

57).   He certainly has provided no evidence that any such request was denied.   The

Eleventh Circuit has made clear that it is not enough to allege inadequacies in legal

---

the language in the SOP attached to Baker's affidavit, which requires all inmates be allowed to
request help from the legal assistants.   (Doc. 35-4 at 29-39).   There is no language in the SOP
excluding death-row inmates from such access.

resources; a petitioner must show how his specific efforts to determine the statute of limitations were thwarted by these inadequacies.   *Helton v. Sec'y for Dep't of Corr.*, 259 F.3d 1310, 1314 (11th Cir. 2001).   Thus, even taking all of Sallie's allegations regarding inadequate legal assistance as true, he has failed to show any connection between these inadequacies and his late filing.   *Id.*; *Finch v. Miller*, 491 F.3d 424, 427 (8th Cir. 2007) (general allegations of inadequate library and aides not enough; petitioner must show that shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim).

Moreover, from October 6, 2003 until October 6, 2004, Sallie had access to legal assistance from sources outside of prison.   The SOPs state that the prisons shall provide "[c]onsultation … with an inmate's attorney of record or other licensed attorney with whom the inmate is attempting to establish an attorney-client relationship or an approved designee of such attorney."   (Doc. 55-2 at 40, 70, 96).   Weir met with Sallie numerous times between December 2003 and October 2004, Kammer met with Sallie once, and criminal defense attorneys Paul Bartels and Bill Cristman[27] visited Sallie regularly. (Docs. 42 at 5; 55-3 at 12-17); *See Miller v. Florida*, 307 F. App'x 366, 368 (11th Cir. 2009) (explaining petitioner did not demonstrate extraordinary circumstances based on lack of access to law library and prison law clerks, in part, because he "could and did communicate about his case with people outside the prison—including many lawyers").

---

[27] Cristman, who was an intern at the Southern Center, observed Sallie's retrial.   (Docs. 42 at 5; 47 at 1).   Cristman started practicing criminal defense in Atlanta in 2002 and visited Sallie regularly until he moved to Vermont in 2008.   (Doc. 47 at 2).   In 2002 or 2003, Cristman introduced Sallie to his co-worker and fellow criminal defense attorney, Bartels.   (Doc. 47 at 2). According to Cristman and Bartels, they tried to help Sallie find adequate post-conviction counsel, but capital habeas litigation was outside of their professional experience and they provided no guidance to Sallie concerning post-conviction issues.   (Docs. 41 at 2; 47 at 3).

With regard to law library access, both Sallie and Respondent agree that in 2003 and 2004 death-row inmates did not have physical access to GDCP's main law library. (Docs. 42 at 6; 55-2 at 3).   According to Sallie, the law library available to death-row inmates was "dismantled not long" after 1981,[28] and during all of 2003 and 2004, he had access to an electronic law library, containing only appellate decisions from state and federal courts.   (Docs. 42 at 6; 66 at 53).   While the record shows GDOC did ultimately transition to an electronic law library, it contradicts Sallie's dates.   Counselor Baker states that until April 2004, death-row inmates had physical access to a satellite reference library that contained legal books.   (Doc. 55-2 at 3-4).   After April 2004, GDOC stopped using the satellite reference library and began relying on the electronic law library. (Docs. 66 at 49; 55-2 at 4).

Sallie apparently understood the procedure for accessing the law library[29] because records reveal that on February 25, 2004 he requested, and was allowed, "a session in the law lib[rary] … today."   (Doc. 55-2 at 5, 128).   Sallie does not maintain that he made any other requests for access to the law library.   Thus, it appears he only visited the law library once between October 6, 2003 and October 6, 2004.

In contrast, prison records[30] reveal Sallie used the law library numerous times from 2006 until 2011.   He attended approximately 37 "law library training" sessions between

---

[28]  The only support cited for this allegation is the following statement made by Thomas J. Killeen, a former staff attorney with the Prisoner Legal Counseling Project:   "While there had been a law library at Georgia Diagnostic and Classification Center at Jackson, it ultimately was dismantled." (Doc. 48 at 1).

[29]  In April 2001, when Sallie was sent back to GDCP following his retrial, part of his formal orientation involved learning about the availability of the library.   (Doc. 52-2 at 123).

[30]  Starting in 2006, GDOC apparently began using a database called SCRIBE to record inmates' law library requests.   (Doc. 55-2 at 5).

October 3, 2006 and September 2, 2008 and approximately 19 "general library sessions" between August 21, 2008 and April 7, 2011.   (Doc. 55-2 at 132-33).   During this period, Sallie drafted two lengthy handwritten post-hearing briefs that were filed in his state habeas action.[31]

Sallie claims the electronic law library contained only appellate court decisions and thus, he had no access to "rules of court or criminal, civil or habeas procedure," statutes, state or federal habeas forms, or books regarding state or federal habeas.   (Doc. 42 at 6).   According to Respondent, death-row inmates have always been able to access materials in the main law library[32] by submitting a written request to the media resource specialist.   (Doc. 55-2 at 2-4).   Citations in Sallie's 2008 briefs support this.   In addition to numerous Georgia and federal cases,[33] Sallie cites and quotes various Georgia

---

[31] On May 12, 2008, the Georgia Resource Center filed Sallie's post-hearing brief in support of his state habeas petition.   (Docs. 86-1 to 86-2).   Attached as an appendix to this brief is Sallie's own 48-page handwritten "Supplemental Brief of Analogous Error's (sic) Filed By Counsel."   (Doc. 86-2 at 41-90).   On October 7, 2008, the Georgia Resource Center filed Sallie's reply to respondent's post-hearing brief.   (Doc. 86-3).   Attached as an appendix to this brief is Sallie's own 19-page handwritten "Petitioner's Post-hearing Supplement Rebuttable Brief."   (Doc. 86-3 at 46-65).

[32] According to all three SOPs in effect between October 6, 2003 and October 6, 2004, materials in the main library included, inter alia:   (1) Georgia Court Rules and Procedures (State and Federal); (2) statutes regarding Georgia crimes and offenses and criminal procedures (O.C.G.A. Volumes 14 and 15); (3) the Georgia Civil Practice Statutes (O.C.G.A. Volumes 6 and 7); (4) U.S.C. Title 28; (5) Federal Civil Judicial Procedures and Rules; (6) Nutshells and Hornbooks covering criminal law, criminal procedure, and post-conviction remedies; and (7) Wilkes State and Federal Postconviction Remedies.   (Doc. 55-2 at 60-61, 83, 110-11).   Additionally, the prisons were required to maintain a supply of state and federal habeas corpus forms and to provide them "free of charge to inmates in reasonable quantities not to exceed five (5) copies ... per month per inmate."   (Doc. 55-2 at 47, 72-73, 98-99).

[33] Also supporting Respondent's assertion that Sallie could receive legal material from the main reference library by submitting a written request is Sallie's July 7, 2009 note to Counselor Clark in which he states:   "The law library computer is missing several federal cases.   It needs to be re-loaded again.   Please send me a printed copy of: *United States v. Rea*, 300 F.3d 952 (2002)

statutes, "Georgia Criminal Trial Practice 1999 Ed.," and "Black's Law Dictionary (7th Ed. 1999)" in the two briefs he wrote in support of his state habeas petition.   (Docs. 86-2 at 47, 52, 55, 64-65, 69-72, 75-77, 80, 84-85; 86-3 at 52-54, 56-58, 60).   The SOP effective September 1, 2004 was still in effect when Sallie drafted these briefs in 2008.   (Doc. 55-2 at 94).   Thus, if Sallie had access to these sources in 2008, it seems likely he would have similar access in 2004, had he made a request.

But even if the Court takes Sallie's allegations regarding the lack of legal materials as true, he still has not shown how this prevented him from timely filing.   The only actions that Sallie maintains he took toward obtaining legal materials are:

> I asked repeatedly over the years about being able to access any other materials in addition to the appellate cases that are located on the computer.
>
> Specifically, I have asked about books or other materials on state habeas procedures; federal civil procedure and habeas procedure; and legal forms, including federal habeas petitions.   A death row inmate cannot get such books.

(Doc. 42 at 6).

Sallie fails to specify when or to whom he made these requests.   His "declaration lacks the necessary specificity to show when he found out about the library's alleged deficiency and what—if anything—he did to remedy the defect."   *Helton*, 259 F.3d at 1314.   Thus, he has failed to show any connection between the alleged lack of legal material and his late filing.   *San Martin*, 633 F.3d at 1267 (holding petitioner not entitled to equitable tolling unless he shows the alleged extraordinary circumstance caused the late filing of his federal habeas petition); *Lugo*, 750 F.3d at 1209 (explaining extraordinary

---

8th Cir."   (Doc. 55-2 at 134).   Again, the SOP that was in effect on July 7, 2009 had been in effect since September 1, 2004.   (Doc. 55-2 at 94).

circumstances not established when argument fails to explain how such impediments prevented the timely filing of his petition).

In sum, it is doubtful whether Sallie has sufficiently alleged the breakdown in Georgia's death penalty scheme constituted an extraordinary circumstance, but even if he has, he has not alleged a sufficient nexus between this alleged breakdown and his inability to timely file his federal habeas petition or file a state habeas petition in time to toll the running of AEDPA's statute of limitations.

### 3. Sallie has not shown he was pursuing his rights diligently.

The facts demonstrating that Sallie has failed to establish extraordinary circumstances also demonstrate his lack of sufficient diligence to timely file a federal habeas petition or file a state habeas petition to toll AEDPA's statute of limitations. Sallie knew he was representing himself from the end of 2003 until well after the Georgia Resource Center filed his *pro se* state habeas petition. (Docs. 42 at 5; 45 at 2; 99 at 16). Sallie admits he "was concerned about the statute of limitations running out in federal habeas." (Doc. 42 at 5). However, Sallie has presented insufficient evidence that he attempted to research the statute of limitations period; attempted to draft his own petition; tried to obtain standard habeas corpus forms from any court, attorney, or paralegal; or made any attempt whatsoever to file a timely *pro se* federal habeas petition or file a *pro se* state habeas to toll AEDPA's statute of limitations.

Instead, when he learned in December 2003 that Singleton and Johnson could no longer represent him, he devoted his efforts to finding counsel. (Docs. 40-7 to 40-23; 45 at 2). His pursuit of counsel does not prove he diligently tried to timely file his action. *See Arthur v. Allen*, 452 F.3d 1234, 1250-51 (11th Cir. 2006), *opinion modified on reh'g*, 459 F.3d 1310 (11th Cir. 2006) (efforts to obtain private counsel did not show diligence in

pursuing habeas claims); *Jihad v. Hvass*, 267 F.3d 803, 806 (8th Cir. 2001).

Sallie tries to excuse his inaction by claiming that he was relying on the Georgia Resource Center to guide him through his post-conviction process.   Of course, "attorney negligence is not a basis for equitable tolling, especially when the petitioner cannot establish his own diligence in ascertaining the federal habeas deadline."   *Howell*, 415 F.3d at 1252.   This is especially true in Sallie's case because he knew the Georgia Resource Center did not represent him, and the Georgia Resource Center never told him it would file a state or federal habeas petition for him.   (Docs. 40-20 at 1; 40-21 at 2; 40-25 at 1).   Knowing he was unrepresented, Sallie did not take the first step to ascertain the federal filing deadline.   Thus, he has not shown diligence.[34]

Sallie's assertion that he could not research AEDPA's statute of limitations and file his own *pro se* petition due to the lack of legal resources available to inmates on death-row is insufficient.

> To show diligence, a petitioner claiming deficiencies in the prison law library must provide details of the specific actions taken toward filing the petition. He must show when he found out about the library's alleged deficiency, must state any independent efforts he made to determine when the relevant limitations period began to run, and must demonstrate how the prison

---

[34] Sallie need only show "'an appropriate degree of diligence for someone in his situation.'" *Myers v. Allen*, 420 F. App'x 924, 927 (11th Cir. 2011) (quoting *Dodd v. United States*, 365 F.3d 1273, 1283 (11th Cir. 2004)).   "Efforts reasonably expected of one petitioner might be unattainable for another."   *Id.* (citing *Hunter v. Ferrell*, 587 F.3d 1304, 1309-10 (11th Cir. 2009)). Certainly it does not appear that Sallie had any type of cognitive impairment that would have impeded his ability to research and determine AEDPA's statute of limitations.   For example, in a September 29, 2003 letter to his mother, Sallie wrote about a book he had just read on trust deed investments:   "It was about using investors [sic] money to buy mortgage deeds.   Pretty much everything a bank does when they loan money for real estate.   Except it's [sic] investors [sic] money.   They must follow SEC rules and they are regulated by banking rules and laws.   Nice to know this is out there.   Not something I'm interested in.   To [sic] risky, and to [sic] close to a scam.   A nascence [sic] industry is best to watch but not participate in."   (Doc. 40-5 at 2-3). Wise counsel in the years leading up to the Great Recession.

> thwarted his efforts.   Absent such evidence, the connection between the
> petitioner's untimely filing and any alleged inadequacies in the library is
> insufficient.

*Arthur,* 452 F.3d at 1253 (internal quotation marks and citations omitted).   As discussed

above, Sallie has not provided details of any actions he took toward researching and filing

his own petition, much less how GDCP thwarted his efforts to do so.

### III.   CONCLUSION

Sallie's initial habeas petition was not timely filed.   (Doc. 21).   He has failed to

establish that "'some extraordinary circumstance stood in his way' and prevented timely

filing."   *Holland*, 560 U.S. at 649 (quoting *Pace*, 544 U.S. at 418).   Nor has he shown

that he acted with any diligence to ascertain the federal filing deadline or took any steps to

file his own state or federal habeas petition.   *Id.*   Thus, Sallie is not entitled to equitable

tolling.

Sallie's argument that 28 U.S.C. § 2244(d)(1)(B) creates a later triggering date for

the application of AEDPA's one year deadline is without merit.   There was no

impediment created by unconstitutional State action that prevented him from timely filing.

Therefore, the Court **DENIES** Sallies initial and renewed motions (Docs. 52, 159)

for an order ruling his initial petition timely filed or, alternatively, granting an evidentiary

hearing and **GRANTS** Respondent's motion to dismiss (Doc. 4).

### CERTIFICATE OF APPEALABILITY

A prisoner seeking to appeal a district court's final order denying his petition for writ

of habeas corpus has no absolute entitlement to appeal but must obtain a Certificate of

Appealability ("COA").   28 U.S.C. § 2253(c)(1)(A).   As amended effective December 1,

2009, Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District

Courts provides that "[t]he district court must issue or deny a [COA] when it enters a final

order adverse to the applicant," and if a COA is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."

Pursuant to 28 U.S.C. 2253(c)(2), a COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." This requires a demonstration that "jurists of reason could disagree with the district court's resolution of [a petitioner's] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). When the Court denies a habeas petition on procedural grounds without reaching the underlying constitutional claims, as in this case, the petitioner must show that "jurists of reason would find it debatable whether the district court was correct in its procedural ruling"; and (2) "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Thus, when a petition is denied on procedural grounds, determining whether to issue a COA "has two components, one directed at the underlying constitutional claims and one directed at the district court's procedural holding." *Id.* at 484-85. The Supreme Court has made clear "that issuance of a COA must not be *pro forma* or a matter of course." *Miller-El*, 537 U.S. at 337.

With regard to Sallie's initial habeas petition, as supplemented and amended (Docs. 1, 9, 39, 66-67), the Court finds the standard for the grant of a COA has not been met. First, there is nothing debatable about the Court's determination that Sallie's initial habeas petition was not timely filed. (Doc. 21). It is clear that Sallie's judgment became final on October 6, 2003, when the United States Supreme Court denied his petition for certiorari, and that he failed to file a federal habeas petition, or a state habeas petition to toll AEDPA's statute of limitations, before October 6, 2004. (Doc. 21). Sallie's

argument that state law determines when a state court judgment is final for purposes of 28 U.S.C. § 2244(d)(1)(A) has been foreclosed by binding precedent from both the Supreme Court and the Eleventh Circuit.   (Docs. 8, 21); *Clay v. United States*, 537 U.S. 522 (2003); *Pugh v. Smith*, 465 F.3d 1295 (11th Cir. 2007).   Thus, the arguments raised by Sallie regarding this issue are not "adequate to deserve encouragement to proceed further."   *Miller-El*, 537 U.S. at 327.

Second, jurists of reason would not find it debatable that the alleged exceptions to the statute of limitations—State impediment and equitable tolling—do not exist in this case.   *Lawrence,* 421 F.3d at 1225.   Sallie clearly has not shown any unconstitutional State action prevented him from timely filing his habeas petition.   28 U.S.C. 2244(d)(1)(B).   While he makes a somewhat better argument for equitable tolling, this Court's rejection of that argument is not reasonably debatable.   Singleton and Johnson's misconduct and the Georgia Resource Center's alleged failures coupled with an alleged lack of legal resources for death-row inmates were not extraordinary circumstances.   But even if they were, Sallie has not shown that these events and conditions prevented him from timely filing.   A habeas petitioner is not entitled to equitable tolling unless he shows a "causal connection between the alleged extraordinary circumstances and the late filing of the petition."   *San Martin*, 633 F.3d at 1267.   Considering the facts of this case in light of this precedent, the Court is satisfied that it cannot grant a COA on the issue of equitable tolling.

Having determined that the Court's procedural rulings regarding the initial habeas petition are not debatable, the Court need not decide if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack,* 529 U.S. at 484.   However, the Court offers some observations, for whatever

benefit they may provide.   Sallie's initial habeas petition, as amended and supplemented, contained 17 claims.   (Docs. 1, 9, 39, 66-67).   When told to brief all claims he wished to pursue, Sallie raised only two:   (1) That trial counsel was ineffective in relation to plea negotiations (the *Strickland* claim) (Doc. 99 at 63); and (2) that the Agreement he and trial counsel entered resulted in the denial of counsel at a critical stage of his trial (the *Cronic*[35] claim) and a conflict of interest that affected the adequacy of his representation (the *Cuyler*[36] claim) (Doc. 99 at 73-74).   Sallie alleges these claims are unexhausted and procedurally defaulted.   (Doc. 99 at 6).   He argues that the lack of counsel when he filed his state habeas petition, followed by ineffective assistance of state habeas counsel once the Georgia Resource Center became counsel of record, provides the cause necessary to overcome default for the claims.   (Doc. 99 at 41-47).   If the Eleventh Circuit decides *Trevino* is applicable to Georgia's criminal procedure, it is conceivable that Sallie could establish cause to overcome the procedural default of his *Strickland* claim.   But regardless of the Eleventh Circuit's interpretation of *Trevino*, it is doubtful his *Cronic* and *Cuyler* claims could escape procedural default.   *Martinez*, 132 S. Ct. at 1319 (explaining that "*Coleman* held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true except as to initial-review collateral proceedings *for claims of ineffective assistance at trial*") (emphasis added); *Trevino*, 133 S. Ct. at 1921 (same).

      With regard to the juror bias claims in Sallie's second amended habeas petition (Doc. 122), the Court found these claims were procedurally defaulted and untimely.

---

[35] *United States v. Cronic*, 466 U.S. 648 (1984).

[36] *Cuyler v. Sullivan*, 446 U.S. 335 (1980).

(Doc. 170).   Sallie acknowledges these claims are unexhausted and even acknowledges that diligent state habeas counsel could have raised the claims.   (Docs. 152 at 7; 160 at 6).   Thus, it is clear state law would bar them as successive and this Court's finding that they are procedurally defaulted is not debatable.   It is also clear that Sallie's claims are time-barred.   By Sallie's own admission, his second amended habeas petition was filed years after "the date on which the factual predicate" of the juror bias claims could have been discovered during his state habeas proceedings.   (Doc. 160 at 6).   Even with statutory tolling until February 7, 2011 (the date his state habeas action was no longer pending), Sallie's second amended habeas petition was untimely because it was not filed until May 9, 2013.   (Doc. 122).   Sallie has not shown that he is entitled to equitable tolling for any time between February 7, 2011 and May 9, 2013.   A habeas petitioner must show that he has been diligently pursing his rights *and* "some extraordinary circumstance stood in his way and prevented timely filing."   *Holland,* 560 U.S. at 649 (internal quotation marks and citations omitted).   Sallie's novel argument that diligent federal habeas counsel coupled with the Court's handling of his federal habeas petition constitute extraordinary circumstances is patently without merit and "deserve[s] [no] encouragement to proceed further."   *Miller-El*, 537 U.S. at 327.

Finally, reasonable jurists could not debate whether this Court erred when it denied Sallie's motion to amend his second amended habeas petition to assert an ineffective assistance of trial counsel claim stemming from the juror bias allegations. (Doc. 169).   That claim is barred by the statute of limitations for the same reasons the claims in his second amended habeas petition are time-barred.

The Court realizes that in capital cases "the nature of the penalty is a proper consideration in determining whether to issue a" COA.   *Barefoot v. Estelle*, 463 U.S. 880,

893 (1983).   "[B]ut the severity of the [death] penalty does not itself suffice to warrant the automatic issuing of a" COA.   *Id.*   The Court has taken into consideration the penalty faced by Sallie and has also taken into consideration that, as of this date, Sallie appears to be the only death-sentenced inmate in Georgia found to be time-barred by AEDPA's statute of limitations.   *Lugo*, 750 F.3d at 1213.   Even with these considerations in mind, after thoroughly reviewing the applicable case law, the Parties' briefs, and the record, the Court cannot find its procedural rulings sufficiently debatable to warrant a COA.

**SO ORDERED** this 15th day of July, 2014.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT